1   Michael K. Brown (SBN 104252)
    mkbrown@reedsmith.com
2   Lisa M. Baird (SBN 179958)
    lbaird@reedsmith.com
3   Michelle L. Cheng (SBN 239711)
    mcheng@reedsmith.com
4   Elizabeth G. Minerd (SBN 260971)
    eminerd@reedsmith.com
5   REED SMITH LLP
    355 South Grand Avenue, Suite 2900
6   Los Angeles, CA 90071

7   Telephone: 213.457.8000
    Facsimile: 213.457.8080

8
    Attorneys for Defendants
9   Medtronic, Inc., and Medtronic Sofamor
    Danek USA, Inc.

10

11                  UNITED STATES DISTRICT COURT

                    CENTRAL DISTRICT OF CALIFORNIA
12

13  CARMELA VITALE, an individual;        Case No. **CV13-07653**
    TAMMY JAMES, an individual; JOHN
14  CURTIS, an individual; KERRY          [Removal from the Superior Court of
    HARDY, an individual, HECTOR M.       California, County of Los Angeles,
15  SANTOS, an individual; and DEBRA      Case No. BC524044]
    IZZO-BLOUNT, an individual,
16                                        **DEFENDANTS MEDTRONIC, INC.**
                         Plaintiffs,      **AND MEDTRONIC SOFAMOR**
17                                        **DANEK USA, INC.'S NOTICE OF**
         vs.                              **REMOVAL OF ACTION UNDER 28**
18                                        **U.S.C. §1441(b) (DIVERSITY)**
    MEDTRONIC, INC., a Minnesota
19  corporation; MEDTRONIC SOFAMOR        Complaint Filed: October 10, 2013
    DANEK USA, INC., DR. GARY K.
20  MICHELSON, and DOES 1-100,            [Filed concurrently with:
    inclusive,                            1.   Civil Cover Sheet;
21                                        2.   Declaration of Bill McKay
                         Defendants.      3.   Declaration of Jerri Province
22                                        4.   Declaration of Michael K. Brown
                                          5.   Certification of Interested Parties;
23                                        6.   Corporate Disclosure Statement; and
                                          7.   Demand for Jury Trial]
24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA:**

PLEASE TAKE NOTICE THAT Defendants Medtronic Inc. ("Medtronic") and Medtronic Sofamor Danek USA, Inc. ("MSD") (collectively, "Medtronic Defendants") hereby remove this action from the Superior Court of the State of California, Los Angeles, to the United States District Court for the Central District of California. Removal is based on 28 U.S.C. §§ 1332, 1441 and 1446. In support of this Notice of Removal, the Medtronic Defendants state as follows:

## I. THE PROCEDURAL REQUIREMENTS FOR REMOVAL ARE SATISFIED

1.     On or about October 10, 2013, seven Plaintiffs[1] commenced this action in the Superior Court of the State of California for the County of Los Angeles, entitles *Vitale, et al. v. Medtronic, Inc., et al.*, Case No. BC524044.

2.     The Complaint and summons were served upon Medtronic, Inc. and Medtronic Sofamor Danek USA, Inc. by process server on October 10, 2013. Upon information and belief, Plaintiff has not served the Complaint on the other named Defendant, Dr. Gary K. Michelson. Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, orders, and other papers served on the Medtronic Defendants are attached hereto as Exhibit 1.

3.     Under 28 U.S.C. § 1446(b), this Notice of Removal must be filed within 30 days of service of the Complaint and summons. Since Defendants are filing this Notice on October 16, 2013, removal is timely.

4.     Dr. Michelson's consent to removal is not necessary because he has been fraudulently joined. *See United Computer Sys., Inc. v. AT&T Corp.*, 298 F.3d 756,

---

[1] Medtronic notes that Plaintiffs' caption identifies six individual plaintiffs (Carmela Vitale, Tammy James, John Curtis, Kerry Hardy, Hector M. Santos, And Debra Izzo-Blount), but the body of the Complaint also references a seventh plaintiff: Daniel Jones. *See Complaint, ¶ 19.*

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  762 (9th Cir. 2002); *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1318 (9th Cir.

2  1998); *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1193 (9th Cir. 1988); *McCabe v.*

3  *General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987); *Simpson v. Union Pac.*

4  *R.R. Co.*, 282 F. Supp. 2d 1151, 1155 (N.D. Cal. 2003).

5        5.    Moreover, Dr. Michelson's consent to this Removal is unnecessary

6  because he has not been served. *Destfino v. Reiswig*, 630 F.3d 952, 955 (9th Cir.

7  2011).

8        6.    No previous request has been made for the relief requested herein.

9        7.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 84(c)(2) and

10  1441(a), because the United States District Court for the Central District of California

11  is the federal judicial district embracing the Superior Court of California, County of

12  Los Angeles where this action was originally filed.

13        8.    Concurrent with the filing of this Notice, the Medtronic Defendants are

14  serving this Notice on Plaintiff's counsel and filing a copy of the Notice with the

15  Clerk of the Superior Court of California, County of Los Angeles.

16        9.    By filing a Notice of Removal in this matter, the Medtronic Defendants

17  do not waive their right to object to service of process, the sufficiency of process,

18  jurisdiction over the person, or venue, and they specifically reserve the right to assert

19  any defenses and/or objections to which they may be entitled.

20  **II.    REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT**

21        **MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§ 1332 AND 1441**

22        10.    This Court has original jurisdiction over this action pursuant to 28 U.S.C.

23  § 1332.  Diversity jurisdiction exists where (1) the amount in controversy exceeds

24  $75,000, exclusive of interest and costs, and (2) the suit is between citizens of

25  different states. *Lee v. Am. Nat'l Ins. Co.,* 260 F.3d 997, 1004 (9th Cir. 2001). Thus,

26  this action may be removed to this Court pursuant to 28 U.S.C. § 1441.

27  **A.    The Amount In Controversy Requirement Is Satisfied**

28        11.    The Medtronic Defendants filed this Notice of Removal in good faith and

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

1    on a reasonable basis in law and in fact that the requisite amount in controversy is

2    being sought in this action.  Where, as here, Plaintiffs fail to allege a specific amount

3    of damages in the Complaint, the District Court must "examine the complaint to

4    determine whether it is 'facially apparent' that the claims exceed the jurisdictional

5    amount." *White v. FCI USA, Inc.*, 319 F.3d 672, 675 (5th Cir. 2003).  When the

6    plaintiff does not expressly seek damages in excess of the jurisdictional minimum, the

7    defendant bears the burden of demonstrating that "it is more likely than not" that the

8    plaintiff's claims meet the federal amount-in-controversy requirement.  *Matheson v.*

9    *Progressive Specialty Ins. Co.,* 319 F.3d 1089, 1090 (9th Cir. 2003); *Gafford v. Gen.*

10   *Elec. Co.,* 997 F.2d 150, 158 (6th Cir. 1993) (citation omitted), *overturned on other*

11   *grounds by Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010); *see also Williams v. Best*

12   *Buy Co.*, 269 F.3d 1316, 1319 (11th Cir. 2001) ("When the complaint does not claim a

13   specific amount of damages, removal from state court is proper if it is facially

14   apparent from the complaint that the amount in controversy exceeds the jurisdictional

15   requirement.").   In determining whether the jurisdictional amount has been satisfied,

16   the amount in controversy "is not measured by the low end of an open-ended claim,

17   but rather by a reasonable reading of the value of the rights being litigated." *Kenneth*

18   *Rothschild Trust v. Morgan Stanley Dean Witter*, 199 F. Supp. 2d 993, 1001 (C.D.

19   Cal. 2002) (citing *Angus v. Shiley Inc.,* 989 F.2d 142, 146 (3d Cir.1993)).

20          12.     Here, the allegations in Plaintiffs' Complaint demonstrate that the

21   amount in controversy in this matter exceeds $75,000, exclusive of interest and costs.

22   The Complaint asserts that each of the Plaintiffs underwent surgical procedures with

23   the Infuse Bone Graft, but "Plaintiffs now suffer from severe injuries and damages,

24   including but not limited to bone overgrowth causing nerve compression, chronic pain

25   and radiculitis, and emotional distress and mental anguish." *Complaint ¶ 266.*

26   Plaintiffs further allege that they "have been forced to undergo multiple painful and

27   expensive revisions surgeries to attempt to remove the BMP-induced bone

28   overgrowth." *Id. ¶ 267.*

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- 3 -

13.    The Complaint therefore seeks general and specific damages, economic and non-economic damages, punitive and exemplary damages, pre-judgment and post-judgment interest, costs of the suit and any other relief the court deems just and proper. *See Prayer for Relief.*

14.    Plaintiffs' allegations of injury are similar to others that have been found to satisfy the amount in controversy requirement.  For example, in *Gebbia v. Wal-Mart Stores,* 233 F.3d 880, 881 (5th Cir. 2000), the Fifth Circuit found that alleged damages in a slip and fall case for "medical expenses, physical pain and suffering, mental anguish and suffering, loss of enjoyment of life, loss of wages and earning capacity, and permanent disability and disfigurement" satisfied the jurisdictional amount.  *See also Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 298 (5th Cir. 1999) (finding that alleged damages to property, travel expenses, emergency ambulance trip, 6-day hospitalization, pain and suffering, humiliation, and an inability to do housework satisfied the jurisdictional amount); *Mendoza v. American Airlines, Inc.*, Case No. 10-7617 RSWL , 2010 WL 5376375, 3 (C.D. Cal. Dec. 22, 2010) (allegations of loss of income, lost benefits and the ongoing emotional and mental distress, punitive damages and attorney's fees sufficient to establish amount in controversy).  It is also well established that punitive damages are included in determining the amount in controversy.  *Gibson v. Chrysler Corp.*, 261 F.3d 927, 946 (9th Cir. 2001); *Hayes v. Equitable Energy Resources Co.*, 266 F.3d 560, 572 (6th Cir. 2001).  Thus, the jurisdictional amount in controversy requirement under § 1332(a) is satisfied.

**B.    There Is Complete Diversity Of Citizenship Between All Properly Joined Parties**

15.    There is complete diversity between the properly joined parties to this action.[2]

---

2 As discussed more fully below, the joinder of multiple Plaintiffs from different states whose only connection to one another is that each had a surgeon who allegedly

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

16.    The Complaint alleges that Plaintiff Carmela Vitale "is a resident and citizen of California."  *Complaint ¶ 14.*

17.    The Complaint alleges that Plaintiff Tammy James "is a resident and citizen of Tennessee."  *Id. ¶ 15.*

18.    The Complaint alleges that Plaintiff John Curtis "is a resident and citizen of Washington."  *Id. ¶ 16.*

19.    The Complaint alleges that Plaintiff Kerry Hardy "is a resident and citizen of Alabama."  *Id. ¶ 17.*

20.    The Complaint alleges that Plaintiff Hector M. Santos "is a resident and citizen of Puerto Rico."  *Id. ¶ 18.*

21.    The Complaint alleges that Plaintiff Daniel Jones "is a resident and citizen of Colorado."  *Id. ¶ 19.*

22.    The Complaint alleges that Plaintiff Debra Izzo-Blount "is a resident and citizen of New York."  *Id.  ¶ 20.*

23.    As Plaintiffs allege (*Id. ¶ 21*), Defendant Medtronic is a Minnesota corporation which has its principal place of business in Minneapolis, Minnesota.  *See* 28 U.S.C. § 1332(c)(1); *see also Declaration of Jerri Province ("Province Decl."), ¶ 4; Branson v. Medtronic, Inc.*, No. 5:06-cv-332-Oc-10GRJ, 2007 WL 170094, at *4 (M.D. Fla. Jan. 18, 2007) (denying plaintiff's motion to remand following removal by Medtronic on the ground that Medtronic's principal place of business is in Minnesota).  Thus, Medtronic is a citizen of Minnesota.  *See* 28 U.S.C. § 1332(c)(1).

24.    Plaintiffs also allege (*Complaint ¶ 22*) that Defendant MSD is a Tennessee corporation with its principal place of business in Memphis, Tennessee. Thus, MSD is a citizen of Tennessee.  *See* 28 U.S.C. § 1332(c)(1); *see also Province Decl., ¶ 4.*  Although Plaintiff Tammy James is also a resident of Tennessee, she is not

_____

implanted an Infuse Device via an off-label procedure is improper under the Federal Rules of Civil Procedure.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

1  properly joined under Federal Rule of Civil Procedure Rule 20, because she has no

2  connection whatsoever with the other Plaintiffs, and her joinder in this action is an

3  attempt to prevent MSD from rightfully removing this case. Thus this Court should

4  sever the claims of Tammy Jones, remand her claims to state court, and retain

5  jurisdiction over the claims of the remaining six plaintiffs.

6      25.    Dr. Michelson is a named defendant in this action (*Complaint* ¶¶ 1, 23,

7  24, 65), yet as discussed below, Plaintiffs fail to allege facts specific to Dr.

8  Michelson's involvement in the claims at issue, beyond boilerplate (and incorrect)

9  allegations that Dr. Michelson "was partly responsible for inventing, designing,

10  promoting, and marketing Medtronic's LT-Cage of INFUSE Bone Graft." *Id.* ¶ 23.

11  Plaintiffs also allege that Dr. Michelson "is, and at all times herein mentioned was a

12  resident of the county of Los Angeles in the state of California." *Id.* As discussed

13  below, the citizenship of Dr. Michelson must be ignored for purposes of establishing

14  diversity.

15      26.    Finally, upon information and belief, none of the remaining DOE

16  defendants have been substituted with any named defendants or been served with

17  process in the state court action. For purposes of removal, "the citizenship of

18  defendants sued under fictitious names shall be disregarded." 28 U.S.C. § 1441(a);

19  *accord Soliman v. Phillip Morris Inc.,* 311 F.3d 966, 971 (9th Cir. 2002); *McCabe*,

20  811 F.2d at 1339. Therefore, the citizenship of DOES 1 through 100 should be

21  disregarded for purposes of diversity

22      27.    Complete diversity exists among the properly joined parties, and no

23  defendant that is a citizen of the State of California has been properly joined and

24  served to this action. 28 U.S.C. § 1441(b)(2). Removal based on the diversity of

25  citizenship is therefore proper.

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

**C.    California Defendant Dr. Michelson Is Fraudulently Joined**

    **(a)    Dr. Michelson Has Been Fraudulently Joined and His Presence Should Be Ignored for Purposes of Establishing Diversity**

28.    Dr. Michelson is fraudulently joined and his citizenship must be ignored for the purpose of establishing diversity. *See Burns v. Medtronic, Inc.,* 2:13-cv-06093, slip op. at pp. 2-3 (C.D. Cal. Oct. 8, 2013) (Infuse Device case brought by same plaintiffs' counsel as here, Judge Wilson found Dr. Michelson fraudulently joined based on ***identical*** allegations as here) (a true and correct copy is attached to the Declaration of Michael K. Brown ("Brown Decl") as Exhibit 1); *see also McCabe*, 811 F.2d at 1339; *accord Ritchey*, 139 F.3d at 1318 ("It is a commonplace that fraudulently joined defendants will not defeat removal on diversity grounds.") (citations omitted); *United Computer Sys.*, 298 F.3d at 762 (A defendant's presence in the lawsuit is ignored for purposes of determining diversity where there is an obvious failure to state a cause of action against the resident defendant.).

29.    As the Ninth Circuit has explained, "[f]raudulent joinder is a term of art." *McCabe*, 811 F.2d at 1339.  A defendant is fraudulently joined and its presence in the lawsuit is ignored for purposes of determining diversity "[i]f the plaintiff fails to state a cause of action against a resident defendant, and the failure is obvious according to the settled rules of the state." *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001); *citing McCabe*, 811 F.2d at 1339.  Further, the defendant "is entitled to present the facts showing the joinder to be fraudulent." *Id.*  To that end, courts may consider the allegations in the complaint and the facts presented by the defendant in its notice of removal, including affidavits or other evidence on the issue of whether a particular defendant's joinder is a fraudulent. *See Ritchey,* 139 F.3d at 1318; *West America Corp. v. Vaughan-Bassett Furniture Co., Inc.*, 765 F.2d 932, 936 n. 6 (9th Cir. 1985).

30.    As set forth below, the Complaint fails to allege any facts sufficient to impose any liability on Dr. Michelson.  The Complaint, instead, makes clear that this is a product liability action, and by Plaintiffs' own allegations (or the lack thereof),

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

1   Dr. Michelson is fraudulently joined.  Moreover, the analysis of the facts and

2   applicable legal authority confirms that there is no basis for Plaintiffs' claims against

3   Dr. Michelson.

**(b)   Plaintiffs' Fail to Plead Sufficient Facts to Meet Their Initial Pleading Burden Under Twombly Regarding Dr. Michelson**

5       31.     The United States Supreme Court has made clear that when filing a

6   complaint, "a plaintiff's obligation to provide the grounds of his entitlement to relief

7   requires more than labels and conclusions, and a formulaic recitation of the elements

8   of a cause of action will not do." *Bell Atlantic v. Twombly*, 127 S.Ct. 1995, 1964-65,

9   550 U.S. 544, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 77

10  U.S.L.W. 4387, 173 L.Ed.2d 868 (2009) (holding that "threadbare recitals of a cause

11  of action's elements supported by mere conclusory statements" is insufficient and

12  extending *Twombly*'s holding to contexts outside of anti-trust).

13      32.     Here, Dr. Michelson is fraudulently joined because Plaintiffs have failed

14  to make any material allegations against him.  *See, e.g., Brown v. Allstate Insur.*, 17 F.

15  Supp. 2d 1134, 1137, (S.D. Cal. 1998) (finding in-state defendants fraudulently joined

16  where "no material allegations against [the in-state defendants] are made").  In fact, as

17  one court held, there is "no better admission of fraudulent joinder of [the resident

18  defendants]" than the failure of the plaintiff "to set forth any specific factual

19  allegations" against them.  *Lyons v. American Tobacco Co.*, No. Civ. A. 96-0881-BH-

20  S, 1997 WL 809677, at *5 (S.D. Ala. Sept. 30, 1997).  Plaintiffs must provide some

21  factual allegations of the grounds upon which the claims rest (*Twombly*, 127 S.Ct. at

22  1965 n.3), and their failure to assert material factual allegations against Dr. Michelson

23  is a hallmark of fraudulent joinder.  *See, e.g. Results Mktg., Inc. v. Buffalo-Lake Erie

24  Wireless Sys. Co.*, LLC, 2008 WL 209865, No. 3:CV-08-0382, *2 (M.D. Pa. May 16,

25  2008) (citing *Twombly* and finding no plausible basis for cause of action against non-

26  diverse defendants); *Tippen v. Republic Fire & Casualty Ins. Co.*, 2007 WL 5219352,

27  Nos. 06-07701, 06-8440, *2 (E.D. La. Nov. 28, 2007) (citing *Twombly* relating to

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

standard of pleading and noting that in analyzing the propriety of removal, the court may pierce the pleadings); *Taylor w. Shelter Lincoln Mercury Ltd.*, 2007 WL 3244701, No. 2:07-CV-0097, *1-2 (W.D. La. Nov. 2, 2007) (citing *Twombly* and finding fraudulent joinder); *Pascale Serv. Corp. v. Int'l Truck and Engine Corp.*, 2007 WL 809677, Nos. 07-0247-S, *2-4 (D.R.I. Oct. 1, 2007) (citing *Twombly* and finding fraudulent joinder).

33.    Plaintiffs fail to allege any facts showing that Dr. Michelson had anything to do with the Infuse Device Plaintiffs allegedly received.  Moreover, the reality is that no set of facts will establish Dr. Michelson's involvement with the Infuse Device because Dr. Michelson had no involvement with the creation, design, promotion or marketing of the Infuse Device.  *See Declaration of Bill McKay ("McKay Decl."), ¶ 4; see also Burns,* p. 2 (in an Infuse Device case where Dr. Michelson was named as a defendant with **identical** allegations, the Court found that Plaintiffs allegations and subsequent evidence submitted in support of their Motion to Remand did not establish a connection between Dr. Michelson and the Infuse Device and he was therefore fraudulently joined); *Wright v. Medtronic, Inc.,* No. 2:13-CV-02130, at p. 3 (C.D. Cal. June 24, 2013) (in an Infuse Device case where Dr. Michelson was named as a defendant, the Court held that the Plaintiff failed "to establish that Dr. Michelson is meaningfully connected to th[e] case") (attached to the *Brown Decl.* as Exhibit 2).  Moreover, Dr. Michelson has **never** had involvement with the manufacturing, distribution processes, or promotional activities for the Infuse Device.  *McKay Decl. ¶ 4.*

34.    Indeed, in *Burns,* Judge Wilson denied the plaintiffs' Motion to Remand where the plaintiffs had asserted **identical** allegations as to Dr. Michelson holding that Dr. Michelson was fraudulently joined.  *Burns,* p. 2.  As here, the Complaint alleged that the Infuse Device was used off-label in the plaintiffs' surgeries because the LT-Cage component was not used; however, the only allegations against Dr. Michelson related to the LT-Cage.  *Id.*  In *Burns,* the plaintiffs (represented by Plaintiffs' counsel

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    here), submitted evidence in support of their Motion to Remand, but the Court found

2    that—at best—this evidence only connected Dr. Michelson to the LT-Cage, not the

3    Infuse Device that plaintiffs received. *Id.* Plaintiffs' allegations here similarly fail to

4    connect Dr. Michelson to their claims or their alleged injuries.

5        35.    Similarly, in *Wright*, Judge Wu gave that plaintiff the opportunity to

6    present evidence to justify her claims against Dr. Michelson, but—similar to the

7    allegations here—the plaintiff's offer of proof merely contained a few copies of

8    websites on which Dr. Michelson's contributions were noted and evidence of a patent

9    dispute. *Wright*, p. 3. Judge Wu expressly found that the documents did not

10    demonstrate that Dr. Michelson controlled the manufacturing and distribution

11    processes for the Infuse Device or that he promoted an "off-label" use of that device

12    to any doctors or patients. *Id.* Plaintiffs' allegations here similarly fail to connect Dr.

13    Michelson to their claims or their alleged injuries.

14        36.    The Complaint is simply devoid of any factual allegations linking Dr.

15    Michelson to Plaintiffs' claims or alleged injuries and the boilerplate allegations

16    Plaintiffs do make are factually incorrect. Indeed, Plaintiffs only specifically

17    reference Dr. Michelson in *four* paragraphs of the 383 paragraph Complaint.

18    Paragraph 1 contains the boilerplate (and incorrect) allegation that the Infuse® Bone

19    Graft/LT-Cage Lumbar Tapered Fusion Device ("Infuse Device") was promoted,

20    invented, marketed, and designed by Dr. Michelson and then lumps all three

21    Defendants together by referring to them collectively as "'DEFENDANTS' or

22    'MEDTRONIC Defendants' or 'MEDTRONIC.'" *Complaint ¶ 1.* Paragraph 23

23    merely reiterates the incorrect boilerplate allegations from Paragraph 1 and alleges

24    that Dr. Michelson is a California citizen. *Id. ¶ 23.* Paragraph 24 merely reiterates the

25    allegation that Dr. Michelson resides in Los Angeles, California. *Id. ¶ 24.* Finally,

26    Paragraph 65 alleges that Dr. Michelson "substantially contributed to the development

27    of the technology related to INFUSE," and that "Dr. Michelson has numerous patents

28    which involved the use of cages and spinal fusion implants, which are the core of

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  Medtronic's business." *Id.* ¶ 65.

2      37.    Thus, other than generally lumping Dr. Michelson together with

3  Medtronic and MSD as "MEDTRONIC Defendants" for purposes of their pleading

4  (*Id.* ¶ 1), nowhere in the Complaint do they identify any specific actions taken by Dr.

5  Michelson that would implicate him in the design, manufacture, construction,

6  assembly, sale and/or distribution of the Infuse Device at issue in this case.  Indeed,

7  even in paragraph 65 (Plaintiffs' least boilerplate allegation regarding Dr. Michelson),

8  Plaintiffs merely allege that Dr. Michelson purportedly invented technology related in

9  an unspecified way to the Infuse Device and holds patents on other spinal implants not

10  specifically tied to the Infuse Device.  Similar allegations were rejected by Judge

11  Wilson in *Burns* and Judge Wu in *Wright*. *See Burns,* p. 2; *Wright,* p. 3.

12      38.    The lack of any material factual allegations beyond establishing Dr.

13  Michelson's California citizenship compels the conclusion that Plaintiffs fraudulently

14  joined Dr. Michelson in an attempt to defeat diversity jurisdiction. *See, e.g., Lyons,*

15  1997 WL 809677, at *5.

16      39.    Simply lumping Dr. Michelson in with Medtronic and MSD fails to state

17  facts sufficient to find any basis for Dr. Michelson participation in this case. *See, e.g.,*

18  *Brown,* 17 F. Supp. 2d at 1137; *Lyons,* 1997 WL 809677 at *5.  And, as other courts

19  have held, Plaintiffs cannot cure this deficiency by simply relying on allegations

20  directed generally toward "Defendants" alone. *See In re Phenylpropanolamine (PPA)*

21  *Prod. Liab. Litig.,* 2002 WL 34418423 at *4-5 (W.D. Wash. Nov. 27, 2002)

22  (allegations directed toward "defendants" or "all defendants" insufficient).  Such

23  general and conclusory allegations cannot be used to thwart removal. *Roe v. General*

24  *American Life Ins. Co.,* 712 F.2d 450, 452 n. * (10th Cir. 1983) ("the joinder of a

25  resident defendant against whom no cause of action is pleaded, or against whom there

26  is no cause of action, will not defeat removal"); *Anderson v. Ford Motor Co.,* 303 F.

27  Supp. 2d 1253, 1258 (W.D. Okla. 2004) ("federal courts must vigilantly protect a

28  defendant's right to proceed in federal court against abuses and manipulations by the

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

plaintiff," thus a defendant's right to remove cannot be defeated by the fraudulent joinder of a resident defendant).

40.    Given Plaintiffs' conclusory allegations, it is evident that Dr. Michelson has been fraudulently joined in this action.  Where a non-diverse defendant has been fraudulently joined, its presence does not preclude removal.  *United Computer Systems, Inc.*, 298 F.3d at 762; *Simpson*, 282 F. Supp. 2d at 1155.  As such, Dr. Michelson's inclusion in this lawsuit should be disregarded for purposes of diversity.

41.    Under California law, only "manufacturers, retailers, and others *in the marketing chain of a product* are strictly liable in tort for personal injuries caused by a defective product."  *Taylor v. Elliott Turbomachinery Co., Inc.*, 171 Cal. App. 4th 564, 575 (2009); *citing Peterson v. Superior Court*, 10 Cal. 4th 1185, 1188 (1995) (emphasis added).  The rules of products liability "focus responsibility for defects, whether negligently or nonnegligently caused, *on the manufacturer of the completed product*."  *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 478–479 (2001) (emphasis added).  As the California Supreme Court explained three decades ago, the basis for imposing liability on a particular defendant is that "he has marketed or distributed a defective product."  *Taylor*, 171 Cal. App. 4th at 575; *citing Daly v. General Motors Corp.*, 20 Cal. 3d 725, 739 (1978).

42.    Dr. Michelson therefore has been fraudulently joined because it has absolutely no involvement of any kind with the Infuse Device at issue in this case.  As such, Plaintiffs fail to allege – and, indeed, will never be able to show – that Dr. Michelson was or is involved in any way with the Infuse Device such that his presence in this lawsuit is valid under any legal theory or cause of action.  *See McKay Decl. ¶ 4; see also Burns*, at p. 2; *Wright*, at p. 3.

**D.    Tennessee Plaintiff Tammy James Is Fraudulently Misjoined**

      **(a)    The Numerous Plaintiffs' Claims Are Legally And Factually Distinct And Tennessee Plaintiff Tammy James' Is Fraudulently Misjoined**

43.    The doctrine of fraudulent misjoinder permits the Court to ignore the

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

citizenship of non-diverse plaintiffs who fail to make "at least one claim that arises out of the same transaction or occurrence or series of transactions or occurrences as the other plaintiffs." *In re Rezulin Prod. Liab. Litig.*, 2002 WL 31496228, at *1 (S.D.N.Y. Nov. 7, 2002); *see also In re Diet Drugs Prod. Liab. Litig.*, 294 F. Supp. 2d 667, 673 (E.D. Pa. 2003) ("Even if a non-diverse plaintiff may have a valid cause of action against a defendant, that plaintiff may not prevent removal based on diversity of citizenship if there is no reasonable basis for the joinder of that non-diverse plaintiff with the other plaintiffs").

44.    In the context of pharmaceutical and medical device product liability litigation, "the joinder of plaintiffs who have no connection to each other except the fact that they ingested [the same product] constitutes misjoinder." *In re Rezulin*, 2002 WL 31496228, at *1; *see also In re Fosamax Prods. Liab. Litig.*, 2012 WL 1118780, at *4 (D.N.J. Apr. 3, 2012) ("[G]iven the complicated causation questions that pervade drug product liability claims, Plaintiffs' claims will require divergent questions of law and fact. Accordingly, the Court finds that Plaintiffs' claims are misjoined."); *see also Baker v. Merck & Co., Inc.*, 2005 WL 5517236, *3 (D. Nev. Sept. 13, 2005) (finding misjoinder and severing and remanding claims of the non-diverse plaintiffs); *In re Diet Drugs*, 294 F. Supp. 2d at 679 (finding misjoinder and severing claims where "plaintiffs reside[d] in various states throughout the country, and were prescribed different drugs by different doctors at different times"); *Alday v. Organon USA, Inc.*, 2009 WL 3531802 at *1 (E.D.Mo. Oct 27, 2009) ("Each Plaintiff was injured at different times in different states allegedly from their use of NuvaRing that was presumably prescribed by different healthcare providers. Nor are Plaintiffs' injuries all the same. As a result, the joinder of the claims of the non-Missouri resident Plaintiffs with the claims of the Missouri resident Plaintiff was a misjoinder of parties in this suit."); *In re Prempro Prods. Liab. Litig.*, 417 F.Supp.2d 1058, 1060 (E.D. Ark. 2006) (dismissing misjoined plaintiffs where their only connection to the case is the use of a product, but where all other facts relevant to their claims are different;

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

1    "Plaintiffs are residents of different states and were prescribed different HRT drugs,

2    from different doctors, for different lengths of time, in different amounts, and suffered

3    different injuries.").

4        45.    As explained in more detail below, Plaintiffs' claims in this action are

5    essentially seven distinct product liability actions, consisting of individuals from

6    seven different states, filed under a single caption.  Except for the allegation that each

7    allegedly was implanted with the Infuse Device in an off-label manner, Plaintiffs

8    assert no other relationship to one another.  Accordingly, Plaintiffs' claims are

9    misjoined, and Tennessee Plaintiff Tammy James' claims should be severed.

10        **(b)    Tennessee Plaintiff Tammy James' Claims Should Be Severed And
11        Remanded To State Court**

12        46.    Pursuant to Federal Rules of Civil Procedure 20 and 21, permissive

13    joinder is not an absolute right, and a court has broad discretion to sever misjoined

14    claims.  *See* Fed. R. Civ. P. 20(a).  Federal Rule of Civil Procedure 20(a) states that:

15    "All persons may join in one action as plaintiffs if they assert any right to relief

16    jointly, severally, or in the alternative in respect of or arising out of the same

17    transaction, occurrence, or series of transactions or occurrences and if any question of

18    law or fact common to all these persons will arise in the action."  Rule 21 states, in

19    part:  "On motion or on its own, the court may at any time, on just terms, add or drop

20    a party.  The court may also sever any claim against a party."  *See* Fed. R. Civ. P. 21;

21    *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1297 (9th Cir. 2000) ("Given the broad

22    discretion with which the district court is vested to make a decision granting severance

23    and the fact that the district court carefully weighed the arguments in favor of and

24    against joinder, we conclude that the district court did not abuse its discretion when it

25    granted Quaker's motion to sever the cases."); *see also Warner v. Stryker Corp.*, Civ.

26    No. 08-6368-AA, 2009 WL 1773170, at *2 (D. Or. June 22, 2009) (severing claims of

27    non-Oregon plaintiffs under Rule 20, ruling that plaintiffs' mere allegations of "a

28    common theory of liability" did not cause claims to arise from "the same transaction,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- 14 -

occurrence or series of transactions, particularly given that *non-Oregon plaintiffs received individualized medical care in vastly different geographical regions*") (emphasis added).

47.    Judge Wilson recently ruled, in an almost identical case brought by the same Plaintiffs' counsel, that the multiple plaintiffs in that case were improperly joined and ordered each Plaintiff to file a separate complaint. *See Burns,* slip op. at p. 3. The same is true here.

48.    Plaintiffs do not even allege that the Infuse Device was used in the same off-label manner in each of them. *See Complaint ¶¶253-258.* The varied off-label procedures listed in the Complaint are just one example of the great factual variation between Plaintiffs' claims. For instance, the Complaint alleges there are three different ways in which the Infuse Device could be implanted in an off-label manner through the lumbar (or lower back) part of the spine. (*Id. at ¶ 82*) (describing the Posterior Lumbar Interbody Fusion, Posterolateral Fusion, and Transforaminal Lumbar Interbody Fusion approaches). The Complaint also describes an additional off-label use of the Infuse Device in the cervical (or neck) part of the spine. (*Id. at ¶ 253*) (describing cervical (neck) surgeries). Thus, on top of the individualized issues of causation, damages, witnesses, and preexisting conditions present in every product liability case, these Plaintiffs' claims vary further as to ***what*** off-label use is at issue. Under such circumstances, courts have found claims to be misjoined, and ignore the citizenship of those parties.

49.    Considering their geographic diversity and the absence of any factual nexus between her and the other six Plaintiffs, Plaintiff Tammy James' attempted joinder in this case will frustrate both the underlying purpose of the joinder rules and the Medtronic Defendants' right to removal. *See In re Fosamax,* 2012 WL 1118780, at *5 (finding joinder of plaintiffs was "egregious" where they could claim no connection with the forum state or other plaintiffs, and ruling that the "joinder was undertaken to thwart Defendants' statutory right of removal to federal court, and

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

1  therefore, Plaintiffs' claims are fraudulently misjoined"); *In re Rezulin*, 168 F. Supp.

2  2d at 147 ("This is not to say the cost and efficiency benefits to joined plaintiffs are

3  immaterial; they simply do not carry the same weight when balanced against the

4  defendant's right to removal.").

5      50.    The Court should find that the Plaintiff Tammy James here has been

6  misjoined – because she has no connection whatsoever with the other Plaintiffs and

7  the state itself—and sever the actions brought by the Plaintiff Tammy James for the

8  purposes of maintaining Defendant MSD's right to removal of the action involving

9  the other plaintiffs.  Defendants therefore request that this Court remand the claims of

10  Plaintiff Tammy James to the Superior Court of Los Angeles County, and retain

11  jurisdiction over the claims of the remaining six Plaintiffs' claims.

12      51.    For the foregoing reasons, this Court has jurisdiction over this action

13  pursuant to 28 U.S.C. § 1332, and this action is properly removed pursuant to 28

14  U.S.C. §§ 1441 and 1446.

15  **III.   CONCLUSION**

16      52.    **WHEREFORE**, the Medtronic Defendants pray that this action be

17  removed from the Superior Court of the State of California for the County of Los

18  Angeles to the United States District Court for the Central District of California.

19  Dated:  October 16, 2013                    REED SMITH LLP

20

21                                          By _____

22                                             Michael K. Brown
                                               Lisa M. Baird
23                                             Michelle L. Cheng
                                               Elizabeth G. Minerd
24                                             Attorneys for Defendants
                                               Medtronic, Inc. and Medtronic Sofamor
                                               Danek USA, Inc.

25  US_ACTIVE-114782098

26

27

28

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. 1441(b)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

 CT Corporation

**Service of Process Transmittal**
10/10/2013
CT Log Number 523670391

TO: Vicki Tersteeg
Medtronic, Inc.
MS: LC300, 710 Medtronic Parkway
Minneapolis, MN 55432-5604

RE: **Process Served in California**

FOR: Medtronic Sofamor Danek USA, Inc. (Domestic State: TN)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Carmela Vitale, etc., et al., Pltfs. vs. Medtronic, Inc., etc., et al. including Medtronic Sofamor Danek, USA, Inc., Dfts. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Instructions, Complaint, Cover Sheet, Cover Sheet Addendum(s) and Statement(s), Notice(s), Amended Order(s) |
| **COURT/AGENCY:** | Los Angeles County - Superior Court - Central District, CA Case # BC524044 |
| **NATURE OF ACTION:** | Product Liability Litigation - Manufacturing Defect - Infused Bone Graft and LT-Cage ("INFUSE") |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 10/10/2013 at 15:00 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Lowell W. Finson Phillips Law Firm 2101 Rosecrans Avenue, Suite 3290 El Segundo, CA 90245 877.480.9142 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 10/11/2013, Expected Purge Date: 10/16/2013 Image SOP Email Notification, Vicki Tersteeg VICKI.ANN.TERSTEEG@MEDTRONIC.COM Email Notification, Jackie Hiltner jackie.hiltner@medtronic.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

EXHIBIT ___|___ PAGE ___|___

Page 1 of 1 / JE

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

OCT 10 2013   3PM

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

MEDTRONIC, INC., a Minnesota corporation; MEDTRONIC
SOFAMOR DANEK, USA, INC.;  (Continued on attachment)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Carmela Vitale, a individual; Tammy James, a individual; John Curtis, a
individual; Kerry Hardy, a individual, (continued)

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

OCT 10 2013

John A. Clarke, Executive Officer/Clerk

By LA TRESE JOHNSON, Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*  Los Angeles Superior Court<br>111 North Hill Street Los Angeles, CA 90012 | CASE NUMBER:<br>*(Número del Caso):* BC524044 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Lowell W. Finson, Esq. 2101 Rosecrans Ave, Suite 3290 El Segundo, CA 90245 / 310-923-9918

| DATE: October 10, 2013 | John A. Clarke | Clerk, by | L. JOHNSON | , Deputy |
|---|---|---|---|---|
| *(Fecha)* 10 2013 | | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

OCT 10 2013

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):*   Medtronic Sofamor Danek, USA Inc.

under: ☒ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)       ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

EXHIBIT 1   PAGE 2

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Carmela Vitale, et al. v. MEDTRONIC, INC., et al. | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

DR. GARY KARLIN MICHELSON; and DOES 1 -100, inclusive

Page __2__ of __3__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

American LegalNet, Inc.
www.FormsWorkflow.com

EXHIBIT 1  PAGE 3

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Carmela Vitale, et al. v. MEDTRONIC, INC., et al. | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

[✓] Plaintiff    [ ] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

Hector M. Santos, a individual; Debra Izzo-Blount, a individual,

Page __3__ of __3__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

American LegalNet, Inc.
www.FormsWorkflow.com

EXHIBIT 1 PAGE 4

 CT Corporation

**Service of Process Transmittal**
10/10/2013
CT Log Number 523668395

TO:     Vicki Tersteeg
        Medtronic, Inc.
        MS: LC300, 710 Medtronic Parkway
        Minneapolis, MN 55432-5604

RE:     **Process Served in California**

FOR:    Medtronic, Inc. (Domestic State: MN)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Carmela Vitale, etc., et al., Pltfs. vs. Medtronic, Inc., etc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Instructions, Complaint, Cover Sheet, Addendum(s) and Statement(s), Notice, Amended Order(s) |
| **COURT/AGENCY:** | Los Angeles County – Superior Court – Central District, CA<br>Case # BC524044 |
| **NATURE OF ACTION:** | Product Liability Litigation - Manufacturing Defect - Personal Injury - INFUSE Bone Graft and LT-Cage |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 10/10/2013 at 15:00 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Lowell W. Finson<br>2101 Rosecrans Ave<br>Suite 3290<br>El Segundo, CA 90245<br>310-923-9918 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 10/10/2013, Expected Purge Date: 10/15/2013<br>Image SOP<br>Email Notification, Vicki Tersteeg VICKI.ANN.TERSTEEG@MEDTRONIC.COM<br>Email Notification, Jackie Hiltner jackie.hiltner@medtronic.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street<br>Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

EXHIBIT 1 PAGE 5

OCT 1 0 2013 3pm

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

MEDTRONIC, INC., a Minnesota corporation; MEDTRONIC SOFAMOR DANEK, USA, INC.;  (Continued on attachment)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Carmela Vitale, a individual; Tammy James, a individual; John Curtis, a individual; Kerry Hardy, a individual, (continued)

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**CONFORMED COPY**
ORIGINAL FILED
Superior Court of California
County of Los Angeles

OCT 1 0 2013

John A. Clarke, Executive Officer/Clerk

By LA TRESE JOHNSON, Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* Los Angeles Superior Court<br>111 North Hill Street Los Angeles, CA 90012 | CASE NUMBER: *(Número del Caso):* BC524044 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Lowell W. Finson, Esq. 2101 Rosecrans Ave, Suite 3290 El Segundo, CA 90245 / 310-923-9918

| | | |
|---|---|---|
| DATE: October 10, 2013<br>*(Fecha)* | John A. Clarke Clerk, by *(Secretario)* L. JOHNSON | , Deputy *(Adjunto)* |

(For proof of service of this summons, use Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

OCT 1 0 2013

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Medtronic, Inc., a Minnesota Corporation

   under: ☒ CCP 416.10 (corporation)         ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

**SUMMONS**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
American LegalNet, Inc.
www.FormsWorkflow.com

EXHIBIT 1 PAGE 6

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Carmela Vitale, et al. v. MEDTRONIC, INC., et al. | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

DR. GARY KARLIN MICHELSON; and DOES 1 -100, inclusive

Page __2__ of __3__

Page 1 of 1

### ADDITIONAL PARTIES ATTACHMENT
#### Attachment to Summons

American LegalNet, Inc.
www.FormsWorkflow.com

EXHIBIT 1 PAGE 7

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Carmela Vitale, et al. v. MEDTRONIC, INC., et al. | |

## INSTRUCTIONS FOR USE

➜ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➜ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

[✓] Plaintiff     [ ] Defendant     [ ] Cross-Complainant     [ ] Cross-Defendant

Hector M. Santos, a individual; Debra Izzo-Blount, a individual,

Page __3__ of __3__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

American LegalNet, Inc.
www.FormsWorkflow.com

EXHIBIT  1  PAGE  8



1   Lowell W. Finson (State Bar No. 275586)
    **PHILLIPS LAW FIRM**
2   2101 Rosecrans Avenue, Suite 3290
    El Segundo, CA 90245
3   877.480.9142  PHONE
    213.330.0296  FAX
4   Email: lowell@justiceforyou.com

5

6   *Attorneys for Plaintiffs*

7

**CONFORMED COPY**
ORIGINAL FILED
Superior Court of California
County of Los Angeles

OCT 10 2013

John A. Clarke, Executive Officer/Clerk

By LA TRESE JOHNSON, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES

8

9   Carmela Vitale, a individual; Tammy
    James, a individual; John Curtis, a
10  individual; Kerry Hardy, a individual;
    Hector M. Santos, a individual; Debra
11  Izzo-Blount, a individual,

12                    Plaintiffs,

13  vs.

14  MEDTRONIC, INC., a Minnesota
    corporation; MEDTRONIC SOFAMOR
15  DANEK, USA, INC.; DR. GARY
    KARLIN MICHELSON; and DOES 1 -
16  100, inclusive
17
18                    Defendants.

19

Case No.  **BC 5 2 4 0 4 4**

**COMPLAINT FOR DAMAGES** **BY FAX**

(1)  Fraudulent Misrepresentation and Fraud in
     the Inducement
(2)  Strict Products Liability –
     Failure to Warn
(3)  Strict Products Liability –
     Design Defect
(4)  Strict Products Liability –
     Misrepresentation
(5)  Products Liability – Negligence
(6)  Negligence per se
(7)  Breach of Express Warranty
(10) Punitive Damages
(11) Loss of Consortium

**DEMAND FOR JURY TRIAL**

20      Plaintiffs, by and through her attorneys, for her Complaint and Jury Demand against

21  Defendants, states, avers and alleges as follows:

22      This is a products liability case arising out of injuries caused by the illegal, off-label

23  promotion by Defendants, who are drug manufacturers, promoters, marketers, and inventors. The

24  Infuse Bone Graft and LT-Cage (collectively known as "INFUSE") is manufactured, promoted,

25  marketed, and distributed by Defendants Medtronic, Medtronic Sofamor, and Danek USA, Inc., and

26  promoted, invented, marketed and designed, in part, by Dr. Gary Karlin Michelson

27      ///

28

EXHIBIT 1 PAGE 9

**INTRODUCTION**

1.      This case arises out of injuries caused by the illegal, off-label promotion by Defendants, who are drug manufacturers, promoters, marketers, and inventors. The INFUSE Bone Graft and LT-Cage (collectively known as "INFUSE") is manufactured, promoted, marketed, and distributed by Defendants MEDTRONIC, INC. and MEDTRONIC SOFAMOR DANEK USA, INC. and was promoted, invented, marketed and designed, in part, by Defendant DR. GARY KARLIN MICHELSON (hereinafter collectively named as "DEFENDANTS" or "MEDTRONIC Defendants" or "MEDTRONIC".)

2.      Infuse® is a bio-engineered liquid bone graft product classified by the FDA as a medical device.  It was designed, manufactured and marketed by a division of Medtronic, Inc. known as Medtronic Sofamor Danek USA, Inc.  Infuse® is used in spinal fusion surgeries, and its purpose is to accomplish the same outcome as implanting a patient's own bone or cadaver bone between the vertebrae in the spine, obviating the necessity of harvesting bone from the patient's own hip.

3.      This case involves a spinal fusion surgery in which Infuse® was used in an *off-label* (i.e. not approved by the FDA) manner in a lumbar spine fusion surgery.  Infuse® is approved by the FDA, however it is indicated *only* for lumbar surgery that is performed through the abdomen (anterior approach), and for some tibia fractures and some specific dental surgeries not relevant to this case.  Further, Infuse® is only approved by the FDA for lumbar surgery that is performed through the abdomen (anterior approach) when it is used *in combination with* an "LT-Cage™," a hollow metal cylinder that is used to insert the Infuse® into the spine.  Infuse® is *not* approved by the FDA for use in cervical spine surgery, or for any lumbar surgery performed through the back or side of the body (posterior approaches).  All cervical spine surgeries, and many lumbar surgeries, and any Infuse® back surgery that does not use an LT-Cage™, are thus off-label uses.

4.      Despite this lack of FDA approval, and the FDA's explicit concerns about the dangers to patients of off-label uses, Infuse® was improperly promoted by the MEDTRONIC

-2-

EXHIBIT 1 PAGE 10

Defendants to be used off-label for posterior approach lumbar spine fusions, for cervical spine fusions, and without an LT-Cage™.

5.    Patients' spine surgeons, including Plaintiffs' surgeon, were persuaded by MEDTRONIC and by MEDTRONIC's consultant "opinion leaders," who are paid physician promoters, to expand their use of Infuse® for off-label uses such as posterior approach lumbar fusions and cervical spine fusions.

6.    When Infuse® is used off-label, it can cause severe injuries to the patient, including Infuse®-induced bone overgrowth and other complications that often necessitate risky, painful, and costly revision surgeries, which may not cure the problems caused by the Infuse® use.

7.    This uncontrolled bone growth (also known as "ectopic" or "exuberant" bone growth) can result in severe damage to or compression of the surrounding neurologic structures in the spine, and bone can grow onto or around the spinal cord or the spinal nerve roots.  When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and the need for revision surgery.

8.    When Infuse® is used off-label, it can cause or contribute to other serious injuries and complications, including extreme inflammatory reactions, chronic radiculitis, retrograde ejaculation, sterility, osteolysis (bone resorption), displacement or migration of the spacer cage, pseudoarthrosis, and worse overall outcomes.

9.    Notwithstanding overwhelming and substantial evidence (including MEDTRONIC-sponsored studies) demonstrating these increased risks of adverse reactions from off-label use of Infuse®, the MEDTRONIC Defendants recklessly and/or intentionally misrepresented, minimized, downplayed, disregarded, and/or completely omitted these off-label risks while promoting Infuse to spine surgeons for off-label uses. In fact, MEDTRONIC promoted to spine surgeons and patients the use of the product in dangerous off-label procedures, thereby demonstrating a conscious disregard for the health and safety of spinal fusion patients such as the Plaintiffs.

10.    Moreover, the actual rate of incidence of serious side effects from off-label use of Infuse® is, in fact, much greater than that disclosed by MEDTRONIC to spine surgeons and

-3-

EXHIBIT 1 PAGE 11

patients. With respect to the off-label approaches, MEDTRONIC failed to accurately disclose the significant off-label risks of which it knew or should have known.

11.    Because of MEDTRONIC's wrongful conduct in actively and illegally promoting the off-label uses of Infuse®, and because of MEDTRONIC's additional wrongful conduct in minimizing, concealing, and/or downplaying the true risks of these non-FDA approved off-label uses of its product Infuse®, thousands of spine patients, including Plaintiffs, underwent surgeries without knowing the true risks inherent in the off-label use of Infuse®.

12.    These patients and their physicians relied on MEDTRONIC's false and misleading statements of material fact including statements and publications by MEDTRONIC's "opinion leaders," "thought leaders" and sales representatives. MEDTRONIC orchestrated a marketing campaign from at least 2002 to the present to persuade spine surgeons to use Infuse® in dangerous off-label uses in the spine. Indeed, absent MEDTRONIC's extensive off-label promotion campaign, physicians, such as the Plaintiffs' spine surgeon, would never have performed these especially risky off-label procedures.

13.    As a result of off-label Infuse® surgery using off-label procedures and/or components, Plaintiffs suffered bodily injuries and damages as described herein.

## PARTIES

14.    Plaintiff Carmela Vitale is an individual who is a resident and citizen of California.

15.    Plaintiff Tammy James is an individual who is a resident and citizen of Tennessee.

16.    Plaintiff John Curtis is an individual who is a resident and citizen of Washington.

17.    Plaintiff Kerry Hardy is an individual who is a resident and citizen of Alabama.

18.    Plaintiff Hector M. Santos is an individual who is a resident and citizen of Puerto Rico.

19.    Plaintiff Daniel Jones is an individual who is a resident and citizen of Colorado.

20.    Plaintiff Debra Izzo-Blount is an individual who is a resident and citizen of New York.

21.    Defendant MEDTRONIC, INC. is a Minnesota corporation, with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432.

-4-

EXHIBIT 1 PAGE 12

22.  Defendant MEDTRONIC SOFAMOR DANEK USA, INC. is a Tennessee corporation, with its principal place of business at 1800 Pyramid Place, Memphis, Tennessee 38132.

23.  Defendant DR. GARY KARLIN MICHELSON is, and at all times herein mentioned was a resident of the county of Los Angeles in the state of California. Dr. Michelson was partly responsible for inventing, designing, promoting, and marketing Medtronic's LT-Cage of INFUSE Bone Graft.

## JURISDICTION AND VENUE

24.  This court has personal jurisdiction over Defendants because at all relevant times they engaged in substantial business activities in the State of California, or in the alternative, were domiciled in the State of California. At all relevant times, Defendants solicited, and conducted business in California through their employees, agents, and/or sales representatives, and derived substantial revenue from such business in California. Furthermore, Dr. Michelson is a resident of the county of Los Angeles, in the State of California.

## BACKGROUND

1) **Summary of Allegations.**

   a) **Generally.**

25.  At all relevant times, Infuse® was researched, developed, manufactured, marketed, promoted, advertised, sold and distributed by the MEDTRONIC Defendants.

26.  Plaintiffs suffered grievous personal injuries as a direct and proximate result of Defendants' misconduct.

27.  In off-label lumbar or cervical spine surgeries, Infuse® often leads to serious complications including, but not limited to, chronic permanent radiculitis and other nerve injuries, uncontrolled bone growth, osteolysis, and poorer overall outcomes.

   b) **MEDTRONIC's Representations.**

28.  At all relevant times, the MEDTRONIC Defendants negligently manufactured, marketed, advertised, promoted, sold and distributed Infuse® as a safe and effective device to be used for spinal fusion surgery. MEDTRONIC negligently, recklessly, and/or intentionally promoted Infuse® for off-label use to physicians and spine patients, including the Plaintiff and

EXHIBIT 1 PAGE 13

1   Plaintiffs' physicians, and downplayed to physicians and spine patients its dangerous effects,

2   including but not limited to the downplaying of the dangerous effects of Infuse® in off-label spine

3   surgeries such as that performed on the Plaintiffs.

4       29.    At all relevant times, the MEDTRONIC Defendants misrepresented the safety of

5   Infuse® to physicians and patients, and recklessly, willfully, and/or intentionally failed to alert

6   physicians and patients of the increased significant danger to patients resulting from the off-label

7   uses of Infuse®.

8       c)    **MEDTRONIC's Knowledge.**

9       30.    MEDTRONIC and its agents knew or should have known and/or recklessly

10   disregarded the materially incomplete, false, and misleading nature of the information that they

11   caused to be disseminated to the public and to spine surgeons regarding Infuse® and including

12   MEDTRONIC's surreptitious campaign to promote the product for off-label uses (i.e. uses that

13   had never been evaluated or approved by the FDA). The ongoing scheme described herein could

14   not have been perpetrated over a substantial period of time, as has occurred, without the

15   knowledge and complicity of personnel at the highest level of MEDTRONIC, including its

16   corporate officers.

17       31.    At all relevant times, MEDTRONIC knew, and/or had reason to know, that

18   Infuse® was not safe for off-label uses in the spine because the device had never been approved

19   for use in the spine, other than solely in anterior approach lumbar fusion surgeries with a LT-

20   Cage™; and its safety and efficacy for use without a LT-Cage™ was known by MEDTRONIC to

21   be unsafe and ineffective.

22       32.    At all relevant times, MEDTRONIC knew, and/or had reason to know that Infuse®

23   was not safe for off-label use because it had not been approved for off-label use; and its safety

24   and efficacy for off-label use was either unknown, or was known by MEDTRONIC to be unsafe

25   and ineffective.

26       33.    MEDTRONIC's acts to promote off-label use of Infuse®, their knowledge of, but

27   failure to disclose, the growing adverse events associated with the product, MEDTRONIC's

28   continued payments to certain spine surgeon "Opinion Leaders" to promote off-label uses, repeat

FDA regulatory action against MEDTRONIC, two whistleblower lawsuits against

EXHIBIT 1 PAGE 14

MEDTRONIC, a Department of Justice ("DOJ") settlement and resulting Corporate Integrity Agreement, and a United States Senate Finance Committee investigation culminating in a scathing report on MEDTRONIC's improper promotional activities on this product demonstrate a conscious and reckless disregard for the health and safety of spinal patients, including Plaintiffs.

34.   At all relevant times, the MEDTRONIC Defendants knew, and/or had reason to know, that their representations and suggestions to physicians that Infuse® was safe and effective for off-label use were materially false and misleading and that physicians and patients would rely on such representations.

35.   MEDTRONIC knew and/or had reason to know of the likelihood of serious injuries caused by the off-label use of Infuse® in the spine, but they concealed this information and did not warn Plaintiffs or Plaintiffs' physicians, preventing Plaintiffs and Plaintiffs' physicians from making informed choices in selecting other treatments or therapies prior to Plaintiffs' implantation surgery and preventing Plaintiffs and his physicians from timely discovering Plaintiffs' injuries.

36.   The prevailing best scientific and medical knowledge, as discussed *supra*, demonstrated prior to the date of Plaintiffs' injury that off-label Infuse® was likely to cause the Plaintiffs' injuries as stated herein.  This prevailing scientific and medical knowledge was known or knowable by MEDTRONIC for at least a year or more prior to Plaintiffs' off-label Infuse surgery.

d)   **MEDTRONIC's Off-Label Promotion.**

37.   MEDTRONIC had knowledge and information reflecting the true risks and dangers to spine patients of off-label use of Infuse®, the extent of the off-label use, and their reckless promotion of the off-label uses.  Despite this knowledge, MEDTRONIC knowingly and recklessly conducted an egregious off-label promotion campaign to the detriment of the spine patients, including the Plaintiffs.

38.   MEDTRONIC and its agents encouraged the off-label promotion of Infuse® described throughout this Complaint, notwithstanding their knowledge of the serious adverse events that patients could, and did, suffer, which have often resulted in the need for additional surgery, emergency intervention, and, in at least one case, the death of a patient.

EXHIBIT 1 PAGE 15

39.    The MEDTRONIC Defendants improperly promoted and marketed Infuse® to Plaintiffs' implanting surgeon for off-label use in the spine, and this improper promotion and marketing improperly influenced Plaintiffs' spine surgeon's decision to implant Infuse® in Plaintiffs' spine using an off-label approach.

40.    The MEDTRONIC Defendants, as herein described, directly and indirectly promoted, trained, and encouraged Plaintiffs' surgeon to perform Plaintiffs' spinal fusion procedure utilizing Infuse in a dangerous off-label manner.  Defendants actions to promote, train and encourage surgeons, including Plaintiffs' surgeon, to use Infuse in a dangerous off-label manner included MEDTRONIC representatives participation during surgery, often times spending hours in the surgery suite with the surgeons, without any knowledge of the patient, encouraging the surgeon to use Infuse®.

41.    The MEDTRONIC Defendants recklessly and/or fraudulently promoted and marketed Infuse® to Plaintiffs and Plaintiffs' physicians for off-label use in the spine.

e)    **Failure to Warn.**

42.    At all relevant times, the MEDTRONIC Defendants misrepresented the safety of Infuse® to physicians and spine patients, including to Plaintiffs and Plaintiffs' physicians, and recklessly, willfully, or intentionally failed to inform Plaintiffs or Plaintiffs' physicians of the significant dangers to patients resulting from the off-label use of Infuse®.

43.    Any warnings MEDTRONIC may have issued concerning the dangers of off-label uses of Infuse® or regarding the specific risks of those uses were insufficient in light of MEDTRONIC's contradictory prior, contemporaneous and continuing illegal promotional efforts and promotion of Infuse® for non-FDA-approved off-label uses in the spine and contemporaneous efforts to hide or downplay the true risks and dangers of the off-label uses of Infuse®.

f)    **Causation.**

44.    Plaintiffs never consented to be treated with Infuse nor have Infuse used at any time during his surgery.  Plaintiffs would not have consented to be treated with the off-label use of Infuse® had he known of or been informed by MEDTRONIC or by his spine surgeon of the true risks of the off-label use of Infuse®.

-8-

EXHIBIT 1 PAGE 66

45.     The MEDTRONIC Defendants' off-label promotion and marketing caused Plaintiffs' spine surgeon to decide to implant Infuse® in Plaintiffs' spine using an off-label approach.

46.     Plaintiffs' spine surgeon received and relied on the MEDTRONIC Defendants' improper promotion of the off-label uses, and MEDTRONIC'S inadequate warnings which hid or downplayed the risks of off-label use of Infuse®.  Plaintiffs' spine surgeon would not have done the procedure using off-label Infuse (or using Infuse at all) in the absence of MEDTRONIC's false and misleading promotion of the off-label uses.

g)     **Alter Ego.**

47.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of each of the other Defendants herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to the Plaintiffs.

48.     At all times herein mentioned, Defendants were fully informed of the actions of their agents and employees, and thereafter no officer, director or managing agent of Defendants repudiated those actions, which failure to repudiate constituted adoption and approval of said actions and all Defendants and each of them, thereby ratified those actions.

49.     There exists and, at all times herein mentioned there existed, a unity of interest in ownership between certain Defendants and other certain Defendants, such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter-ego of the other certain Defendants and exerted control over those Defendants.  Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

50.     At all times herein mentioned, the MEDTRONIC Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing,

-9-

processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the Plaintiffs and Plaintiffs' physicians.  As such, each of the MEDTRONIC Defendants is individually, as well as jointly and severally, liable to the Plaintiff for their damages.

51.    The harm which has been caused to Plaintiffs resulted from the conduct of one or various combinations of the Defendants, and through no fault of the Plaintiffs.  There may be uncertainty as to which one or which combination of Defendants caused the harm.  Defendants have superior knowledge and information on the subject of which one or which combination of the Defendants caused Plaintiffs' injuries.

52.    Thus, the burden of proof should be upon each Defendant to prove that the Defendant has not caused the harms suffered by Plaintiff.

2)    **The Infuse® Device and Spinal Fusion Surgery Generally.**

53.    The MEDTRONIC Defendants designed and marketed Infuse® for lumbar spine fusion surgery, a surgical technique in which one or more of the vertebrae of the spine are united together ("fused") so that motion no longer occurs between them.

54.    Spinal fusion is used to treat a number of conditions, including treatment of a fractured vertebra, spinal deformities (spinal curves or slippages), back pain from instability, or abnormal or excessive movement between vertebrae.  Similar to the concept of welding, spinal fusion surgery uses bone grafts to join vertebrae together and eliminate or reduce movement between vertebrae.

55.    In a spinal fusion procedure, the graft — usually the patient's own harvested bone (autograft) or cadaver bone (allograft) — is placed in a spacer cage within the disc space between the vertebrae during the surgery.  Over the following months, a physiological mechanism similar to that which occurs when a fractured bone heals causes the graft to join, or "weld," the vertebrae together.  The goal of spinal fusion is to obtain a solid fusion of the vertebrae.

56.    For years, autologous bone graft has been considered the "gold standard" in fusion surgery.  In an autologous bone graft — or "autograft" — the surgeon procures bone graft material from another part of the patient's body, typically from the patient's pelvis or iliac crest or from the patient's own spine (from the parts of one or more vertebrae removed to gain access to

-10-

EXHIBIT 1  PAGE 18

the disc space to perform the fusion), and implants the bone graft in the site where fusion is desired.  Successful fusions occur at very high rates in autograft procedures, as the harvested bone exhibits all the properties necessary for bone growth (including osteogenic, osteoconductive and osteoinductive properties).

57.    As an alternative to autograft, patients can undergo an "allograft" procedure using cadaver bone instead of autograft.   Although healing and fusion is not as predictable when using allograft as when using autograft (the patient's own bone), an allograft eliminates the need for the harvest procedure required in an autograft.

58.    A newer option to traditional bone graft procedures is bio-engineered and bio-manufactured bone-growth materials, including Infuse®.  Infuse® and similar materials were thus (at least initially) appealing to many spine surgeons, since they can obviate the need for using autograft harvested from the patient's own body.

59.    Infuse® is a genetically engineered material containing a bone morphogenetic protein ("rhBMP-2"), and is used as an alternative or supplement to autograft and allograft to help fuse the vertebrae in the spine as part of the spinal fusion surgery.  The purpose of Infuse® is to accomplish the same clinical outcomes as grafting a patient's own bone into these locations but without the need to harvest bone from the patient's hip or spine.

60.    MEDTRONIC'S Infuse® product consists of  (1) a metallic spinal fusion cage (the LT-Cage™); (2) the bone graft substitute which consists of liquid rhBMP-2 (derived from Chinese hamster cells); and (3) a sponge-like carrier or scaffold for the protein (manufactured from bovine collagen) that is placed inside the fusion cage.

61.    The fusion cage component maintains the spacing and temporarily stabilizes the diseased region of the spine, while the Infuse® bone graft component is used to form bone, which is intended to permanently stabilize (fuse) this portion of the spine.

62.    During surgery, the rhBMP-2 is soaked onto and is intended to bind with the absorbable collagen sponge that is designed to resorb, or disappear, over time.  As the sponge dissolves, the rhBMP-2 stimulates the cells to produce new bone.

EXHIBIT  1  PAGE  19

63.    Certain bone morphogenetic proteins ("BMP"s) have been studied for decades because of their ability to heal bone and potentially decrease or eliminate the need for bone graft harvesting from other parts of the body.

64.    Scientists isolated the gene for one protein (rhBMP-2) from bone tissue and used molecular biology techniques to create genetically engineered cells. These cells then produce large quantities of rhBMP-2. A similar process is used to manufacture other proteins, such as insulin.

65.    Plaintiffs are informed and believe, and thereon allege, that Dr. Michelson substantially contributed to the development of the technology related to INFUSE. Medtronic's own website fact sheet for INFUSE gives credit to Dr. Michelson, stating that INFUSE "Incorporates technology developed by Gary K. Michelson, M.D.," thus, Dr. Michelson's name was directly tied in with the INFUSE on Medtronic's websites. Dr. Michelson's has numerous patents which involved the use of cages and spinal fusion implants, which are the core of Medtronic's business.

66.    Attempting to seize on this potentially lucrative opportunity to develop a new spinal fusion method, Sofamor Danek Group, Inc., a Memphis, Tennessee-based spinal device maker ("Sofamor Danek"), acquired the exclusive rights to rhBMP-2 for spinal applications in February 1995. The "rhBMP-2" liquid bone protein sold as Infuse is a genetically engineered version of a naturally occurring protein that stimulates bone growth, developed as a commercially viable bone morphogenetic protein ("BMP") technology.

67.    In October 1996, Sofamor Danek filed with the FDA an application for an Investigational Device Exemption to conduct a pilot study on the effects of rhBMP-2 in humans, marking the first step to obtaining approval to commercially market BMP.

68.    In January 1999, MEDTRONIC purchased Sofamor Danek for $3.6 billion. On July 2, 2002, the FDA approved Infuse®, a medical device containing an absorbable collagen sponge that is treated with rhBMP-2, for one limited and very specific spinal fusion procedure.

-12-

EXHIBIT 1 PAGE 20

3)     **FDA Approval of Infuse®:**

      a)     **The Pre-Market-Approval Process.**

69.     The current regulatory framework for medical device approval was established in the Medical Device Amendments of 1976 ("MDA") to the Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA"). The MDA contains a three-class classification system for medical devices. Class I devices pose the lowest risk to consumers' health, do not require FDA approval for marketing, and include devices such as tongue depressors. Class II devices pose intermediate risk and often include special controls including post-market surveillance and guidance documents. Finally, Class III devices pose the greatest risk of death or complications and include most implantable surgical devices such as cardiac pacemakers, coronary artery stents, automated external defibrillators, and several types of implantable orthopedic devices for spine and hip surgery. Infuse® is a Class III device.

70.     Manufacturers such as the MEDTRONIC Defendants seeking to market Class III devices, such as Infuse®, are required to submit a Premarket Approval Application ("PMA") that must be evaluated and approved by the FDA. The PMA requires the manufacturer to demonstrate the product's safety and efficacy to the FDA through a process that analyzes clinical and other data, including: (1) technical data and information on the product, including non-clinical laboratory studies and clinical investigations; (2) non-clinical laboratory studies that provide information on microbiology, toxicology, immunology, biocompatibility, stress, wear, shelf life, and other laboratory or animal tests of the device—all of which must be conducted in compliance with federal regulations which set forth, *inter alia*, criteria for researcher qualifications, facility standards and testing procedures; and (3) clinical investigations in which study protocols, safety and effectiveness data, adverse reactions and complications, device failures and replacements, patient information, patient complaints, tabulations of data from all individual subjects, results of statistical analyses, and any other information from the clinical investigations are provided, including the results of any investigation conducted under an Investigational Device Exemption ("IDE").

71.     A PMA requires that all pertinent information about the device be articulated in the application and requires the manufacturer to specify the medical device's "intended use." The

-13-

EXHIBIT 1 PAGE 21

indications for use required on the label are based on the nonclinical and clinical studies described in the PMA. Indications for use for a device include a general description of the disease or condition the device will diagnose, treat, prevent, cure, or mitigate, including a description of the patient population for which the device is intended.

72.     In addition, each PMA submission must include copies of all proposed labeling for the device, which must comply with federal requirements. Specifically, the label must include the common name of the device, quantity of contents, and the name and address of the manufacturer, as well as any prescription use restrictions, information for use (including indications, effects, routes, methods, and frequency and duration of administration; and any relevant hazards, contraindications, side effects, and precautions), instructions for installation and operation, and any other information, literature, or advertising that constitutes "labeling" under the FDCA. Approval of the product's labeling is conditioned on the applicant incorporating any labeling changes exactly as directed by the FDA, and a copy of the final printed labeling must be submitted to the FDA before marketing.

       **b)**    **Infuse's® Limited FDA-Approved Uses.**

73.     In October 1996, Sofamor Danek submitted an IDE to the FDA to study the use of rhBMP-2 as applied to an absorbable collagen sponge inserted into an LT-Cage™ interbody fusion device to treat patients with degenerative disc disease. Designed as a pilot study intended to support the initiation of a larger pivotal study, the IDE involved 14 patients—11 of whom received spinal fusion procedures using the rhBMP-2/ACS/LT-Cage™ device and 3 who received the LT-Cage™ with autologous bone—and marked the first time rhBMP-2 was used in patients undergoing spinal fusion. In this initial clinical trial, all 11 patients who had been implanted with rhBMP-2 achieved successful fusion within six months from the time of surgery.

74.     Sofamor Danek used the results of this pilot study to petition the FDA to initiate a pivotal trial of rhBMP-2 with the LT-Cage™®. This trial, which was approved by the FDA in July 1998, involved 135 investigational patients who had rhBMP-2 implanted in a single-level Anterior Lumbar Interbody Fusion (ALIF) procedure and 135 control patients who underwent the same procedure using autologous bone graft instead of rhBMP-2.

EXHIBIT 1 PAGE 22

75.    After acquiring Sofamor Danek in 1999, MEDTRONIC filed the Infuse® PMA on January 12, 2001, and was granted expedited review status by the FDA.

76.    As presented in MEDTRONIC's original PMA (eventually approved by the FDA in July 2002), the initially-approved Infuse® product consisted of two components:

a.    A specific type of spacer (the LT-Cage™ Lumbar Tapered Fusion Device) component, which is a thimble-sized hollow metal cylinder which keeps the two vertebrae in place and provides a frame that contains and directs the development of new bone growth; and

b.    The Infuse® Bone Graft Component, which includes a collagen sponge that acts as a carrier and scaffold for the active ingredient in Infuse®, and rhBMP-2, the actual active ingredient that is reconstituted in sterile water and applied to the collagen sponge before it is placed inside the spacer cage.

77.    According to the label sought by MEDTRONIC in the PMA and subsequently approved by the FDA, Infuse® can only be used in an ALIF procedure, involving a single-level fusion in the L4-S1 region of the lumbar spine.[1] ALIF is performed by approaching the spine from the front through an incision in the abdomen.

78.    On July 2, 2002, the FDA approved Infuse® to treat degenerative disc disease, but only by means of one specific procedure, namely, the ALIF procedure, and only in one-level procedures at lumbar spine levels L4 through S1.

79.    Importantly, the initial approved labeling for the product indicates in bold underlined formatting: **"These components <u>must</u> be used as a system. The Infuse® Bone Graft component <u>must not</u> be used without the LT-Cage™ Lumbar Tapered Fusion Device component."** The labeling also directs the specific manner in which both components are to be used in a fusion procedure.

---

[1] While the product's label remains substantially the same as that approved by the FDA in 2002, the FDA has made minor amendments to the label through post-approval supplements. For example, on July 29, 2004, the FDA approved a supplement expanding the indicated spinal region from L4-S1 to L2-S1. Infuse® has been approved by the FDA for only two other uses: certain oral maxillofacial surgeries and repair of tibial fractures that have already been stabilized with IM nail fixation after appropriate wound management. Infuse® was approved by the FDA on March 9, 2007, for certain oral maxillofacial uses. While Infuse® has also been approved for treatment of certain tibial fractures and certain oral maxillofacial uses, these uses represent a very minor percentage of the product's overall sales.

-15-

EXHIBIT 1 PAGE 23

80.    Despite the fact that the FDA only approved rhBMP-2 for use in the spine in combination with use of the LT-Cage™, MEDTRONIC sells Infuse® separately from the LT-Cage™, and has done so continuously since the approval in 2002.

81.    Infuse® has never been approved by the FDA for use in other parts of the body or for use in any other type of procedure, other than two non-spinal uses as noted in footnote 1. Any other uses are thus, by definition, "off-label" experimental uses which are not approved by the FDA.

82.    There are numerous lumbar and cervical spine surgical procedures for which Infuse® was not initially approved, and for which it has never subsequently been approved. No cervical fusion procedure, whatsoever, using Infuse has ever been approved by FDA, regardless of the approach or procedure. The non-approved lumbar procedures include:

a.    Posterior Lumbar Interbody Fusion ("PLIF"), a procedure that is used to treat nerve compression, and back pain resulting from a number of causes, involves approaching the spine from the back. PLIF, however, is a more delicate surgical approach in some respects because the spinal canal and nerves are posterior to the vertebral body, and because a surgeon must manipulate the dural sac (the membranous sac that encases the spinal cord within the vertebral column) to perform the PLIF procedure;

b.    Posterolateral Fusion ("PLF") which is similar to the PLIF procedure, but instead of removing the disc space and replacing it with a bone graft, the disc space remains intact and the bone graft is placed between the transverse processes in the back of the spine. This allows the bone to heal and stabilizes the spine by fusing the transverse process of one vertebra to the transverse process of the next vertebra; and

c.    Transforaminal Lumbar Interbody Fusion ("TLIF"), which is also similar to the PLIF procedure, and is a technique utilized when an inter-body fusion is performed via a posterior approach. TLIF allows the surgeon to perform a fusion from a posterior approach without disturbing the dural sac by approaching the spine via a more lateral, or sideways, approach.

-16-

EXHIBIT 1  PAGE 24

4)   **Off-Label Use of Infuse, Risks Associated with Off-Label Uses, and MEDTRONIC's Knowledge of Such Risks.**

a)   **Generally**

83.   Physicians may use FDA-approved medical devices in any way they see fit — either on-label or off-label, but medical device companies are prohibited by federal law to promote off-label uses for their medical devices or to pay doctors inducements or kickbacks to promote off-label uses, or to perform procedures using the devices off-label. When a physician chooses to use a medical device in an off-label manner, he or she must inform the patient of the off-label nature of the surgery and the expected risks and benefits of such off-label use, and obtain the patient's informed consent to such use.

b)   **FDA's Initial Concerns with Infuse's® Off-Label Uses.**

84.   The FDA's approval of Infuse® was limited to one specific lumbar procedure (the ALIF procedure) due to FDA's concerns about potential adverse events in posterior uses that had already been reported at the time of the product's approval. As a result, the FDA approved Infuse® for the small percentage of overall spinal fusion surgeries which are ALIF procedures, with the device label specifying this limited surgical application.

85.   FDA approval of Infuse® was limited to ALIF only because of the number of adverse events resulting from the use of rhBMP-2 in off-label applications. In particular, a MEDTRONIC-sponsored trial examining the application of rhBMP-2 in off-label PLIF (Posterior Lumbar Interbody Fixation) procedures was halted in December 1999 when uncontrolled bone growth developed in a number of the patients. Indeed, the study reported that one patient required two additional surgeries to remove excessive bone growth from the spinal canal. Such bone overgrowth observed in this PLIF trial was particularly alarming because it could, and did, in many patients, result in worsening the very pain that the fusion procedure was designed to eliminate, and in some cases necessitating difficult revision surgeries to remove the bone overgrowth.

86.   Moreover, the 1999 PLIF trial demonstrated that bone overgrowth complications from Infuse® result from the product's very mechanism of action; i.e., rhBMP-2 stimulates the growth of new bone. Thus adverse events can result when the rhBMP-2 leaks out of the area in

-17-

EXHIBIT 1 PAGE 25

which bone growth is desired and/or when too much rhBMP-2 is used. In such cases, Infuse® can stimulate bone growth where new bone is not desired or can lead to excessive bone growth in the target area, which is often associated with other complications such as swelling, compression of nerves, and associated additional or new pain. Such unintended bone growth and swelling can be especially problematic in spinal surgeries because of the proximity to sensitive neurological structures in which Infuse® is used; i.e., the spinal cord and the exiting nerve roots.

87.    During the FDA Advisory Committee Panel ("FDA Panel") hearing on January 10, 2002 concerning potential FDA approval of Infuse®, Panel members voiced concerns regarding potential off-label use of the product, and asked MEDTRONIC to describe its efforts to guard against off-label use of the product.

88.    In response to FDA concerns of off-label applications, one MEDTRONIC consultant, who is alleged to have received hundreds of thousands of dollars in the form of kickbacks from consulting agreements promoting Infuse®, dismissed the FDA Panel's concerns of off-label use, stating: "this specific application before the panel today is through an anterior approach," and thus, "seems to me to be outside the scope of what we ought to be focusing on today."

89.    Reiterating its concerns on off-label use, the FDA Panel cautioned MEDTRONIC to guard against procedures outside the specifically approved ALIF procedure provided in the labeled application. The FDA Panel's admonishment included concerns voiced by panel member Dr. John Kirkpatrick that off-label use could result in harm to patients. More specifically, the use of the *tapered* LT-Cage™— which is difficult to implant in a posterior approach—would, if required, "prevent a majority of surgeons from applying this from a Posterior Lumbar Interbody Fusion [PLIF] perspective." In other words, the FDA explicitly warned MEDTRONIC against promoting Infuse® for use in off-label PLIF procedures because, according to the statements of the FDA Panel, such use could endanger patients.

90.    At this 2002 FDA Advisory Committee Panel hearing, the panel members stressed concerns regarding potential off-label use of the product and repeatedly asked the MEDTRONIC presenters questions about how MEDTRONIC would seek to guard against off-label applications of the product.

EXHIBIT 1 PAGE 26

91.    At the conclusion of the hearing, the FDA Advisory Panel again reiterated concerns regarding the potential for off-label use, specifically admonishing the MEDTRONIC Defendants to guard against procedures other than the specific ALIF (anterior lumbar interbody fusion) procedure approved by the FDA.

c)    **Off-Label Use of Infuse® is Dangerous and Causes Adverse Side Effects.**

92.    The off-label use of Infuse® in the spine frequently causes serious adverse events. This has been known to MEDTRONIC and its key "opinion leaders" for many years.

93.    The FDA Panel's initial fears in 2002 concerning the dangers of off-label use of this product were confirmed by subsequent medical studies that demonstrate that off-label use of Infuse® may present severe risks and dangers to patient safety.

94.    For example, an early study sponsored and funded by MEDTRONIC in 1999 demonstrated an approximately 70% rate of ectopic bone growth — meaning bone overgrowth where such growth is not desired. Only a few months into this clinical trial of Infuse®, CT scans showed unwanted bone had formed in the spinal canals of 70% of the patients treated with Infuse®. This clinical trial, intended to include hundreds of people with degenerative disc disease, was halted after only 34 patients were treated with Infuse®.

95.    A spine surgeon who participated in this PLIF with Infuse study reported that one of the patients he treated required two extra surgeries to clear the excessive bone growth from the patient's spinal canal. The complications observed in this PLIF trials were particularly serious given the potential of neural impingement (or nerve pinching) from such bony overgrowth in that procedure, potentially triggering the very sort of pain that a fusion procedure attempts to eliminate.

96.    This bone overgrowth results from Infuse®'s very mechanism of action. In such cases, Infuse® can stimulate bone growth where new bone is not desired and can lead to excessive bone growth into areas where bone should not be growing — *i.e.*, into or against the spinal cord or other spinal nerves.

97.    There is insufficient scientific evidence concerning the proper dosages of rhBMP-2 for use in the off-label procedures such as PLIF, TLIF, PLF and cervical fusions, or the

-19-

EXHIBIT 1 PAGE 27

1  expected responses to the protein in different biological environments. Indeed, many adverse

2  events associated with the use of Infuse® result from off-label use of the product by surgeons who

3  do not fully understand the highly potent nature of this molecule.

4        98.    A study entitled, "Prevalence, Complications, and Hospital Charges Associated

5  with Use of Bone-Morphogenetic Proteins in Spinal Fusion Procedures," Cahill, et al.,

6  *JAMA*, 2009 Jul 1;302(1):58-66, analyzed the integration of BMP into spinal surgeries since

7  2002, and the association between its use and postoperative complications, length of hospital

8  stays, and hospital charges. Significantly, the study determined that use of bone morphogenetic

9  proteins is associated with a substantially higher rate of complications in anterior cervical fusion

10  procedures, which has resulted in an approximate 41% increase in hospital charges for these

11  procedures. Notably, the study only considered complications that occurred during postoperative

12  inpatient hospitalization immediately following the surgical procedure, and did "not include

13  delayed complications in the outpatient setting," such as hospital readmission-related

14  complications.

15        99.    Such a shortcoming likely resulted in a significant understatement of the extent of

16  complications resulting from use of bone morphogenetic proteins because, as an FDA Public

17  Health Notification regarding complications from use of BMP in the cervical spine indicated,

18  "[m]ost complications occurred between 2 and 14 days post-operatively with only a few events

19  occurring prior to day 2." Indeed, acknowledging this fact, Dr. Kevin S. Cahill, who led the study,

20  publicly commented, "ours is probably a bottom estimate."

21        100.    Aside from potential understatement of complications, the study found that the rate

22  of complications in anterior cervical fusions was 51.4% higher when using bone morphogenetic

23  protein than in similar cases when bone morphogenetic protein was not used. These

24  complications included increased rates of voice and swallowing-related problems, and swelling of

25  the neck. The study's authors noted a "significantly greater" rate of complications when using

26  bone morphogenetic proteins in these surgeries, even after considering and compensating for

27  numerous other variables that could affect complications rates, such as age, sex, etc.

28        101.    Astonishingly, it was not until 2004 that a paper about the disastrous 1999 PLIF

trial by spine surgeons with financial ties to MEDTRONIC was finally published in a medical

EXHIBIT 1 PAGE 28

journal. This article inaccurately maintained that these patients were not harmed by Infuse®. The paper (Haid, et al., *Posterior lumbar interbody fusion using recombinant human bone morphogenetic protein type 2 with cylindrical interbody cages, The Spine Journal*, 4(5):527-538, September 2004) downplayed the bone overgrowth complications claiming that while it showed up on CT scans, patients did not suffer ill effects. This claim was false and misleading and further encouraged dangerous off-label uses of Infuse.

102.    In fact, David Malone, M.D., a Tulsa, Oklahoma spine surgeon involved in this 1999 PLIF clinical trial with Infuse, told the *Milwaukee Journal Sentinel* that two of his patients had to undergo additional surgeries because the BMP-induced bone overgrowth was painfully impinging on their nerve roots. One of the patients, a man who was in his 50s at the time, needed three operations - one for the implant, a second to remove the unwanted bone formation, and then a third when the additional bone grew back yet again.[2]

103.    "It was a pretty amazing biological response," Malone said in an interview. "It grew back even larger than the first time. It got to the point that secretaries in our clinic could look at X-rays and tell who got the BMP (Infuse) and who did not. You could see that much bone growth."[3]

104.    A May 15, 2006 medical article in *Spine* entitled "Controlling Bone Morphogenetic Protein Diffusion and Bone Morphogenetic Protein-Stimulated Bone Growth Using Fibrin Glue" observed, "rhBMP-2 may stimulate bone growth in areas in which bone is not desired, especially as the material 'leaks' into such spaces. . . . Although this phenomenon has not been thoroughly studied, it implies that the release of rhBMP-2 into the soft tissues stimulates a rapid, potentially life-threatening, inflammatory reaction." [4]

105.    Again, in a November 2006 issue of *Spine*, several authors noted a significantly increased risk of swelling from off-label use of Infuse® in cervical spine fusions compared to traditional fusion surgeries. Of the 234 patients studied, 27.5% of those patients treated with

---

[2] *See, e.g.*, "Infuse® Cited in Patients' Painful Bone Overgrowth: More Surgery Needed After Use, Surgeon Says," by John Fauber, *Milwaukee Journal Sentinel*, June 27, 2011.
[3] *Id.*
[4] Patel, et al, *Controlling Bone Morphogenetic Protein Diffusion and Bone Morphogenetic Protein-Stimulated Bone Growth Using Fibrin Glue, Spine*, 31(11): 1201-1206, May 2006.

-21-

EXHIBIT 1 PAGE 29

Infuse® had significant swelling after the surgery, while only 3.6% of those patients not treated with Infuse® experienced such a complication. Further analysis demonstrated that "patients receiving rhBMP-2 were *10.1 times more likely* to have a swelling complication versus those who did not receive rhBMP-2." (Emphasis added.)[5]

106.    A March 2007 article in *The Spine Journal* highlighted the severity of the complications associated with off-label use of Infuse®. According to this article, five days after Infuse® was implanted off-label in a cervical spine fusion surgery, the implanted patient experienced serious swelling of the neck and difficulty swallowing which required emergency medical treatment such as an exploratory surgery and implantation of a breathing tube.[6]

107.    A *European Spine Journal* article in August 2007 found that use of Infuse® in certain cervical spine fusions resulted in a statistically significant increase in the number of complications, including dysphagia (difficulty in swallowing) and swelling in the neck area. The authors determined that "[d]ysphagia was a common complication and it was significantly more frequent and more severe in patients in whom rhBMP-2 was used. Post-operative swelling . . . was significantly larger in the rhBMP-2 group." Of the patients evaluated, 85% of those treated with Infuse® reported difficulty swallowing after the surgery; a complication that was far less severe in those not treated with Infuse®. Indeed, one patient required a feeding tube for six weeks after the surgery as a result of the complication. [7]

108.    On July 1, 2008, the FDA issued a Public Health Notification to healthcare practitioners entitled "Life-threatening Complications Associated with Recombinant Human Bone Morphogenetic Protein in Cervical Spine Fusion" (the "FDA Notification"), which strongly warned medical professionals who used Infuse® and other BMP products of serious complications that had occurred from the off-label use of these products in the cervical spine.[8]

---

[5] Smucker, et al., *Increased Swelling Complications Associated with Off-Label Usage of rhBMP-2 in the Anterior Cervical Spine, Spine*, 31(24): 2813-2819, November 2006.

[6] Perri, et al., *Adverse Swelling Associated with Use of rh-BMP-2 in Anterior Cervical Discectomy and Fusion: A Case Study, The Spine Journal*, 7(2): 235-239, March 2007.

[7] Vaidya, et al., *Complications of Anterior Cervical Discectomy and Fusion Using Recombinant Human Bone Morphogenetic Protein-2, European Spine Journal*, 16(8): 1257-1265, March 2007.

[8] FDA Public Health Notification: Life-threatening Complications Associated with Recombinant Human Bone Morphogenetic Protein in Cervical Spine Fusion, July 1, 2008, http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/PublicHealthNotifications/ucm062000.htm

-22-

109.    The FDA Notification stated that the agency had received numerous reports of complications from BMP use in the cervical spine that "were associated with swelling of neck and throat tissue, which resulted in compression of the airway and/or neurological structures in the neck. Some reports describe difficulty swallowing, breathing or speaking." The notification further stated that these complications had resulted in "the need for emergency medical intervention," which included "respiratory support with intubation, anti-inflammatory medication, tracheotomy and most commonly second surgeries to drain the surgical site." The FDA Notification concluded that "in light of the serious adverse events described above, FDA recommends that practitioners either use approved alternative treatments or consider enrolling as investigators in approved clinical studies."

110.    On September 4, 2008, *The Wall Street Journal* published a front-page article entitled "MEDTRONIC Product Linked to Surgery Problems."[9]  This article noted both the complications resulting from the use of Infuse® in the cervical spine already disclosed in the FDA Notification and additional complications resulting from other off-label applications of the product, stating:

> The FDA's alert about Infuse® was specific to neck surgeries. But a review of
> FDA records and medical literature shows there have been scores of other cases in
> which serious complications arose after the product was used in other off-label
> situations. Many of these cases involve unwanted bone growth near nerves or in
> areas outside targeted fusion sites. That can lead to pain, repeat surgeries and, in
> some cases, emergency intervention.

The article further stated that at least three-quarters, or 75%, of the adverse events reported to the FDA involved off-label use of Infuse®. Of course, this news had serious implications for MEDTRONIC because off-label use of Infuse® accounted for the majority of all Infuse® sales.

111.    A September 2008 article in *The Spine Journal* also observed that the use of Infuse® in the cervical spine "has been associated with reports of serious adverse events.[10]

---

[9] "Medtronic Product Linked to Surgery Problems," by David Armstrong and Thomas M. Burton, *Wall Street Journal*, September 4, 2008.
[10] Jarosz, et al., *Complications of BMP Use in Cervical Spine Surgery, The Spine Journal*, 8(5): 23S-24S, September 2008.

-23-

Postoperative hematoma formation [a collection of blood outside the blood vessels, generally manifesting as bruises], prevertebral soft tissue swelling, [and] swallowing difficulty . . . are a few examples." Of the complications observed in this patient study group, 17% occurred in patients treated with traditional techniques, while 83% occurred in patients treated off-label with Infuse®. The authors concluded that the "cervical spine has proven much less forgiving with the institution of rhBMP-2 use. Complications induced by . . . rhBMP-2 were clearly evident in our review."

112.    On November 18, 2008, in connection with reporting MEDTRONIC's financial results for its 2009 second quarter (ended October 24, 2008), MEDTRONIC reported that revenue from its Spinal segment had, in fact, declined to $829 million for the quarter – down $30 million from the previous quarter. The decreased sales in the Spinal segment, clearly stemming from a significant decline in Infuse® sales, were a sharp deviation from MEDTRONIC's reports of repeated, double-digit, growth in the Spinal segment in previous quarters. Moreover, MEDTRONIC disclosed, for the first time, that it "recently received a subpoena from the Department of Justice looking into off-label use of Infuse®."

113.    Thereafter, MEDTRONIC continued to report lower sales of Infuse®, which it admittedly linked to a public health notice from the FDA regarding off-label use of recombinant human bone morphogenetic protein in the cervical spine that was issued in July 2008, a previously disclosed government investigation, negative newspaper stories, and a whistleblower lawsuit filed by two former MEDTRONIC employees against MEDTRONIC and a number of spine surgeons and distributors of the Infuse® bone graft.

114.    The use of Infuse® in off-label procedures was further scrutinized in a study published in the July 1, 2009 issue of JAMA that documented the health risks associated with off-label use of Infuse® and, contrary to previous studies conducted by MEDTRONIC-funded physicians, cast doubt on the cost-effectiveness of the product.[11]

115.    At least 1,200 reports of adverse events involving Infuse® have been made to the FDA from 2002 to 2011.  In 2011, for example, 278 Infuse-related adverse events were reported;

---

[11] Cahill, et al., *Prevalence, Complications, and Hospital Charges Associated with Use of Bone-Morphogenetic Proteins in Spinal Fusion Procedures, JAMA,* 302(1): 58-66, July 2009.

-24-

EXHIBIT 1 PAGE 32

1    in 2010, 362 adverse events were reported; and in 2009, 244 adverse events were reported.  The

2    vast majority of these adverse event reports involve off-label use of Infuse®.

3         116.    In fact, in a 2012 article published in The Spine Journal, FDA researcher Emily

4    Woo, M.P.H. concluded on-label use of Infuse accounts for only a tiny percentage (0.5%) of

5    adverse events.  Off-label use of Infuse accounts for 99.5% of adverse events.[12]

6         117.    The number of Infuse-related adverse events is growing steadily over the years,

7    and the proportion of off-label adverse events grows, as well, as a direct result of the

8    MEDTRONIC Defendants' long-standing campaign of improper off-label promotion of the more

9    dangerous off-label uses of Infuse which were never approved by the FDA.  The extent of these

10   adverse events was, at all relevant times, hidden or downplayed by MEDTRONIC and its paid

11   consultants.

12        d)    **MEDTRONIC's Prior Knowledge and Concealment of the Dangers of Off-
13              Label Infuse® Uses.**

14        118.    Even at the time of FDA approval, MEDTRONIC and its senior management and

15   its paid consultant "opinion leaders," were well aware of the concerns regarding off-label uses of

16   Infuse® and the serious dangers to patients posed by those off-label uses.

17        119.    Notwithstanding the original FDA Panel's well-founded concerns regarding off-

18   label use, as well as the medical literature's corroboration of the same, both of which

19   MEDTRONIC had knowledge, MEDTRONIC intentionally, negligently and recklessly concealed

20   these dangers from the general public, including the Plaintiff and Plaintiffs' physicians.

21        120.    MEDTRONIC had actual knowledge of the Advisory Committee's concerns

22   regarding off-label use of the product and the dangers posed by off-label use. Indeed, Defendants

23   were on actual notice at this time of the Advisory Committee's warnings that MEDTRONIC

24   should guard against off-label uses of this potent genetically-engineered liquid bone protein.

25   Thus, even *prior* to FDA approval, Defendants were on actual notice of the dangers that off-label

26   use of Infuse® posed to patients, such as the Plaintiff.

27

28   _____
     [12] Emily Jane Woo, *Recombinant Human Bone Morphogenetic Protein 2: Adverse Events
     Reported to the Manufacturer and User Facility Device Experience Database, The Spine Journal,*
     12(10): 894-899, October 2012.

121.   Further, as described immediately *infra*, the MEDTRONIC-funded studies on Infuse® from 1999 to until at least 2007 failed to accurately describe the adverse effects that were observed in the earliest trials of Infuse®, such as severe uncontrolled or ectopic bone growth, severe inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation in men, urinary retention, bone resorption, and implant displacement.  These MEDTRONIC-funded articles also omitted any mention of the risks of sterility and cancer associated with rhBMP-2 use, as reported in FDA documents and hearings.  MEDTRONIC discouraged the publication of these results in the medical journal literature, thereby hiding significant side effects from spine surgeons and patients.

122.   Further, Confidential Witness #2 ("CW 2") in a shareholder derivative lawsuit filed against MEDTRONIC, more fully discussed *supra*, stated that MEDTRONIC was aware of adverse events resulting from off-label use of Infuse® in the cervical spine, including swallowing, and breathing problems.

123.   In response to these reports of adverse events, CW 2 stated that MEDTRONIC attempted to disseminate information to the medical community regarding what it considered to be the proper dose of Infuse® for this off-label application. MEDTRONIC also issued a "Safety Alert" letter to surgeons on September 14, 2004, informing them that MEDTRONIC had received reports of complications associated with off-label use of Infuse® in anterior cervical fusion procedures. MEDTRONIC wrote, "*[l]ocalized soft tissue edema has been reported in anterior cervical spine fusion surgery following the use of Infuse® Bone Graft…. Some reports were accompanied by patient complaints of swelling and difficulty in swallowing and breathing, three of which resulted in surgical intervention.*" (Emphasis added.)

124.   These adverse events were not isolated incidents, as described above.  These adverse event reports from off-label uses of Infuse® indicate the very same complications as those noted in the studies discussed above, including, swelling, difficulty swallowing and breathing, excessive bone growth resulting in dangerous and painful spinal nerve compression and corresponding injuries, etc., and often require emergency medical intervention or a second surgery.

125.    For example, a December 12, 2005 report indicates that four or five days after an off-label PLIF procedure using Infuse®, the patient's swelling became so severe that surgical intervention was required. These are only a few examples of the hundreds of similar reports of serious complications related to off-label uses of Infuse® found on the MAUDE Database.

126.    A November 3, 2006 report indicates that a patient reported neck swelling, difficulty swallowing and possible shortness of breath two to three days after a cervical spine fusion using Infuse®. As a result, this patient had to undergo another surgery four days after the initial fusion.

127.    A July 21, 2008 report indicates that a patient developed massive neck swelling, very thick tracheal and bronchial secretions, and required a tracheostomy—a procedure in which an incision is made in the neck and a tube inserted to allow the patient to breathe—following a cervical fusion procedure with Infuse®.

128.    Through MEDTRONIC's monitoring procedures—which include written procedures for complaints, corrective and preventative actions and adverse event reporting—all complaints and adverse events are documented, tracked, and trended (or should be) in a database. MEDTRONIC is required by federal regulation to "establish and maintain" such an adverse event database. *See* 21 C.F.R. § 803.1(a).  In addition, a report from a June 2006 FDA inspection of a MEDTRONIC facility at 1800 Pyramid Place in Memphis, Tennessee, revealed that MEDTRONIC had initiated a Preventative Action, dated April 21, 2006, and was "studding [sic] the reason for an increase in the number of reported fluid collection, hematoma, and seroma complaints since 4/2005." According to the report, the "study indicated that sales for the Infuse® Bone Graph [sic] have increased and more graphs [sic] are being implanted," and that the "study is still open."

129.    According to Confidential Witness #15 ("CW 15") in the *Minneapolis Firefighters* lawsuit filed against MEDTRONIC, more fully discussed *supra*, a Senior Vice President who worked at MEDTRONIC for numerous years until 2006 and a "Quality Group" at MEDTRONIC's Spine division were responsible for addressing adverse events. According to CW 15, former COO Michael DeMane, former President of MEDTRONIC Spinal and Biologics Mr. Wehrly, and former Worldwide Vice President and General Manager, Biologics, Jon

1   Serbousek, were all aware of the adverse events related to Infuse®.  As a part of his employment

2   with Defendants, CW 15 discussed the complaints related to Infuse® at meetings with these

3   individuals and members of the Quality Group to decide whether or not certain adverse events

4   should be reported to the FDA.  Moreover, MEDTRONIC's Spinal division used the very same

5   complaint/adverse event reporting system as MEDTRONIC corporate, which provided

6   MEDTRONIC's executive officers access to a database containing details of every

7   complaint/adverse event MEDTRONIC received relating to Infuse®.

8        130.    MEDTRONIC was further clearly aware of its settlement with the Department of

9   Justice ("DOJ") and entry into a Corporate Integrity Agreement, discussed *supra*, in July of 2006.

10   As a result, MEDTRONIC had actual knowledge of the heightened risks to spine patients

11   associated with MEDTRONIC's illegal, improper, and unethical promotion of off-label use of

12   Infuse® by MEDTRONIC's Spinal or Biologics Divisions.

13   **5)**   **Infuse® is Profitable and thus MEDTRONIC had an Economic Motive to Promote**
14          **Infuse Off-label.**

15        131.    Infuse® has become a best seller for MEDTRONIC.  MEDTRONIC's Infuse®

16   sales have exceeded $3.6 billion since the launch of the Infuse® Bone Graft in July 2002. As a

17   J.P. Morgan research analyst covering MEDTRONIC noted in a report dated November 12, 2008:

18   Infuse® is an $800M product for MEDTRONIC (6% of sales), having enjoyed robust

19   growth since its initial approval in the U.S. in July 2002. In fact, it is the one piece of

20   MEDTRONIC's Spine business that continues to post strong double-digit growth without

21   any issues (LTM: +16.9%). That is, until now.

22        132.    MEDTRONIC has depended heavily on Infuse® sales because so many of its other

23   products, such as cardiac defibrillators, have slowed as the result of recalls of those defective

24   defibrillators in the past several years.

25        133.    Revenue generated by sales of Infuse® was approximately $800 million for the

26   2011 fiscal year, and the vast majority of these sales were attributable to off-label use of the

27   product.  Off-label uses of Infuse® account for 85% to 90% of all spine surgeries involving

28   Infuse®.

-28-

134.    Plaintiff is informed and believes and based thereon alleges that, as a result of MEDTRONIC's illegal and improper off-label promotion, sales of Infuse® have soared and have totaled more than 4 billion of dollars from 2002 to 2011.

135.    MEDTRONIC has consistently sought to expand the use of Infuse® by, among other things, illegally and improperly promoting dangerous and/or insufficiently studied off-label uses for Infuse® in various parts of the spine for various types of spine surgeries, as discussed throughout this Complaint.

**6)    MEDTRONIC Improperly Promoted Off-Label Uses of Infuse.**

**a)    Generally**

136.    In spite of the very specific and limited FDA approval of Infuse (for ALIF procedures only), the overwhelming majority of MEDTRONIC's Infuse® sales have been driven by non-FDA approved, or "off-label," uses, such as that used on the Plaintiff in this civil action. Until recently, MEDTRONIC was very successful (and profitable) in driving off-label sales of Infuse® through undisclosed "consulting" and royalty agreements with physicians who, in exchange for handsome sums of money from MEDTRONIC or lavish trips paid for by MEDTRONIC, would push off-label usage in a number of ways, including by authoring scientific and medical literature promoting such uses, and by direct advocacy to other spine surgeons.

137.    MEDTRONIC also directed its own sales representatives to promote off-label uses of the product, many of whom went so far as to recommend dosages of this potent molecule in risky off-label procedures, and guide surgeons through off-label uses of the product during surgery. Indeed, MEDTRONIC's unlawful off-label promotion campaign was so extensive that it caught the attention of, among others, the FDA (on numerous occasions), the United States DOJ, Congress, the United States Army, several major universities, multiple medical journals, numerous major newspapers, independent physicians, and investors.

138.    Moreover, MEDTRONIC's unlawful off-label campaign has resulted in, among other actions, two whistleblower lawsuits (resulting in a multi-million dollar settlement with the DOJ, which included a Corporate Integrity Agreement), a shareholder derivative lawsuit that was recently settled for $85 million, several adverse regulatory actions by the FDA, and a congressional investigation (led by the United States Senate Committee on Finance).

139.    Indeed, even following MEDTRONIC's settlement with the DOJ in 2006 for unlawful kickbacks to physicians to use and promote its products, and corresponding entry into a Corporate Integrity Agreement ("CIA"), discussed *supra*, MEDTRONIC failed to disclose its continued reliance on kick-backs, royalties, and other undisclosed payments to physicians to drive Infuse® sales, primarily for off-label use.

140.    Off-label use of Infuse® was and remains particularly concerning due to the known adverse (and in at least one case deadly) side effects known to MEDTRONIC at the time of the product's original FDA approval in 2002.   Nonetheless, off-label use of Infuse® increased year-after-year from the time of its original limited use approval by the FDA in 2002, to the point where off-label use of Infuse® Bone Graft accounted for an astounding 85% to 90% of all Infuse sales.

141.    Although undisclosed by MEDTRONIC, the first-hand accounts of its former employees demonstrate that this extraordinarily high off-label use was driven by MEDTRONIC's sales force. Specifically, MEDTRONIC's marketing and sales employees directed spine surgeons to MEDTRONIC-compensated consultants or "Opinion Leaders" or "Thought Leaders" – other spine surgeons paid by enormous sums of money by MEDTRONIC – the sole purpose of which was to promote off-label uses of Infuse®.   Through these and other illegal and improper practices, MEDTRONIC was able to increase Infuse® sales year after year while continuing to hide and downplay the product's dangerous side effects when used off-label in the spine.

142.    MEDTRONIC actively promoted off-label use of Infuse® through its sales representatives and massive payments to its "Opinion Leader" spine surgeon consultants, which included sponsoring presentations at continuing medical education courses, and appearances at consulting engagements promoting off-label applications of Infuse®.   In turn, MEDTRONIC's sales force directed other physicians to these consultants and "Opinion Leaders" or to their written work (paid for by MEDTRONIC) to further drive off-label sales of Infuse®.   Indeed, MEDTRONIC engaged in such conduct even after its settlement of the whistleblower action with the DOJ in which it agreed to employ stricter compliance controls regarding the sale and marketing of its spine products.

-30-

143.    The MEDTRONIC Defendants, while providing spine surgeons with MEDTRONIC-funded studies and published articles purporting to support the efficacy and safety of the off-label uses, simultaneously and systematically concealed or downplayed other non-MEDTRONIC-funded studies and articles demonstrating serious and frequent adverse events caused by the same off-label uses.

144.    Several spine surgeons have already testified under oath at depositions that MEDTRONIC sales personnel overtly and directly promoted to them the off-label uses of Infuse in the spine, and Plaintiffs are thus informed and believe that MEDTRONIC engaged in a scheme at all relevant times to expand its market share of this product by improperly encouraging such off-label uses.

145.    In this particular case, MEDTRONIC actively promoted the off-label procedures to Plaintiffs' spine surgeon, and Plaintiffs' spine surgeon would not have performed the off-label Infuse procedure in the absence of such promotion.  MEDTRONIC's off-label promotion of Infuse to Plaintiffs' surgeon was false and misleading, in that it overemphasized the purported benefits of the off-label use, and hid, minimized, or downplayed the true risks and dangers of the off-label use, all of which were known to MEDTRONIC at all relevant times.

**b)**    **Off-label Promotion of Infuse® Violates the Food, Drug, and Cosmetic Act.**

146.    The FDCA specifically provides that the FDA has no authority to "limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed [medical] device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship," and physicians are free to prescribe or use medical devices in any manner they deem medically appropriate. 21 U.S.C. § 396.

147.    Importantly, however, medical device manufacturers such as MEDTRONIC cannot actively promote products for uses not approved by the FDA. Indeed, federal law provides for significant penalties for manufacturers that promote their products in ways inconsistent with a product's labeling. Severe penalties for off-label promotion, such as fines of up to twice the amount of the gross pecuniary gain from the offense, were designed to ensure that the FDA's careful, deliberate consideration of a product's suitability for public consumption is not undermined by manufacturers seeking to circumvent that process. The MEDTRONIC Defendants

1    are medical device companies, not physicians, and they are prohibited by federal law including

2    the relevant FDA regulations, at all relevant times, from promoting to physicians or patients any

3    off-label use of Infuse®.

4        148.    Under the FDCA and its accompanying regulations, a device manufacturer must

5    include all intended uses in the label, otherwise the device is misbranded. 21 C.F.R. §801.4.

6    Under the FDCA, device manufacturers can be held liable for off-label promotion when their

7    products are deemed "misbranded" under the statute. 21 U.S.C. § 331(b).

8        149.    A product is "misbranded" when the directions and indications for the unapproved

9    uses that the manufacturer "intends" the product to be used for have not been included on the

10   label. *See* 21 C.F.R. §801.4. Further, a device's intended uses are evidenced by the

11   manufacturers' conduct, not by reference to what the FDA has approved. *Id.* A product's intended

12   uses can be derived from oral statements by persons speaking on behalf of a company about its

13   product. In other words, a manufacturer can be liable under the FDCA if its conduct demonstrates

14   intent to encourage product use inconsistent with or outside the scope of the product's approved

15   label. *Id.*

16       150.    The FDCA's accompanying regulations require that medical devices sold by

17   manufacturers have adequate directions for use, 21 C.F.R. §801.5, and failure to have adequate

18   instructions for use is considered "misbranding," 21 U.S.C. § 352(f), which is prohibited. 21

19   U.S.C. § 331(b).

20       151.    The FDCA requires medical device manufacturers to disclose all material facts in

21   advertising and labeling,[13] 21 U.S.C. §321(n), and false or misleading labeling is considered

22   "misbranding," 21 U.S.C. § 352(a), (q)(1), which is prohibited. 21 U.S.C. § 331(b).

23       152.    Further, the FDCA requires medical device manufacturers to maintain and submit

24   information as required by regulation, 21 U.S.C. § 360i, including submitting adverse event

25   reports, 21 C.F.R. § 803.50, and establishing internal procedures for reviewing complaints and

26   event reports. 21 C.F.R. § 820.198(a).

27

28

---

[13] 21 U.S.C. §321(m) defines the scope of medical device labeling.

-32-

153.    MEDTRONIC violated the FDCA statutes and accompany regulations by promoting Infuse® for off-label uses, and by failing to account for adverse events and update its labeling, directions for use, and advertising to account for the adverse events resulting from these off-label uses.

154.    MEDTRONIC's violation of these FDCA statutes and accompany regulations, as discussed above, constitutes violation of the state law tort causes of action alleged in this Complaint, as set forth below.

155.    MEDTRONIC's violation of the FDCA statutes and accompany regulations, as discussed above, directly caused or significantly contributed to the off-label use of Infuse® generally, and directly caused or significantly contributed to the off-label use of Infuse® in this particular Plaintiff, and MEDTRONIC's misconduct in this regard thus caused or contributed to Plaintiffs' injuries and damages.

c)    **MEDTRONIC Settles Whistleblower Litigation with the DOJ and Agrees to Enter into a Corporate Integrity Agreement**

156.    The MEDTRONIC Defendants were named as defendants in two *qui tam* actions, *United States ex rel. (UNDER SEAL) v. MEDTRONIC. Inc., et al.*, Civil Action No. 02-2709 (W. D. Tenn. 2002) (hereinafter "*[Under Seal]*"), and *United States ex rel. Poteet v. MEDTRONIC, Inc., et al.*, Civil Action No. 03-2979 (W. D. Tenn. 2003) (hereinafter "*Poteet I*"), (collectively the "qui tam lawsuits"), both of which alleged that MEDTRONIC violated the False Claims Act, 31 U.S.C. § 3729, *et seq.*, by paying illegal kickbacks to physicians in connection with promoting the off-label use of Infuse® in the spine, which resulted in the submission of false or fraudulent claims to federal health care programs.

157.    Based on its investigation, the DOJ contended that certain of the payments, services, and remuneration mentioned above were improper and resulted in the submission of false or fraudulent claims in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), *et seq.*, which prohibits individuals from offering, soliciting or making any payment or remuneration to induce business reimbursed under a federal or state health care program, and the False Claims Act, 31 U.S.C. § 3729, *et seq.*, which provides penalties for the submission of false

1  claims to the federal government. Both *[Under Seal]* and *Poteet I* were brought by

2  MEDTRONIC's former employees who made these allegations.

3      158.   In these lawsuits, the DOJ contended that between January 1, 1998 and April 30,

4  2003, MEDTRONIC made payments and provided other remuneration to a number of physicians

5  and entities in connection with its spinal products in the form of (1) payments and other

6  remuneration for physicians' attendance and expenses at medical education events, "think tanks,"

7  VIP/opinion leader events, and meetings at resort locations; (2) services and payments for

8  services to physicians through MEDTRONIC's Healthcare Economic Services and eBusiness

9  Departments; and (3) payments made pursuant to consulting, royalty, fellowship and research

10  agreements with various physicians and entities

11      159.   Specifically, *[Under Seal]* was brought by a former MEDTRONIC in-house

12  counsel, who alleged that MEDTRONIC's "aggressive and illegal" sales and marketing efforts

13  were intended by MEDTRONIC to improperly induce physicians to use MEDTRONIC's Spinal

14  products, including Infuse®. The conduct alleged included, *inter alia*: (1) lucrative consulting and

15  royalty agreements with physicians that used MEDTRONIC Spinal products, "the true purpose

16  [of which were] to funnel money to the physicians so that they will be induced to use

17  [MEDTRONIC Spinal] products;" and (2) "[l]avish all-expense paid trips to fine resorts . . .

18  disguised as Medical Education seminars, think tanks, or discussion groups . . . held in places

19  such as Hawaii, Cancun, Alaska, Beaver Creek, Whistler, Malaysia, Amelia Island, Teton Valley,

20  and New Orleans at Mardi Gras . . . [t]he purpose of these lavish trips was to induce the

21  physicians to use [MEDTRONIC Spinal] products."

22      160.   The complaint further alleged that: "Most of the illegal kickback practices

23  described herein were begun by Sofamor Danek and continued by [MEDTRONIC] after the

24  acquisition. Kickbacks were the culture and way of doing business at Sofamor Danek and the

25  company was determined to continue that culture, and did continue that culture, when Sofamor

26  Danek became part of the MEDTRONIC empire."

27      161.   *Poteet I* brought by a former MEDTRONIC employee who was tasked by

28  MEDTRONIC to arrange travel (including expense reimbursement) for numerous spinal surgeons

to attend MEDTRONIC-sponsored events and other professional meetings.  This former

-34-

employee also alleged that MEDTRONIC paid surgeons substantial fees—sometimes up to hundreds of thousands of dollars per year—for consulting services that were grossly in excess of their fair market value, entered into royalty agreements that were designed to disguise illegal remuneration, and provided physicians opportunities for lavish travel and recreational activities, including "upgraded lodging for physicians, dinners, entertainment and activities such as golf, snorkeling, sailing, fishing, shopping trips, [and] horse-back riding" for using MEDTRONIC products. These consulting agreements and other payments were illegitimate means of inducing physicians to use MEDTRONIC products and to recommend to other physicians that they do the same.

162.    On July 18, 2006, MEDTRONIC agreed to pay $40 million to the United States of America to settle these lawsuits under the False Claims Act, 31 U.S.C. §§ 3729-3733, the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, and the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12.

163.    As part of the DOJ settlement, MEDTRONIC agreed to enter into a five-year Corporate Integrity Agreement ("CIA") with the Office of the Inspector General/Health and Human Services that, as MEDTRONIC described in its July 18, 2006 press release, implemented substantial oversight structures and procedures meant to ensure "top-level attention to corporate compliance measures." Among other things, the CIA required MEDTRONIC to establish an electronic database to capture and manage all non-sales related transactions between MEDTRONIC's Spinal segment and its physicians or customers, with all such transactions subject to an established set of internal controls and review processes, including monitoring by MEDTRONIC senior management and MEDTRONIC's Chief Compliance Officer.

164.    Moreover, the CIA required MEDTRONIC to implement internal policies and procedures to ensure stricter regulatory compliance, which obligated MEDTRONIC to institute a number of changes to improve oversight of its Spinal division.

165.    Significantly, the CIA required MEDTRONIC to adopt procedures to ensure that any "arrangements"—a term intended to cover physician consulting agreements and broadly defined as engagements involving "directly or indirectly, the offer, payment, solicitation, or receipt of anything of value; [] between [MEDTRONIC] and any actual or potential source of

health care business [e.g., physicians]"—would not violate federal law. Such procedures were to include, among other things: (1) creating a database of all existing and new or renewed arrangements; (2) tracking remuneration from MEDTRONIC to all other parties to such arrangements; (3) tracking service and activity logs to ensure that parties to an arrangement are performing their duties under the applicable arrangement; (4) implementing procedures that ensure all arrangements are reviewed for adherence to the Anti-Kickback Statute; and (5) regular (at least quarterly) review by the MEDTRONIC Compliance Officer of the arrangements database along with reporting (at least quarterly) to the MEDTRONIC Compliance Committee.

166.    The CIA and the previous whistleblower and wrongful termination litigation placed MEDTRONIC and its agents on actual notice that its practice of marketing, and promoting Infuse® for off-label uses was improper and required wholesale change to avoid further adverse regulatory action or other liability.

167.    As a result of this settlement, MEDTRONIC agreed to negotiate with representatives of the National Association of Medicaid Fraud Control Units to reach an agreement that provides for distribution of certain sums to the several states with which MEDTRONIC agreed to a settlement concerning the conduct at issue in the False Claims lawsuits.

168.    Nonetheless, MEDTRONIC's unlawful practices continued, as did MEDTRONIC's aggressive efforts to drive Infuse® sales by promoting off-label applications, such as precisely those used on the Plaintiff.  MEDTRONIC has continued to improperly and illegally promote the off-label use of Infuse® for non-FDA-approved uses of the product.  Indeed, it was motivated to do so knowing that, absent off-label use, sales of Infuse® would dramatically decline.  In order to prevent a decline in sales revenue, MEDTRONIC continued to covertly employ the same lucrative "consulting" arrangements and other unlawful conduct to promote off-label uses of Infuse®.

169.    As a result of MEDTRONIC's undisclosed misconduct, the percentage of off-label Infuse® usage increased over time, including after the DOJ settlement on July 14, 2006.  By 2011, off-label use of Infuse constituted more than 90% of the total use of Infuse® in spinal fusion procedures.

-36-

1    170.    Indeed, MEDTRONIC's unlawful marketing and promotion was so effective that a
2    MEDTRONIC analyst from Bernstein Research noted in a November 21, 2006 report that
3    analysts were "expecting *continued indication expansion (e.g., recent dental approval and likely*
4    *approval for posterior lateral fusion) for Infuse®* to be the main driver for the spinal business* in
5    the mid-term." (Emphasis added.) What this analyst and the public at large did not know was that,
6    despite the limited FDA-approved applications of Infuse®, MEDTRONIC continued to drive sales
7    solely through off-label indications; and was doing so in spite of the CIA, the material risk of
8    further regulatory action or other liability, and in conscious disregard for the health and welfare of
9    spine patients such as the Plaintiff.

10    d)    **Testimony of Former Medtronic Employees Regarding Off-label Promotion**
11    **of Infuse® in a Shareholder Derivative Action Against Medtronic.**

12    171.    A federal securities lawsuit filed on behalf of the Minneapolis Firefighters' Relief
13    Association against MEDTRONIC, *Minneapolis Firefighters' Relief Assoc. vs. MEDTRONIC,*
14    *Inc.*, Civil No. 08-6324 (PAM/AJB) (D.Minn., 2009), also alleged evidence of MEDTRONIC's
15    egregious campaign of off-label promotion of Infuse®, even after the CIA.  MEDTRONIC's
16    actions, described by the "Confidential Witnesses" ("CW"), included:

17    a.    MEDTRONIC-sponsored physician meetings, during which MEDTRONIC
18    would employ paid consultants – typically surgeons hand selected by MEDTRONIC – to present
19    off-label presentations to local physicians. CW1, Consolidated Class Action Complaint dated
20    August 21, 2009, at ¶ 93.

21    b.    MEDTRONIC's instructions to its sales representatives regarding various
22    off-label uses of Infuse®, including how much of the biologic to use with off-label cervical
23    fusions, the purpose of which was to instruct physicians regarding off- label uses. CW1, *Id.* at ¶
24    94.

25    c.    MEDTRONIC's directions to its sales representatives that they be present
26    during off-label Infuse® surgeries "to assist and direct and give advice when asked." CW1, *Id.* at
27    ¶ 95; CW2, *Id.* at ¶ 97; CW5, *Id.* at ¶ 101; CW6, *Id.* at ¶ 102.

28

d.    MEDTRONIC's creation of sales quotas that were described by the CWs
as impossible to reach without pushing off-label use. CW1, *Id.* at ¶ 95; CW9, *Id.* at ¶ 105; CW11,
*Id.* at ¶ 107; CW12, *Id.* at ¶ 108.

e.    MEDTRONIC sales representatives' references to data from published
literature (presumably funded by MEDTRONIC) when questioned by surgeons, the purpose of
which was to provide surgeons with information regarding proffered techniques for off-label
procedures and to educate them regarding off-label uses. CW2, *Id.* at ¶ 96.

f.    MEDTRONIC's development of smaller-sized Bone Graft kits under the
guise of selling them for FDA-approved uses, when, in actuality, MEDTRONIC had designed
them to be used in off-label cervical fusion surgeries. CW2, *Id.* at ¶ 97; CW7, *Id.* at ¶ 103.

g.    Moreover, by comparing the number of units of rhBMP-2 with the sales of
the LT-Cage™ component – which were packaged and sold separately – CW2, 11, and 12
determined that the driving force behind MEDTRONICs $750 million in sales of Infuse® was
solely attributable to off-label uses. Although the FDA required the rhBMP-2 and LT-Cage™ to
be used together, sales of the rhBMP-2 component greatly outpaced those of the LT-Cage™.
component. CW2, *Id.* at ¶ 98; CW11, *Id.* at ¶ 107; CW12, *Id.* at ¶ 108.

h.    When questioned by a physician about how to use Infuse® off-label,
MEDTRONIC sales representatives directed physicians to other surgeons who used the product
off-label and also would demonstrate or explain how to do so. CW3, *Id.* at ¶ 99; CW5, *Id.* at ¶
101; CW6, *Id.* at ¶ 102; CW10, *Id.* at ¶ 106; CW11, *Id.* at ¶ 107.

i.    MEDTRONIC held quarterly meetings in at least one sales region, during
which a national biologics specialist would attend to explain how to conduct off-label
applications of Infuse®. CW3, *Id.* at ¶ 99.

j.    MEDTRONIC directed its sales representatives to instruct physicians to
use half the dose of rhBMP-2 during cervical fusion, and MEDTRONIC, aware of adverse events,
instructed the representatives to tell physicians to use steroids to combat potential inflammation.
CW4, *Id.* at ¶ 100; CW5, *Id.* at ¶ 101.

1    k.  MEDTRONIC directed physicians using the product in cervical spine

2 fusion to throw away a large portion, sometimes up to half, of the rhBMP-2 dosage. CW6, *Id.* at ¶

3 102.

4    l.  MEDTRONIC gave to physicians a small book containing no reference to

5 MEDTRONIC, which contained information regarding the volume or dosage of rhBMP-2 that

6 should be used for off-label applications of Infuse®. CW7, *Id.* at ¶ 103; CW8, *Id.* at ¶ 104; CW9,

7 *Id.* at ¶ 105.

8    m.  MEDTRONIC instructed CW8 and others during sales presentations

9 regarding how to "get around" restrictions on off-label promotion. CW8, *Id.* at ¶ 104.

10    n.  CW13 was brought into MEDTRONIC to develop a marketing plan; which

11 included: a) Development of a "referral marketing" campaign designed to promote the product for

12 off-label uses via a physician referral network; b) identifying which surgeons would be targeted

13 as part of MEDTRONIC's off-label campaign and what claims MEDTRONIC would make about

14 the product; c) development of a "cookie- cutter" CD series that outlined MEDTRONIC's off-

15 label campaign and included information on off-label procedures that was distributed to

16 MEDTRONIC sales representatives. According to CW13, the referral marketing program

17 involved having surgeons meet with other surgeons as a means of prompting discussion of off-

18 label uses of Infuse® Bone Graft among practitioners.  CW13 also stated that MEDTRONIC used

19 a physician training program involving cadaver labs as a means to instruct surgeons regarding

20 off-label applications. CW13, *Id.* at ¶ 109.

21    o.  CW13 was rebuffed for raising concerns about off-label promotion, and

22 was told "we're paying you a lot of money to launch this. Shut your mouth and take the money.

23 Let us worry about what is off-label or isn't." CW13, *Id.* at ¶ 110.

24    p.  A sales representative was present in the operating room during an off-

25 label cervical procedure which led to the patient's death. The patient's family subsequently

26 initiated civil litigation against MEDTRONIC and the sales representative who was allegedly

27 encouraging the off-label procedure at MEDTRONIC's behest. *Id.* at ¶ 111.

28    q.  Although MEDTRONIC is under an obligation to report all serious adverse

events associated with Infuse®, MEDTRONIC failed to report the death of this patient until three

months after it occurred. FDA guidelines recommend that a manufacturer make a minimum of three attempts to retrieve additional information regarding any adverse event. While the company filed an adverse event report with the FDA in which it noted the complications immediately following the procedure, MEDTRONIC did not inform the agency of her death until after a lawsuit was filed by the patient's family and reported in *The Wall Street Journal. Id.* at ¶ 112.

r.    In a separate civil suit against MEDTRONIC, a physician admitted to attending numerous national spine meetings during which off-label uses of rhBMP-2 in the cervical spine were promoted. A MEDTRONIC sales representative was in the operating room a lot when he was performing off-label uses. He admitted to doing over 100 cervical procedures, insinuating that the MEDTRONIC sales representative was in the room for a fair number of these procedures. *Id.* at ¶ 113.

172.    The plaintiffs in the *Minneapolis Firefighters* lawsuit also discovered the growing percentage of off-label Infuse® usage from 2003-2007 by analyzing surgical procedural codes used by hospitals.[14] The results of this analysis demonstrate that off-label usage of Infuse® was high, even from the inception of FDA approval, and increased by an astonishing 10% over the next 4 years, to wit:

| Year | Estimated On-Label Procedur | Estimated Off-Label Procedur |
|------|------|------|
| 2003 | 25.7% | 74.3% |
| 2004 | 20.6% | 79.4% |
| 2005 | 15.8% | 84.2% |
| 2006 | 15.3% | 84.7% |
| 2007 | 14.8% | 85.2% |

173.    Moreover, the data further demonstrate that off-label use of Infuse® in the cervical spine grew to as much as 18% of overall Infuse® use as of 2007, despite the known increased medical risks associated with that application.

174.    Indeed, to set sales projections for Infuse®, CW 2 stated that MEDTRONIC's marketing department accounted for the scope and number of procedures performed, including

---

[14] The methodology employed was consistent with a July 1, 2009 report in the JAMA that conducted a retrospective cohort study of 328,468 patients undergoing spinal fusion procedures from 2002-2006, using the same codes from the NIS database.

the numbers of off-label procedures, such as PLIFs and TLIFs, to predict sales projections. This analysis was based, in part, on data purchased from market research companies demonstrating the number of procedures involving different areas of the spine, e.g., certain lumbar (on- or off-label) versus cervical (off-label). Once MEDTRONIC determined its sales projections, these figures were incorporated into a budget presented to MEDTRONIC's senior management. Importantly, the final sales quotas for Infuse® were dictated by MEDTRONIC senior management, and were far in excess of what MEDTRONIC's Spinal Division had projected, or could be achievable absent promotion of the product for off-label uses. According to CW 2, "when the numbers came back down, they never reflected the projections. They were much larger."

175.   Numerous confidential witnesses, including CWs 1, 9, 12 and CW 14 (a senior manager for MEDTRONIC's Spinal and Biologics division from 2005 to 2008), confirm the intense pressure MEDTRONIC's management placed on its sales representatives to meet the sales quotas the company set. Like CW 2, CW 14 explained that sales goals were set by a handful of MEDTRONIC executives, and that they were "very, very, very aggressive." Likewise, CW 12 stated that there was a lot of pressure on MEDTRONIC's Spinal and Biologics division to reach unreasonable sales targets.

176.   As demonstrated, by years 2006-07, off-label uses accounted for an astounding 85% of Infuse® sales; a fact known or recklessly disregarded by all employees, who reviewed marketing data and analyses to set sales quotas for Infuse®. Indeed, sales quotas for Infuse® required sales to grow 20% year-over-year, and MEDTRONIC knew that such increases could not be achieved without substantial off-label sales, and thus that such aggressive targets would encourage off-label promotion by its employees and representatives.

e)   **MEDTRONIC's Payments to Opinion Leaders.**

i)   **Generally.**

177.   In addition to encouraging its sales representatives to promote off-label use of Infuse®, MEDTRONIC also promoted the off-label use of the product through its outside physician "Opinion Leaders" to whom MEDTRONIC paid undisclosed sums in return for publishing medical journal articles and delivering presentations explaining, endorsing, and promoting off-label applications of the product. Indeed, even after settlement with the DOJ and

entry into the CIA as a result of this very activity, MEDTRONIC continued its practice of providing lucrative consulting fees (amounting to millions of dollars per year) to surgeons who actively promoted off-label use of Infuse®, often with direct involvement by MEDTRONIC's senior management.

178.    MEDTRONIC has sought to expand the off-label uses (and has succeeded in doing so) by paying large amounts of money to key "Opinion Leader" spine surgeons around the country, many of whom then published studies and articles advocating the off-label use of Infuse® and minimizing the risks or dangers to patients from these uses.

179.    Medical device companies look for surgeons who are known as "Opinion Leaders" and who will not only use a high volume of their products, but who can and will persuade other surgeons to use a particular device.  Opinion leaders are physicians whose opinions on medical procedures and medical devices are held in high regard by other surgeons.  If these influential physicians are willing to promote the use of a certain device, then other surgeons are likely to follow suit and use that device, sometimes including off-label uses which are illegal for the company itself to promote.

180.    Many medical device companies, including MEDTRONIC, cultivate relationships with these "Opinion Leaders," paying them handsome (and in the case of Infuse®, sometimes seven-figure) consulting fees, travel expenses for seminars, sham or exaggerated royalty payments, and numerous other perks, to encourage these physicians to promote the use of a particular medical device.

181.    Prior to the date of Plaintiffs' spine surgery which involved off-label Infuse®, MEDTRONIC provided millions of dollars in undisclosed payments to certain spine surgeon "Opinion Leaders" who published articles in medical journals, delivered presentations at continuing medical education courses, and appeared at consulting engagements to promote off-label applications of Infuse® in the spine.  In turn, MEDTRONIC's sales force would direct other physicians to these "Opinion Leaders" or to their written work to further drive off-label sales of the Infuse®.  In this way, MEDTRONIC consciously and deliberately orchestrated a campaign to end-run the FDA's 2002 approval of and labeling for the Infuse® device.

-42-

182.    MEDTRONIC, for example, paid more than $45 million to the 12 spine surgeons who authored the first 13 studies sponsored by MEDTRONIC on Infuse®.  Additionally, "Medtronic paid a total of approximately $210 million to physician authors of Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty, and other miscellaneous arrangements." *Staff Report on Medtronic's Influence on Infuse Clinical Studies*, U.S. Senate Committee on Finance, October 25, 2012.

ii)    <u>Walter Reed "Opinion Leaders:" Timothy Kuklo, M.D., Rick Sasso, M.D., and David Polly, M.D.</u>

183.    Just one of MEDTRONIC's highly compensated "consultants"—Dr. Timothy Kuklo, a former Army physician who retired from the military as chief of orthopaedic surgery at Walter Reed Army Medical Center ("Walter Reed"), the nation's premier military research hospital in December 2006—received hundreds of thousands of dollars per year in fees in the years following the DOJ settlement. Specifically, *The Wall Street Journal* and *New York Times* reported in 2009 that Dr. Kuklo received $356,242 in 2007, $249,772 in 2008 and $132,453 in the first few months of 2009 from MEDTRONIC for consulting, speaking, travel, and training services.  MEDTRONIC paid Dr. Kuklo $42,627 in 2006 while he was still on active duty at Walter Reed, as well as amounts totaling $42,295 from 2001 through 2005, primarily for travel to medical conferences and speeches at MEDTRONIC events, including direct payments to hotels and airlines. MEDTRONIC confirmed that Dr. Kuklo was a paid consultant for MEDTRONIC and that the company has paid him more than $800,000 over an eight year period.

184.    While it is not inherently illegal or unethical for physicians to perform paid consulting work for medical device companies, the history of the growing Infuse® scandal demonstrates an egregious pattern of both MEDTRONIC and its "Opinion Leaders" overstepping ethical lines while recklessly promoting dangerous off-label uses of this product.  Dr. Kuklo, for example, worked closely with MEDTRONIC as an active promoter of off-label uses of Infuse®; that is, until a U.S. Army investigation into a falsified study touting the benefits of Infuse® uncovered shocking misconduct by this former Army surgeon. For example, Dr. Kuklo appeared as a "distinguished guest surgeon" at a MEDTRONIC Spine Division Business Overview Conference Call on September 28, 2006, alongside another MEDTRONIC consultant, Dr. Rick

Sasso—who received $150,000 in consulting fees in 2006—as well as Ellis and Peter Wehrly ("Wehrly"), MEDTRONIC Spinal Division Senior Vice President . During the call, a Merrill Lynch analyst asked about "issues that have come up in the past in terms of potential side effects with using Infuse® in the cervical region," and whether such off-label use was a concern for surgeons. Dr. Sasso responded by referring to a "Level 1, controlled randomized study which was published in 2002" which, according to Dr. Sasso, demonstrated that "when you used the appropriate dosage of Infuse®, you did not get problems with esophageal obstruction and problems swallowing." For his part, Dr. Kuklo responded that the question "was well answered as far as appropriate dosage. I think it's really the bottom line."

185.    Although Dr. Kuklo's and Dr. Sasso's rendition of the medical literature may not have been entirely accurate—in fact they baldly misrepresented the seriousness of the adverse events that MEDTRONIC knew were occurring in the cervical spine—their misrepresentations only hinted at the influence of MEDTRONIC's payments on its consultants' medical judgment. Indeed, an Army investigation later revealed that Dr. Kuklo deliberately falsified data by exaggerating the benefits of off-label use of Infuse® in a study published in the August 2008 issue of *The Journal of Bone and Joint Surgery*.

186.    Dr. Kuklo's "study," which purported to compare fusion results of sixty-seven (67) patients who received an autogenous bone graft versus sixty-two (62) that were treated with Infuse® to treat certain tibial (shin bone) fractures in injured soldiers (including certain off-label uses), reported that employing Infuse® resulted in "strikingly" better outcomes than a traditional (autogenous) bone graft. Specifically, Dr. Kuklo reported that those receiving autogenous bone grafts had successful fusions in 76% of procedures, while the union rate for the Infuse® group was significantly better at 92%; a claimed "striking finding."

187.    According to Dr. Kuklo, not only were the reported union rates claimed better with Infuse® than with an autograft, but, according to this (falsified) study, patients who received Infuse® also reportedly experienced favorable outcomes in other clinical measures. Specifically, the study concluded that "the primary outcome measures of union, rate of infection, and reoperation were all improved with rhBMP-2," and that those treated with Infuse® had a "strikingly lower infection rate (3.2%), which we believe is directly attributable to rhBMP-2."

1     188.    MEDTRONIC continued paying Dr. Kuklo as a consultant even after his article

2    was discovered to be largely fabricated and thus retracted by *The Journal of Bone and Joint*

3    *Surgery*. Indeed, MEDTRONIC only placed Dr. Kuklo on "inactive status" after reports that he

4    had falsified the study's data were published in *The New York Times*.

5     189.    On May 13, 2009, *The New York Times* reported that the U.S. Army's

6    investigation into a study authored by Dr. Kuklo concluded that he falsified an entire study

7    touting the benefits of Infuse® to treat wounded soldiers injured in Iraq – conduct that Col. J.

8    Edwin Atwood, an Army physician who led the Army's inquiry, described as "the ultimate

9    tragedy and catastrophe in academic medicine."

10     190.    Per *The New York Times* and *The Wall Street Journal*, the true facts regarding

11    Dr. Kuklo's study were only uncovered when one of the study's supposed "co-authors," Lt. Col.

12    Romney C. Andersen, was congratulated on its publication by a colleague. After this discovery,

13    Lt. Col. Andersen alerted Army investigators who found that:

14         a.    Dr. Kuklo listed four other Army surgeons as "co-authors" without their

15    knowledge, and these four physicians did not participate in or review the article's preparation or

16    submission for publication;

17         b.    The signatures of the four physicians listed as co-authors on the copyright

18    release forms submitted to *The Journal of Bone and Joint Surgery* were forged by Dr. Kuklo;

19         c.    The number of cases cited by Dr. Kuklo in the article differed from the

20    number of cases contained in the U.S. Army's wartime casualty database, with no explanation for

21    the discrepancies in the article;

22         d.    Contrary to Army policy, Dr. Kuklo did not obtain publication review or

23    clearance from Walter Reed prior to submitting the article for publication; and

24         e.    The published results of the article suggested a much higher efficacy rate

25    for Infuse® than is supported by the experience of the purported co- authors.

26     191.    According to one of the Army's investigators, Col. Norvell V. Coots, the study

27    cited higher numbers of patients and injuries than the hospital could account for having as

28    patients. According to Col. Coots, "It's like a ghost population that were reported in the article as

-45-

having been treated that we have no record of ever having existed ... this really was all falsified information."

192.    After receiving correspondence from Walter Reed dated November 6, 2008 stating that Dr. Kuklo did not follow Army regulations in submitting the article, that the signatures of the purported co-authors had been forged, and that the article's purported co-authors had questioned the study's findings, *The Journal of Bone and Joint Surgery* formally retracted the article and banned Dr. Kuklo from submitting further papers to *The Journal of Bone and Joint Surgery*. As noted in a May 19, 2009 follow-up article in *The New York Times*, when questioned about its ties to Dr. Kuklo, MEDTRONIC repeatedly declined to disclose when it began its financial relationship with him or the extent of funding it provided.

193.    As discussed in more detail *supra*, U.S. Senator Charles Grassley discovered that Dr. Kuklo's name did not appear on a list of paid consultants for Infuse® provided by MEDTRONIC that the Senator had requested in a September 30, 2008 letter to MEDTRONIC. Senator Grassley disclosed the list MEDTRONIC provided—which included twenty-two (22) physicians who were paid a total of $943,000 from 2005 to 2008—in a May 18, 2009 letter to MEDTRONIC that was published in the Congressional Record the following day.  According to the May 18, 2009 letter, Senator Grassley was "concerned" that MEDTRONIC did not provide Dr. Kuklo's name in response to his inquiry that specifically requested information regarding consultants who work on Infuse®, as it was "clear that Dr. Kuklo had some sort of consulting agreement" and was named in *The New York Times* as a consultant on Infuse®. Indeed, by this time, Dr. Kuklo had given countless presentations on behalf of MEDTRONIC about off-label use of the product.

194.    The list provided to Senator Grassley also omitted names of other MEDTRONIC consultants who had promoted off-label uses of Infuse®, such as David Polly, M.D., another former Walter Reed surgeon.  Frustrated with MEDTRONIC's omissions, Senator Grassley stated that "[i]n the future, I hope that instead of not providing me with the name of the physician involved in Infuse®, or any other matter that I am looking into, that MEDTRONIC contact me to avoid the situation in which we find ourselves." A May 19, 2009 *New York Times* article reported that MEDTRONIC also faced a DOJ inquiry regarding its illegal promotion of Infuse®.

195.    As a result, on June 18, 2009, MEDTRONIC disclosed to *The Wall Street Journal* that Dr. Kuklo had received almost $850,000 in payments from MEDTRONIC over the past 10 years, the majority of which—nearly $800,000— were made in the preceding three years when Dr. Kuklo was submitting his bogus fabricated study on Infuse® to medical journals for publication.  Specifically, MEDTRONIC paid Dr. Kuklo $356,242 in 2007, the year Dr. Kuklo sought publication of the study in two medical journals, and $249,772 in 2008, the year the study was published in the *Journal of Bone and Joint Surgery*.  MEDTRONIC made both of these payments after MEDTRONIC announced the settlement with the DOJ in July 2006.

196.    In July 2009, Senator Grassley also publicly disclosed information demonstrating that Dr. Kuklo hid his financial relationship from Washington University and failed to disclose his financial ties in conflict-of-interest disclosure forms while he was conducting research related to Infuse®.  In fact, MEDTRONIC financed two separate, unpublished studies that also examined the use of Infuse® on Walter Reed patients with combat-related leg injuries while Dr. Kuklo was supposedly conducting research for the falsified study. At the time Washington University approved the study protocols, Dr. Kuklo indicated on disclosure forms that he did not receive any payments from MEDTRONIC when, in fact, Dr. Kuklo signed a contract with MEDTRONIC shortly after joining the Washington University faculty and had received payments from MEDTRONIC for almost a year into his research.

197.    In mid-2007, after Dr. Kuklo disclosed to Washington University that he had received funding from MEDTRONIC, the University's internal disclosure review board re-reviewed Dr. Kuklo's involvement in the MEDTRONIC-sponsored studies and informed him he would have to reduce his personal financial interest with MEDTRONIC to less than $10,000 per year or discontinue his involvement with the research. Dr. Kuklo opted to stop the two studies, which were closed in February 2008.

198.    Another highly compensated MEDTRONIC consultant involved in the promotion of off-label Infuse® use, Dr. Polly, a professor and Chief of the Spine Service at the University Of Minnesota Department Of Orthopaedic Surgery, received consulting fees from MEDTRONIC totaling $1.14 million from 2003 to 2007. As with Dr. Kuklo, MEDTRONIC's financial relationship with Dr. Polly began while the surgeon was on active military duty at Walter Reed.

-47-

Although Dr. Polly has claimed that his consulting relationship with MEDTRONIC did not begin until 2004, documents obtained through requests under the Freedom of Information Act ("FOIA") reveal that MEDTRONIC paid almost $30,000 in travel expenses for Dr. Polly to speak at various medical conferences in the Bahamas, San Diego, and a $10,000 trip to Switzerland, while he was stationed at Walter Reed in 2003. Dr. Polly attended these conferences to report on his research that purportedly demonstrated that Infuse® was more cost effective than traditional spinal fusion procedures.

199.    After his discharge from the military, Dr. Polly authored an article with Dr. Kuklo reporting positive results in treating wounded soldiers with rhBMP-2 at Walter Reed. According to their article, published in the November 2004 issue of "Minnesota Medicine," rhBMP-2 was used in more than 100 military patients with traumatic bone fractures who had served in Iraq and Afghanistan. Although the use of Infuse® in tibial fractures was not approved until April 30, 2004, Dr. Polly reported that the "decision to use rhBMP-2 was made early in the Afghanistan conflict and was based on evidence from clinical trials in Europe on open tibial fractures that suggested use of rhBMP-2 not only improved bone healing but led to a decreased number of secondary interventions and lower rates of infection." According to Dr. Polly, "the military's experience with rhBMP-2 has been favorable."

200.    Moreover, additional evidence demonstrates that, even before his and Dr. Polly's November 2004 article was published, MEDTRONIC reimbursed Dr. Kuklo for a meeting with MEDTRONIC representatives in Memphis, Tennessee on April 20, 2004 regarding "Review of BMP Trauma and Spine Surgery."

201.    Dr. Polly later sought a government grant for a similar study in May 2006, when he testified before the Defense Subcommittee of the U.S. Senate Appropriations Committee regarding research that would examine the use of Infuse® and antibiotics to treat traumatic and infected bone fractures. Dr. Polly stated that he was "speaking on behalf of the American Academy of Orthopedic Surgeons." However, according to information recently released by Senator Grassley, who, in conjunction with Senator Baucus, has been conducting an inquiry into MEDTRONIC's consulting payments, Dr. Polly actually billed MEDTRONIC $7,000 in connection with his Senate testimony, and was therefore speaking on behalf of MEDTRONIC,

-48-

not the American Academy of Orthopedic Surgeons, as he had claimed. Furthermore, Dr. Polly billed MEDTRONIC a total of $50,000 over several months for his lobbying efforts in securing the $466,644 Department of Defense grant for this Infuse® research study.

202.    The information released by Senator Grassley, discussed more fully *supra*, which includes billing reports submitted to MEDTRONIC by Dr. Polly and approved by MEDTRONIC, indicates that throughout this period, Dr. Polly had frequent meetings, telephone calls, and email correspondence with numerous MEDTRONIC senior executives, including former COO Michael DeMane ("DeMane"), and former President of MEDTRONIC Spinal and Biologics Wehrly, while speaking frequently regarding Infuse® at medical conferences and other events. For example, the records show meetings and other contacts between Dr. Polly and Hawkins on the following dates: February 13, 2007; June 15, 2007; July 27, 2007; August 8, 2007; August 24, 2007; September 26, 2007; and September 27, 2007. Indeed, they further show that Dr. Polly billed MEDTRONIC for a meeting with Hawkins on July 13, 2005 to discuss a "spine surgery advocacy effort."

### iii)    Opinion Leader Dr. Thomas A. Zdeblick.

203.    Thomas A. Zdeblick, M.D., the Chairman of the Department of Orthopedics and Rehabilitation at the University of Wisconsin, received over $19 million from MEDTRONIC from 2003 to 2007 for consulting services and royalty payments. Although Dr. Zdeblick only disclosed annual payments exceeding $20,000 in University conflict of interest forms, he actually received between $2.6 and $4.6 million per year. In 2007 alone, Dr. Zdeblick received $2,641,000 in consulting fees from MEDTRONIC. From 1998 through 2004, Dr. Zdeblick was paid an annual salary of $400,000 by MEDTRONIC under a contract that only required him to work eight days per year at a MEDTRONIC site in Memphis, Tennessee, and to participate in "workshops" for surgeons.

204.    Dr. Zdeblick also has been a significant contributor to MEDTRONIC's promotion of Infuse®, authoring seven peer-reviewed articles on rhBMP-2 and appearing as a presenter at medical conferences and symposia in which the topics included discussion of off-label uses of the product. On a MEDTRONIC-owned website, "www.Back.com," Dr..Zdeblick describes the advantages of Infuse® and appears in an online video discussing the benefits of the product.

205.     As discussed more fully *supra*, on January 16, 2009, *The Wall Street Journal* reported on a letter sent by Senator Charles Grassley to Kevin P. Reilly, President at the University of Wisconsin, regarding Defendants' consulting and royalty payments to Dr. Zdeblick, who co-authored preliminary studies that led to the FDA's approval of Infuse®. Although the University is required to monitor its researchers' financial conflicts-of-interest, the amounts MEDTRONIC paid Dr. Zdeblick far exceeded those he reported to the University. Specifically, Dr. Zdeblick was required to disclose annual amounts in excess of $20,000 per year, and in one year reported payments in excess of $40,000. In reality, Dr. Zdeblick received between $2.6 million and $4.6 million per year from MEDTRONIC, totaling an astonishing $19 million in payments, from 2003 through 2007.

206.     As revealed in a June 20, 2009 article in the *Milwaukee Journal Sentinel*, Dr. Paul A. Anderson, an orthopedic surgeon and colleague of Dr. Zdeblick at the University of Wisconsin School of Medicine and Public Health, was paid $150,000 by MEDTRONIC for just eight days of work. Dr. Anderson, along with MEDTRONIC consultants Drs. Boden, Keith H. Bridwell, and Jeffrey C. Wang, authored a July 2007 article in *Journal of Bone and Joint Surgery* article, titled "What's New in Spine Surgery." The article discussed, among other things, a study that examined the use of Infuse® in an off- label Posterolateral Fusion procedure. According to the authors, the study reported that Infuse® improved fusion rates when used in combination with iliac crest bone graft in a procedure in which the BMP was wrapped around local bone as a bulking agent. According to the authors, the study's findings suggested that "the current [Infuse®] kit, while likely not sufficient as a stand-alone graft substitute for the posterolateral spine, can provide a significant enhancer effect, improving the success of an autogenous bone graft."

207.     On June 20, 2009, the *Milwaukee Journal Sentinel* reported that, during calendar year 2008, MEDTRONIC paid Dr. Zdeblick $2 million in royalty payments for eight days of consulting work, and that Dr. Paul Anderson received $150,000 in MEDTRONIC consulting fees for working just eight days.

        iv)     Norton Hospital Leatherman Spine Center Opinion Leaders.

208.     Another set of highly compensated surgeons, those affiliated with the Norton Hospital Leatherman Spine Center in Louisville, Kentucky, collectively received more than one

-50-

1    million dollars in consulting fees in 2006 alone, including Drs. John R. Johnson ($162,750),

2    Steven D. Glassman ($200,300), Rolando M. Puno ($106,000), John R. Dimar, II ($192,300),

3    David Rouben ($109,300), Mitch Campbell ($212,000) and Mladen Djurasovic ($55,900).

4        209.    According to CW 1, several surgeons from the Leatherman Spine Center were

5    requested by MEDTRONIC to speak at MEDTRONIC-sponsored physician talks attended by

6    between ten and twenty-five surgeons, including several "pretty high profile" physicians.  At

7    these physician talks a MEDTRONIC consultant, such as one of the surgeons at the Leatherman

8    Spine Center, provided presentations covering the purported benefits of off-label usage of

9    Infuse®. According to CW 1, "What [MEDTRONIC] would do is bring in one of their 'paid

10   consultants' and set up a dinner in the area and invited a number of physicians to attend." The

11   guest surgeon—the "paid consultant"— would then "basically give a presentation on off-label

12   usage." Importantly, these physician talks were also attended by all MEDTRONIC sales

13   representatives who worked in the area.

14       210.    These same MEDTRONIC-funded surgeons associated with the Leatherman Spine

15   Center have also written extensively on off-label uses of Infuse®.  These surgeons have

16   collectively authored at least 15 articles addressing the use of BMP, including many of the early

17   medical articles on the use of Infuse® in off-label posterolateral lumbar and anterior cervical

18   fusion procedures. Specifically, Dr. Campbell has contributed to at least eight articles examining

19   the use of BMP; Dr. Dimar has authored nine; Dr. Djurasovic, four; Dr. Johnson, five; Dr. Puno,

20   five; and Dr. Glassman has written at least fifteen articles addressing the use of BMP, the vast

21   majority of which involve applications of the product in off-label procedures.

22            v)    **Other Various Opinion Leaders.**

23       211.    Several physicians who authored a May 2003 article describing positive results of

24   Infuse® used in the cervical spine were paid tens of thousands of dollars in consulting fees by

25   MEDTRONIC. The article, "New Technologies in Anterior Cervical Spine Fixation," published

26   on SpineUniverse, a website intended for the general public that provides information regarding

27   spinal disorders and treatment, described the physicians' use of Infuse® "in the cervical spine with

28   very good results." According to the authors, "[p]reliminary results are promising and Infuse®

-51-

may be especially appropriate in people undergoing multiple level fusions" (emphasis added)—i.e., for indications outside FDA limited approval to single-level fusion procedures.

212.   One of the authors of this article, Dr. Regis Haid, Jr., received consulting fees of $50,000 from MEDTRONIC in 2006 and similar amounts in the previous two years. Another author, Dr. Gerald Rodts, received payments of $80,000 from MEDTRONIC in 2006 and similar amounts in the previous two years. The SpineUniverse article does not mention that its authors received compensation from MEDTRONIC, nor do the website profiles of Dr. Haid and Dr. Rodts, both of whom serve on the publication's editorial board, disclose their financial ties to MEDTRONIC.

213.   Dr. Haid was also the lead author of an article describing the results of the study of Infuse® in off-label PLIF procedures that was halted in December 1999 after several patients experienced adverse incidents of uncontrolled bony overgrowth. In addition, two of the article's other authors—Dr. J. Kenneth Burkus and Dr. Charles L. Branch—received consulting fees from MEDTRONIC. Specifically, MEDTRONIC paid Dr. Branch $154,900 in 2006 and similar amounts in the preceding two years, while Dr. Kenneth Burkus—who has written over a dozen articles addressing the use of rhBMP-2, including studies examining the use of Infuse® in off-label PLIF and anterior cervical procedures—received $416,775 in 2006 and similar amounts in the two preceding years.

214.   Although the negative outcomes in the PLIF study prompted the FDA Advisory Panel to recommend a more restrictive labeling and indication in approving Infuse®, the MEDTRONIC-funded authors reviewing the study's results surprisingly did not find the incidents of bony overgrowth to be a clinically significant concern. Shockingly, the physicians noted, "[a]lthough not desirable, bone formation in the spinal canal does not appear to have a discernible effect on patient outcomes," and "the de novo rhBMP-formed bone occurred predictably, not compressing the neural structures."

215.   In a commentary on the study, Dr. Neil Kahanovitz, an independent surgeon, questioned the authors' interpretations, suggesting that they may have been "overwhelmed by their enthusiasm of using" rhBMP-2 in a PLIF procedure. Dr. Kahanovitz noted that, while there are "lengthy discussions of various trends throughout this study, which imply the superiority of

rhBMP over autograft . . . one fact remains: in every clinical measure examined in this study, there were no statistically superior outcomes in the rhBMP group except one, and the clinical significance of this one statistically significant finding is unclear."

216.   Importantly, Dr. Kahanovitz also disagreed with the authors' conclusion that the presence of bone growth in the spinal canal and foramina (the two apertures between vertebrae) in those patients who received rhBMP-2 had no clinical implications. Rather, Dr. Kahanovitz predicted that "most surgeons would be less than enthusiastic to see this statistically significant variable present in the majority of their patients."

217.   CW 1 stated that Drs. Lawrence "Larry" G. Lenke and Keith H. Bridwell, two surgeons from Washington University in St. Louis – where Dr. Kuklo worked as an associate professor until recently – similarly acted as "Opinion Leaders" or "guest surgeons" during "corporate visits" in which MEDTRONIC would invite targeted surgeons to attend training sessions in Memphis, Tennessee. While in Memphis, the visiting surgeons met with MEDTRONIC corporate officers, product managers, and guest surgeons, such as Drs. Lenke and Bridwell. The visiting surgeons also received "hands-on training" on Infuse®, including instruction in cadaver labs. According to CW1, who personally attended two such meetings, "[t]here was training on off- label procedures, for sure." The visiting surgeons "would bring up the use of Infuse® and ask how to use it, and [the guest surgeons] would show them how to do it." CW1 stated that MEDTRONIC chose which surgeons to invite to these corporate visits based, in part, upon the volume of Infuse® procedures they performed.

218.   Another prominent MEDTRONIC consultant, Jeffrey Wang, M.D., the Chief of Spine Surgery for the Department of Orthopaedic Surgery and Executive Co-Director of the University of California, Los Angeles's ("UCLA") Comprehensive Spine Center, also spoke about off-label uses of Infuse®. Unsurprisingly, Senator Grassley recently discovered that Dr. Wang received $275,000 in royalty and consulting payments from MEDTRONIC from 2003 until 2008.

219.   Furthermore, Dr. Wang failed to disclose his substantial financial relationship with MEDTRONIC while researching MEDTRONIC products, which violated UCLA's policy requiring him to do so. For example, on a disclosure form to UCLA dated January 10, 2007, Dr.

Wang checked "no" when asked if he received income of $500 or more from MEDTRONIC, notwithstanding the fact that MEDTRONIC was, at that very moment, funding one of Dr. Wang's studies. In fact, Dr. Wang received $14,600 on January 4, 2007 for "lecture and teachings at spine meetings and universities in Korea for one week." As a result of his repeated failures to disclose payments received from MEDTRONIC, Dr. Wang lost his position as Executive Co-Director of UCLA's Comprehensive Spine Center.

220. As discussed more fully *supra*, Senator Grassley also discovered that, in addition to the compensation to MEDTRONIC consultants, MEDTRONIC collectively paid twenty-two other surgeons $943,000 from 2003 to 2008 to work on matters specific to Infuse®.

221. In June 2011, one of the leading journals on spine surgery, *The Spine Journal*, described more fully *supra*, devoted an entire issue to publishing various articles regarding the risks associated with Infuse®, including articles on MEDTRONIC's failure to accurately report the side effects from its clinical trials; MEDTRONIC's failure to report that many of the authors who studied and promoted Infuse® had significant financial ties to MEDTRONIC, with a median range of $12 to $16 million per study; that Infuse® can cause severe injuries to the spinal nerves and spinal cord; that off-label use of Infuse® can lead to other severe side effects; and that MEDTRONIC and its paid consultants/study authors downplayed the risks associated with Infuse®, over-emphasized its benefits and over-emphasized the risks associated with traditional non-Infuse® spine fusion procedures.

**f)    U.S. Senators' Letters to MEDTRONIC Regarding to the Promotion and Marketing of Infuse®.**

**i)    September 30, 2008 Letter.**

222. Despite the July 2006 Settlement with the DOJ, concerns regarding MEDTRONIC's off-label marketing activities and related payments to doctors continued.

223. On September 30, 2008, U.S. Senator Herb Kohl sent a letter to MEDTRONIC noting that earlier in 2008, MEDTRONIC's outside counsel provided to the Special Committee on Aging a written account of MEDTRONIC's efforts to comply with the July 2006 Settlement Agreement it reached with the DOJ concerning allegations that MEDTRONIC and its subsidiary improperly compensated surgeons and physicians in connection with the Infuse® device.

224.    Senator Kohl's letter expressed several concerns, including the following: That account also addressed the corporate integrity agreement (CIA) that MEDTRONIC and its subsidiary entered into with the Office of the Inspector General of the United States Department of Health and Human Services stemming from those same allegations. In that same letter to the Committee, MEDTRONIC and its subsidiary both denied that "improper payments were made to physicians in the first place (MEDTRONIC's agreement with DOJ does not contain any admission of liability), much less that improper payments 'have continued.' Consequently, it was with concern that I read recent articles, in the *Wall Street Journal* and elsewhere, which outlined highly disturbing allegations of improper, if not illegal, payments by MEDTRONIC to surgeons and physicians. These continuing allegations are directly relevant to the Committee's oversight of inappropriate physician compensation practices within the medical device industry. All of the major orthopedic device companies that settled with DOJ over such allegations were required to publicly reveal information related to their payments to physicians. MEDTRONIC's response to the Committee's initial inquiry articulated no specific reasons as to why MEDTRONIC has yet to voluntarily make the same disclosures.

225.    In this letter, Senator Kohl requested both documentation of MEDTRONIC's efforts to comply with the July 2006 Settlement Agreement and interviews with corporate witnesses and documents "given the ongoing, serious concerns publicly raised regarding the integrity and transparency of MEDTRONIC's physician compensation practices."

226.    Senator Kohl also asked MEDTRONIC to explain "the circumstances that led MEDTRONIC's former counsel to file suit against the company [alleging improper payments to physicians] and how that matter was subsequently settled."

227.    Also on September 30, 2008, U.S. Senator Charles Grassley sent a similar letter to MEDTRONIC pertaining to the marketing of Infuse® and allegations of related kickbacks to physicians regarding the sale of Infuse®, noting that:

Last week, the *Wall Street Journal (WSJ)* reported on allegations of financial perks provided to doctors that included "entertainment at a Memphis strip club, trips to

-55-

1      Alaska and patent royalties on inventions they played no part in."[15]  I would

2      appreciate your assistance in better understanding these allegations and would like

3      to take this opportunity to lay out my specific concerns and questions.

4          228.    Senator Grassley went on to express his concern over the *Wall Street Journal*'s

5   reports "that one of the incentives MEDTRONIC provided physicians was to include them on

6   patents for medical devices and reward them with royalties, even though the physicians may not

7   have contributed to the development of the product."

8          229.    This letter specifically addressed issues related to MEDTRONIC's marketing of

9   Infuse®:

10      Fourth, earlier this month the WSJ reported on problems with off-label use of

11      MEDTRONIC's Infuse®.  Infuse® is a bone graft replacement technology that uses

12      a protein which creates bone.  Specifically, it was reported that MEDTRONIC

13      gave payments to physicians, in the form of consulting agreements, as a means of

14      increasing sales of Infuse®.  The allegations that MEDTRONIC has been

15      disguising these consulting agreements as inducements or kickbacks for physicians

16      to use Infuse® are equally troubling.  Likewise, this is a practice that I would like

17      to better understand and I would like to know what if anything has changed since

18      these reported events.

19          230.    Senator Grassley, in his September 30, 2008 letter, also questioned why several

20   lawsuits against MEDTRONIC pertaining to Infuse® remained under seal, and indicated that he

21   would like to "better understand the status of these lawsuits and the procedural process that has

22   led to the current situation."

23          ii)    **June 21, 2011 Letter.**

24          231.    The U.S. Senate Committee on Finance investigated whether MEDTRONIC has

25   continued to misrepresent the adverse events that result from Infuse® and rhBMP-2, as well as the

26   possibility that MEDTRONIC improperly influenced clinical trials and reporting regarding

27   rhBMP-2.

28

---

[15]  David Armstrong, "Lawsuit Says MEDTRONIC Gave Doctors Array of Perks," *Wall St. J.*,
Sept. 25, 2008.

232.    On June 21, 2011, U.S. Senators Charles Grassley and Max Baucus sent another letter to MEDTRONIC on behalf of the Senate Committee on Finance requesting that MEDTRONIC produce documents and communications pertaining to "adverse postoperative events and/or medical complications" resulting from the use of rhBMP-2.[16] The letter also requests that MEDTRONIC provide "[a] detailed account of payments that MEDTRONIC made to all Infuse® clinical investigators."

233.    In their June 21, 2011 letter, Senators Grassley and Baucus state: "We are extremely troubled by press reports suggesting that doctors conducting clinical trials examining the safety and effectiveness of Infuse® on behalf of MEDTRONIC were aware that Infuse®, a treatment commonly used in spinal surgery, may cause medical complications, but failed to report this in the medical literature. This issue is compounded by the fact that some clinical investigators have substantial financial ties to MEDTRONIC."

234.    The letter further states: "We are also concerned that other severe side-effects of Infuse® and similar bone-growth products developed by MEDTRONIC may have been unreported or under-reported in clinical literature. Reports have linked Infuse® to potentially fatal swelling in the neck and throat, and radiating leg pain. Concerns have also been expressed about a potential link to cancer."

iii)    **December 13, 2011 Letter.**

235.    Senators Herb Kohl, Charles Grassley, and Richard Blumenthal wrote to MEDTRONIC again in December 2011 demanding more information from the company over adverse events caused by on-label and off-label use of Infuse®. The letter noted that "your company has experienced safety issues, such as with your spine product Infuse®."

236.    The letter also demanded that MEDTRONIC explain whether or not it requires physicians who receive funds from MEDTRONIC to disclose those payments to their patients before the patients receive one of MEDTRONIC's medical devices and "If not, why not?"

237.    This new letter requires that MEDTRONIC produce this information to the U.S. Senate's Special Committee on Aging by no later than January 23, 2012.

---

[16] Letter from Grassley and Baucus (June 21, 2011), *available at*, http://finance.senate.gov/ newsroom/chairman/release.

-57-

238.    On information and belief, this continued investigation by a U.S. Senate committee suggests that MEDTRONIC has not changed its ways with regard to its illegal promotion of Infuse®, despite signing the CIA and paying a $40 million fine to DOJ in 2006.

g)    <u>June 1, 2011 Issue of *The Spine Journal.*</u>

239.    On June 1, 2011, the *Spine Journal*, a leading medical journal in the United States, published a special edition dedicated to addressing serious patient safety and ethical concerns related to the use of rhBMP-2 (Infuse®) in the spine.

240.    This special edition reviewed thirteen peer-reviewed articles about rhBMP-2 by MEDTRONIC-sponsored authors, and concluded that these articles had inaccurately reported the safety of rhBMP-2 applications in the spine by underestimating its risks.

241.    In an editorial summarizing the findings of this special issue, five prominent physicians, including spine surgeons at Stanford University Medical Center, wrote that the earlier industry-sponsored trials and reports were "remarkable for the complete absence of reported rhBMP-2-related clinical adverse events." For example, the industry-sponsored articles omitted mention of indications from the earliest trials of inflammatory reactions, adverse back and leg pain events, radiculitis, retrograde ejaculation, urinary retention, bone resorption, and implant displacement. They also omitted mention of sterility and cancer risks associated with rhBMP-2, as reported in FDA documents and hearings. The trials and reports suffered from idiosyncratic trial design, reporting bias, and peer-review/publication shortfalls.

242.    According to this editorial and several of the accompanying articles in the *Spine Journal*, the thirteen MEDTRONIC-funded articles reported only successful fusions and extremely low or nonexistent rates of complications with Infuse®, which led to the growth of "off-label" use of Infuse® in lumbar fusion procedures. The articles "may have promoted widespread poorly considered on- and off-label use, eventual life-threatening complications and deaths."

243.    Contrary to the conclusions of the earlier MEDTRONIC-sponsored trials and articles, an article in this special issue of the *Spine Journal* suggested "an estimate of adverse events associated with rhBMP-2 use in spine fusion ranging from 10% to 50% depending on approach."

Anterior cervical fusion with rhBMP-2 has an estimated 40% greater risk of adverse events with rhBMP-2 in the early postoperative period, including life-threatening events.  After anterior interbody lumbar fusion rates of implant displacement, subsidence, infection, urogenital events, and retrograde ejaculation were higher after using rhBMP-2 than controls.  *Posterior lumbar interbody fusion was associated with radiculitis, ectopic bone formation, osteolysis, and poorer global outcomes.*  In posterolateral fusions, the risk of adverse effects associated with rhBMP-2 use was equivalent to or greater than that of iliac crest bone graft harvesting, and 15% to 20% of subjects reported early back pain and leg pain adverse events; higher doses of rhBMP-2 were also associated with a greater apparent risk of new malignancy."

Eugene J. Carragee, Eric L. Hurwitz & Bradley K. Weiner, *A Critical Review Of Recombinant Human Bone Morphogenetic Protein-2 Trials In Spinal Surgery: Emerging Safety Concerns And Lessons Learned*, The Spine Journal 11, 471-72 (2011) (emphasis added).

244.    This article also reported that ten of the earlier industry-sponsored rhBMP-2 trials were funded in whole or in part by the manufacturer of rhBMP-2 (Infuse®), MEDTRONIC.  Furthermore, in twelve of these earlier studies, the median-known financial association between the authors and MEDTRONIC Inc. was approximately $12,000,000-$16,000,000 per study (range, $560,000-$23,500,000). *Id.* at 475.

245.    The following are some of the other significant conclusions in these articles in the June 1, 2011 Issue of *The Spine Journal*:

a.    Many of the risks now accepted have been known since a publication by Poynton and Lane in 2002, which listed overgrown and uncontrolled bone formation, osteoclast activity (graft subsidence, migration, loss of fixation etc.), local safety (inflammation, edema, wound problems, and infection), potential negative effect of BMPs on exposed dura and nerves (neurologic events, retrograde ejaculation, persistent bladder retention, early back pain, leg pain, radiculitis, functional loss, carcinogenicity). *However, it appears that these risks were ultimately washed out and marginalized by the wealth of positive data from industry-sponsored studies.*

-59-

b.    A 2-year rhBMP-2 follow-up published by Burkus, et al., reported no adverse events. However, in a 6-year follow-up publication using the same subjects, the authors contradict their earlier publication stating that there had been seven early adverse events associated with subsidence in the rhBMP-2 group, yet they were not reported in the two year follow-up.

c.    In fact, on closer inspection of the Burkus studies, it was noted that all adverse events mentioned in the six-year follow-up had occurred within the first two years.

d.    Furthermore, four of the adverse events required further surgery, and 22 additional surgeries for device failures occurred in the same rhBMP-2 group between 0-2 years after surgery according to the FDA summary, but were not specifically reported in the 2003 or 2004 studies, which were the same patients over the same time frame.

e.    The estimates of rhBMP-2 safety from the original publications underestimated rhBMP-2-related adverse events of the product. In the small pilot studies, there were inadequate numbers to assess safety, but some suggestion of potential harm was seen in at least one study. In the larger trials, there is evidence in each trial that rhBMP-2 complications may be common and may be serious, but in each publication these were underreported.

f.    The presence and magnitude of conflicts-of-interest and the potential for reporting bias were either not reported or were unclear in each of the original industry sponsored studies. Some of the conflicts-of-interest statements reported appeared to be vague, unintelligible, or were internally inconsistent.

g.    The original estimates of ICBG (Iliac Crest Bone Graft, the pre-rhBMP-2 gold standard procedure for spinal fusion) harvesting morbidity were based on invalid assumptions and methodology. This in turn may have exaggerated the benefit or underestimated the morbidity of rhBMP-2 in the clinical situations tested.

h.    The control group methods and techniques, as selected for both posterior approach methods (PLIF and PLF) were potentially handicapped by significant design bias against the controls.

i.    In those studies for which other data sources have been made available on the same patient sets (either FDA documents or subsequent reporting of follow-up data), serious

contradictory findings have emerged. Major complications, additional surgeries, neurologic/urologic injury, and major back/leg pain events were apparently observed but not reported in the original articles.

j.      By falsely reporting perfect or near perfect safety, the original studies might have led others to widespread off-label use of the product with some potentially catastrophic outcomes. Revised estimates of adverse events are:

i.      Posterior lumbar interbody fusion techniques:  25-50% risk of associated adverse events.

ii.     Anterior lumbar interbody fusion:  10-15% risk of adverse events.

iii.    Anterior cervical fusion:  40% greater risk of adverse events in the acute postoperative period including potentially life-threatening complications.

iv.     Posterolateral fusions: equivalent or greater early postoperative risk of morbidity compared with ICBG harvesting for this dosage; 16-20% of rhBMP-2 subjects had adverse back and leg pain events, *a probable two to threefold increase in the first three months after surgery over control groups* (emphasis added).

h)      <u>October 25, 2012 U.S. Senate Committee on Finance Report on Medtronic's Manipulation of the Infuse® Studies and Close Financial Ties with Researchers</u>

246.    On October 25, 2012, Senate Finance Committee Chairman Max Baucus (D-Mont.) and senior member Chuck Grassley (R-Iowa) released the results of their 16-month investigation into MEDTRONIC, which revealed questionable ties between the company and its physician "Opinion Leader" consultants tasked with testing and reviewing Infuse®.  Without public disclosure of their roles, MEDTRONIC employees collaborated with the physician authors to edit – and in some cases, write – segments of published studies on Infuse®.  The studies may have inaccurately represented Infuse®'s risks and may have overemphasized the side effects of prior more traditional treatments.  The Senate report found that MEDTRONIC also maintained significant, previously-undisclosed financial ties with the physicians who authored the early studies on Infuse®, making $210 million in payments to physicians over a 15-year period.

247.    "Medtronic's actions violate the trust patients have in their medical care.  Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical

-61-

1    devices, but patients are at serious risk when companies distort the facts the way Medtronic has,"

2    Senator Baucus said.  "Patients everywhere will be better served by a more open, honest system

3    without this kind of collusion."

4          248.    "These findings emphasize the value of the Grassley-Kohl Physician Payments

5    Sunshine Act, which will result in public disclosure of industry payments to physicians starting

6    next year.  The findings also should prompt medical journals to take a very proactive approach to

7    accounting for the content of the articles along with the authorship of the articles and studies they

8    feature," Grassley said.  "These publications are prestigious and influential, and their standing

9    rests on rigorous science and objectivity.  It's in the interest of these journals to take action, and

10   the public will benefit from more transparency and accountability on their part."

11         249.    The report released on October 25, 2012 by Senators Baucus and Grassley on

12   behalf of the U.S. Senate Finance Committee – which has sole jurisdiction over Medicare and

13   Medicaid – was the product of an investigation they began in June 2011.[17]  The major findings of

14   the investigation include:

15               a.     MEDTRONIC was involved in drafting, editing, and shaping the content of

16   medical journal articles on Infuse® authored by its physician consultants who received significant

17   amounts of money through royalties and consulting fees from MEDTRONIC.  The company's

18   significant role in authoring or substantively editing these articles was not disclosed in the

19   published articles.  Medical journals should ensure any industry role in drafting articles or

20   contributions to authors be fully disclosed.

21               b.     MEDTRONIC paid a total of approximately $210 million to physician

22   authors of MEDTRONIC-sponsored studies from November 1996 through December 2010 for

23   consulting, royalty and other arrangements.

24               c.     An e-mail exchange shows that a MEDTRONIC employee recommended

25   against publishing a complete list of adverse events, or side effects, possibly associated with

26   Infuse® in a 2005 *Journal of Bone and Joint Surgery* article.

27

28   _____

[17] The Senate's full report is available online at: http://www.finance.senate.gov/newsroom/chairman/download/?id=e54db17c-a475-4948-bd81-69c8740c6aaf. In the interest of brevity, Plaintiff has not attached the full 2,315 page report.

d.    MEDTRONIC officials inserted language into studies that promoted

Infuse® as a better technique than an alternative by emphasizing the pain associated with the

alternative.

**i)    Further Evidence of MEDTRONIC's Off-label Promotion.**

250.    MEDTRONIC's knowledge and promotion of off-label use of Infuse® is further

evidenced by comparing sales of the rhBMP-2 component to the sales of the LT-Cage™

component (both components are required pursuant to FDA approval). On information and belief,

MEDTRONIC sells the rhBMP-2 component separately from the LT-Cage™ in order to illegally

and improperly promote off-label uses of Infuse® in the lumbar spine and in the cervical spine,

procedures in which the LT-Cage™ is not used.  As a result, sales of the rhBMP-2 component are

and were at all relevant times far larger than sales of the LT-Cage™ component, despite FDA

requirements that both be used according to the product's labeling; i.e. that the entire medical

device (rhBMP-2 and the LT-Cage™) be used in the procedure.

251.    As described in detail above and throughout this Complaint, therefore,

MEDTRONIC's off-label promotion of Infuse was not truthful.  Instead, MEDTRONIC's off-

label promotion of Infuse was false and misleading. "Of course, off-label promotion that is false

or misleading is not entitled to First Amendment protection." *United States v. Caronia*, No. 09-

5006-cr, 2012 U.S. App. LEXIS 24831, at *39, n. 11(2d Cir., Dec. 3, 2012).

252.    MEDTRONIC's aggressive off-label promotion described above created the

conditions for widespread acceptance by spine surgeons of the off-label uses of Infuse® after the

2002 PMA approval, and MEDTRONIC's violations of federal law described above (which

parallel Plaintiffs' state-law tort claims) directly caused or significantly contributed to the

widespread off-label use of Infuse® generally, and also specifically with respect to Plaintiff.  In

particular, MEDTRONIC's off-label promotion activities and failure to report adverse events

caused spine surgeons, including Plaintiffs' surgeon to use Infuse® in dangerous off-label

procedures.

**7)    Plaintiffs'-specific Allegations.**

253.    On or about November 2009, Plaintiff **CARMELA VITALE** Anterior Cervical

Discectomy and Fusion (ACDF) using the off-label Infuse®. Upon information and belief, at all

1   times Plaintiffs' doctor was unaware of the risks associated with off-label use of Infuse in

2   surgery.

3       254.   On or about March 2010, Plaintiff **TAMMY JAMES** underwent Anterior

4   Cervical Discectomy and Fusion (ACDF) using the off-label Infuse®. Upon information and

5   belief, at all times Plaintiffs' doctor was unaware of the risks associated with off-label use of

6   Infuse in surgery.

7       255.   On or about February 12, 2012, Plaintiff **JOHN CURTIS** underwent Posterior

8   Lumbar Interbody Fusion (PLIF) L4-5, L5-S1 using the off-label Infuse®. Upon information and

9   belief, at all times Plaintiffs' doctor was unaware of the risks associated with off-label use of

10   Infuse in surgery.

11       256.   On or about November 30, 2011. Plaintiff **KERRY HARDY** underwent Anterior

12   Cervical Discectomy and Fusion (ACDF) using the off-label Infuse®. Upon information and

13   belief, at all times Plaintiffs' doctor was unaware of the risks associated with off-label use of

14   Infuse in surgery.

15       257.   On or about June 9, 2011 and June 30, 2011, Plaintiff **HECTOR M. SANTOS**

16   underwent lumbar surgery using the off-label Infuse®. Upon information and belief, at all times

17   Plaintiffs' doctor was unaware of the risks associated with off-label use of Infuse in surgery.

18       258.   On or about November 30, 2011, Plaintiff **DEBRA IZZO-BLOUNT** underwent

19   Posterior Lumbar Interbody Fusion (PLIF) L5-S1 using the off-label Infuse®. Upon information

20   and belief, at all times Plaintiffs' doctor was unaware of the risks associated with off-label use of

21   Infuse in surgery.

22       259.   Prior to this surgery, MEDTRONIC did not inform Plaintiffs that there were any

23   risks specific to the use of Infuse® in the lumbar spine, and MEDTRONIC did not adequately

24   inform his implanting surgeon, Dr. Nelson, of the true incidence of ectopic or uncontrolled or

25   unusual bone growth resulting from the use of Infuse® in off-label procedures, or of other risks or

26   dangers or complications associated with the off-label use of Infuse® in the spine. At no time did

27   Plaintiffs consent for Infuse® to be used during his surgery and at no time did Defendants obtain

28   Plaintiffs' consent for Infuse® to be used and/or explain the risks of using Infuse® during his

surgery.

260.   Plaintiff's post-operative period was marked by increasingly severe pain.

261.   Imaging studies ultimately showed that Plaintiffs had developed uncontrolled bone growth (aka "bone overgrowth") and resulting nerve compression at or near where the Infuse® was implanted.

262.   The nature of the Plaintiffs' injuries and their relationship to the off-label use of Infuse® were inherently undiscoverable; and, consequently, the discovery rule should be applied to toll the running of the statute of limitations until Plaintiffs knew or through the exercise of reasonable care and diligence should have known of the existence of their claims against Defendants. Plaintiffs did not discover, and through the exercise of reasonable care and due diligence, could not have discovered, their injuries earlier

263.   Further, Plaintiffs did not have knowledge of facts that would lead a reasonable, prudent person to make inquiry to discover Defendants' tortious conduct. Under appropriate application of the discovery rule, Plaintiffs' suit was filed well within the applicable statutory limitations period

264.   Before and after the implantation surgery using Infuse®, MEDTRONIC knowingly concealed from Plaintiffs and his/her implanting surgeons, the significant rate of injuries and complications resulting from the off-label use of Infuse®. MEDTRONIC'S improper promotion of Infuse® and MEDTRONIC's concealment from Dr. Nelson of serious patient safety risks associated with off-label Infuse® were significant causes or contributing factors in Dr. Nelson's decision to use off-label Infuse® in his/her patients.

265.   MEDTRONIC's fraudulent concealment of the relevant facts tolled any relevant statutes of limitation.

266.   As a direct and proximate result of the use of Infuse® in this lumbar fusion surgery, Plaintiffs now suffer from severe injuries and damages, including but not limited to bone overgrowth causing nerve compression, chronic pain and radiculitis, and emotional distress and mental anguish.

267.   As a direct and proximate result of the use of Infuse® in this lumbar fusion surgery, Plaintiffs have been forced to undergo multiple painful and expensive revision surgeries to attempt to remove the BMP-induced bone overgrowth.

268.   As a result of the off-label use and failure to warn of the risks of off-label use of Infuse® as manufactured, sold and supplied by MEDTRONIC, and as a result of the negligence, callousness and the other wrongdoing and misconduct of MEDTRONIC, as described herein:

269.   Plaintiffs have been injured and suffer injuries to his/her body and mind, the exact nature of which are not completely known to date;

270.   Plaintiffs have sustained economic losses, including loss of earnings and diminution of the loss of earning capacity, the exact amount of which is presently unknown.

271.   Plaintiffs will be required to incur additional medical expenses in the future to care for himself as a result of the injury and damages he has suffered.

272.   Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

273.   Defendant's conduct as alleged above was malicious, intentional and outrageous and constitutes a willful and wanton disregard for the rights and safety of others.  Such conduct was directed specifically at Plaintiff and as such, warrants an imposition of punitive damages.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Fraudulent Misrepresentation and Fraud in the Inducement**
**(By Plaintiffs against the MEDTRONIC Defendants)**

274.   Plaintiffs incorporate by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

275.   In connection with their Infuse® products, the MEDTRONIC Defendants fraudulently and intentionally misrepresented material and important health and safety product risk information from Plaintiff and Plaintiffs' physicians, all as alleged in this Complaint. Plaintiff and Plaintiffs' physicians would not have decided to use Infuse® without an LT-Cage™® or to implant it via posterior or lateral approaches using cages other than an LT-Cage™® had they known of the safety risks related to Infuse®.

276.   The MEDTRONIC Defendants marketed their Infuse® product to and for the benefit of Plaintiffs, and marketed it to Plaintiffs' physicians, and Defendants knew or had reason to know of the unreasonable dangers and defects in their Infuse® product, and knew or had reason to know that Plaintiffs and Plaintiffs' physicians would use the product.

-66-

277. Any of the following is sufficient to independently establish the MEDTRONIC Defendants' liability for fraudulent misrepresentation and/or fraud in the inducement:

a. The MEDTRONIC Defendants fraudulently concealed and misrepresented the health and safety hazards, symptoms, constellation of symptoms, diseases and/or health problems associated with the off-label use of Infuse®;

b. The MEDTRONIC Defendants fraudulently concealed and misrepresented their practice of promoting and marketing to physicians, including Plaintiffs' physician, the off-label practice of using of Infuse® without an LT-Cage™® and placing it posteriorly or laterally;

c. The MEDTRONIC Defendants fraudulently concealed and misrepresented information about the known comparative risks and benefits of the use of Infuse® and the relative benefits and availability of alternate products, treatments and/or therapies.

278. The MEDTRONIC Defendants knew, or should have known, that they were concealing and misrepresenting true information about the known comparative risks and benefits of the use of Infuse® and the relative benefits and availability of alternate products, treatments and/or therapies.

279. The MEDTRONIC Defendants knew that Plaintiff and Plaintiffs' physicians would regard the matters Defendants concealed and misrepresented to be important in determining the course of treatment for the Plaintiff, including Plaintiff and Plaintiffs' physician's decision whether or not to use Infuse® without an LT-Cage™® or to place it via a posterior or lateral approach in Plaintiffs' lumbar spine fusion surgery.

280. The MEDTRONIC Defendants intended to cause Plaintiff and Plaintiffs' physicians to rely on their concealment of information and misrepresentations about the safety risks related to Infuse® to induce them to make off-label use of Infuse® for Plaintiffs' lumbar spine fusion surgery.

281. Plaintiffs and Plaintiffs' physicians were justified in relying, and did rely, on MEDTRONIC's concealment of information and misrepresentations about the safety risks related to Infuse® in deciding to make use of Infuse® in an off-label manner in Plaintiffs' lumbar spine fusion surgery.

282.     As the direct, proximate and legal cause and result of the Defendants' fraudulent concealment and misrepresentations and suppression of material health and safety risks relating to Infuse® and Defendants' dangerous and irresponsible marketing and promotion practices, Plaintiff has been injured and has incurred damages, including but not limited to medical and hospital expenses, lost wages and lost earning capacity, physical and mental pain and suffering, and loss of the enjoyment of life.

283.     As a result of the off-label use and failure to warn of the risks of off-label use of Infuse® as manufactured, sold and supplied by MEDTRONIC, and as a result of the negligence, callousness and the other wrongdoing and misconduct of MEDTRONIC, as described herein:

284.     Plaintiffs have been injured and suffer injuries to his/her body and mind, the exact nature of which are not completely known to date;

285.     Plaintiffs have sustained economic losses, including loss of earnings and diminution of the loss of earning capacity, the exact amount of which is presently unknown.

286.     Plaintiffs will be required to incur additional medical expenses in the future to care for himself as a result of the injury and damages she has suffered.

287.     Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

288.     Defendant's conduct as alleged above was malicious, intentional and outrageous and constitutes a willful and wanton disregard for the rights and safety of others.  Such conduct was directed specifically at Plaintiff and as such, warrants an imposition of punitive damages.

## SECOND CAUSE OF ACTION
### Strict Products Liability – Failure To Warn
### (By Plaintiffs against the MEDTRONIC Defendants)

289.     Plaintiffs incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

290.     MEDTRONIC had a duty to warn Plaintiffs and Plaintiffs' physicians about the dangers of Infuse® of which it knew, or in the exercise of ordinary care, should have known, at the time the Infuse® left the Defendants' control.  The MEDTRONIC Defendants did know of these dangers of off-label use of Infuse®, and breached this duty by failing to warn Plaintiffs and

Plaintiffs' physicians of the dangers of its off-label practice of using Infuse® without an LT-Cage™® and placing it posteriorly or laterally in a lumbar spine fusion surgery.

291.    Defendants, and each of them, knew that Infuse® would be purchased and used without inspection for defects in the design of the product.

292.    The Infuse® used in Plaintiffs was defective when it left the control of each of these Defendants.

293.    Defendants knew or should have known of the substantial dangers involved in the reasonably foreseeable use of Infuse®, whose defective design, manufacturing, and lack of sufficient warnings caused Infuse® to have an unreasonably dangerous propensity to cause catastrophic injuries.

294.    The warnings accompanying the Infuse® product did not adequately warn Plaintiffs and Plaintiffs' physicians, in light of the scientific and medical knowledge at the time, of the dangers associated with Infuse® when used without an LT-Cage™® and placed posteriorly or laterally in a lumbar spine fusion surgery including, but not limited to, pain and weakness in limbs, radiculitis, ectopic bone formation, osteolysis, and poorer global outcomes than alternative treatments.

295.    The warnings accompanying the Infuse® product failed to provide the level of information that an ordinary physician or consumer would expect when using the product in a manner reasonably foreseeable to MEDTRONIC.  MEDTRONIC either recklessly or intentionally minimized and/or downplayed the risks of serious side effects related to the off-label use of Infuse®, including but not limited to the risk of ectopic or uncontrolled bone growth.

296.    Defendants failed to provide adequate warnings, instructions, guidelines or admonitions to members of the consuming public, including Plaintiffs and Plaintiffs' physicians, of the problems with off-label use of Infuse®, which Defendants knew, or in the exercise of reasonable care should have known, to have existed in Infuse®.

297.    Defendants knew that these substantial dangers are not readily recognizable to an ordinary consumer or physicians, and that consumers and physicians would purchase Infuse® without inspection.

298.    At the time of Plaintiffs' injury, Infuse® was being used in a manner promoted by Defendants, and in a manner that was reasonably foreseeable by Defendants as involving substantial danger that was not readily apparent to its users.

299.    Plaintiffs' physician relied on MEDTRONIC's inadequate warnings in deciding to use Infuse® in an off-label manner. Plaintiff and Plaintiffs' physician would not have made off-label of Infuse® without an LT-Cage™® and placement of it posteriorly or laterally had they known of the true safety risks related to Infuse®.

300.    As a direct and proximate result of one or more of the above-listed dangerous conditions and defects, and of MEDTRONIC's failure to provide adequate warnings about them, Plaintiff sustained serious injuries of a personal and pecuniary nature.

301.    Plaintiffs have sustained extreme pain, suffering, and anguish from the date of Plaintiffs' lumbar spine fusion surgery in which Infuse® was implanted without an LT-Cage™® and was placed posteriorly or laterally until the present.

302.    As a result of the off-label use and failure to warn of the risks of off-label use of Infuse® as manufactured, sold and supplied by MEDTRONIC, and as a result of the negligence, callousness and the other wrongdoing and misconduct of MEDTRONIC, as described herein:

303.    Plaintiffs have been injured and suffers injuries to his/her body and mind, the exact nature of which are not completely known to date;

304.    Plaintiffs have sustained economic losses, including loss of earnings and diminution of the loss of earning capacity, the exact amount of which is presently unknown.

305.    Plaintiffs will be required to incur additional medical expenses in the future to care for himself as a result of the injury and damages she has suffered.

306.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

307.    Defendant's conduct as alleged above was malicious, intentional and outrageous and constitutes a willful and wanton disregard for the rights and safety of others. Such conduct was directed specifically at Plaintiff and as such, warrants an imposition of punitive damages.

### THIRD CAUSE OF ACTION
#### Strict Products Liability – Design Defect
#### (By Plaintiffs against the MEDTRONIC Defendants)

308.    Plaintiffs incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

309.    Defendants' Infuse® device was defectively designed at the time that it left the Defendants' control and was placed into the stream of commerce in California. The device reached Plaintiff without a substantial change in the condition in which it was sold.

310.    Defendants' Infuse® device was defectively designed because the design was unsafe when used in the manner promoted by Defendants and/or in a manner reasonably foreseeable by Defendants. The Infuse® product failed to perform as safely as an ordinary consumer would expect when used, as it was promoted by MEDTRONIC for use off-label without an LT-Cage™® and placement posteriorly or laterally in lumbar spine fusion surgeries.

311.    Defendants' Infuse® device was defectively designed because the risks of danger in the design outweigh the benefits of the design.

312.    The Infuse® product was designed in a way that caused users to suffer injuries including, but not limited to, pain and weakness in limbs, radiculitis, ectopic bone formation, osteolysis, and poorer global outcomes than equally-effective, alternative designs and treatments.

313.    The foreseeable risks of harm posed by using the Infuse® product in a manner promoted by Defendants could have been reduced or avoided by adopting a reasonably alternative design. Defendants did not adopt a design that would have rendered the Infuse® product reasonably safe.

314.    Plaintiffs and Plaintiffs' physicians used Infuse® in a manner intended and reasonably foreseeable by Defendants.

315.    Plaintiffs were not aware of the aforementioned defects at any time prior to the injuries caused by the Infuse®.

316.    As a legal and proximate result of the aforementioned defects of Infuse®, Plaintiff has sustained the injuries and damages set forth herein.

317.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

-71-

## FOURTH CAUSE OF ACTION
### Strict Product Liability – Misrepresentation
### (By Plaintiffs against the MEDTRONIC Defendants)

318.    Plaintiffs incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

319.    Specific defects in the Infuse® product, as specified above in this Complaint, rendered it defective and unreasonably dangerous.

320.    At all relevant times, Defendants were engaged in the business of selling Infuse® for resale or use, and in fact did sell the Infuse® device used by Plaintiffs' implanting surgeon.  In the course of marketing Infuse®, the MEDTRONIC Defendants made untrue representations of material facts and omitted material information to Plaintiff, Plaintiffs' physicians, and the public at large.  The MEDTRONIC Defendants sponsored biased medical trials, reports, and articles that wrongfully and inaccurately claimed that the dangers inherent to off-label use of Infuse® did not exist or were significantly less than the actual dangers.  The MEDTRONIC Defendants made these misrepresentations and omissions to guide doctors and physicians in their purchase and use of Infuse®.

321.    Plaintiffs and Plaintiffs' physicians would not have purchased and made off-label use of Infuse® without an LT-Cage™® and placement of Infuse® posteriorly or laterally for a lumbar spine fusion surgery had they known of the true safety risks related to Infuse®.

322.    Defendants were negligent in making the untrue misrepresentations and omitting material information because Defendants knew, or had reason to know, of the actual, unreasonable dangers and defects in their Infuse® product.

323.    Plaintiffs and Plaintiffs' physicians would reasonably be expected to use Infuse®.  Defendants intended to induce Plaintiffs and Plaintiffs' physicians to rely on their misrepresentations and omissions to use Infuse® in an off-label manner.

324.    Plaintiffs and Plaintiffs' physicians were justified in relying, and did rely, on the misrepresentations and omissions about the safety risks related to Infuse® in deciding to make off-label use of Infuse® without an LT-Cage™® and placement of Infuse® posteriorly or laterally for a lumbar spine fusion surgery.

325.    As the direct, producing, proximate and legal result of the Defendants' misrepresentations, Plaintiffs have suffered severe physical pain, medical and hospital expenses, lost wages, pain and suffering, and pecuniary loss.

326.    As a result of the off-label use and failure to warn of the risks of off-label use of Infuse® as manufactured, sold and supplied by MEDTRONIC, and as a result of the negligence, callousness and the other wrongdoing and misconduct of MEDTRONIC, as described herein:

327.    Plaintiffs have been injured and suffers injuries to his body and mind, the exact nature of which are not completely known to date;

328.    Plaintiffs have sustained economic losses, including loss of earnings and diminution of the loss of earning capacity, the exact amount of which is presently unknown.

329.    Plaintiffs will be required to incur additional medical expenses in the future to care for himself as a result of the injury and damages she has suffered.

330.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

331.    Defendant's conduct as alleged above was malicious, intentional and outrageous and constitutes a willful and wanton disregard for the rights and safety of others.  Such conduct was directed specifically at Plaintiff and as such, warrants an imposition of punitive damages.

### FIFTH CAUSE OF ACTION
### Product Liability – Negligence
### (By Plaintiffs against the MEDTRONIC Defendants)

332.    Plaintiffs incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

333.    Defendants marketed their Infuse® product to and for the benefit of Plaintiffs, and additionally marketed it to Plaintiffs' physicians, and these Defendants knew or should have known that Plaintiff and Plaintiffs' physicians would use their product, including for the off-label use of Infuse® without an LT-Cage™® and the placement of Infuse® posteriorly or laterally in lumbar spine fusion.

334.    Defendants owed Plaintiffs and Plaintiffs' physicians' duties to exercise reasonable or ordinary care under the circumstances in light of the generally recognized and prevailing best scientific knowledge.

-73-

335.   Defendants had a confidential and special relationship with Plaintiffs due to (a) Defendants' vastly superior knowledge of the health and safety risks relating to Infuse®, and (b) Defendants' sole and/or superior knowledge of their dangerous and irresponsible practices of improperly promoting to physicians the off-label use of Infuse® without an LT-Cage™® and the placement of Infuse® posteriorly or laterally in lumbar spine surgeries.

336.   As a result, Defendants had an affirmative duty to fully and adequately warn Plaintiffs and Plaintiffs' physicians of the true health and safety risks related to the off-label use of Infuse®, and Defendants had a duty to disclose their dangerous and irresponsible practices of improperly promoting to physicians the off-label use of Infuse® without an LT-Cage™® and the placement of Infuse® posteriorly or laterally for lumbar spine surgeries. Independent of any special relationship of confidence or trust, Defendants had a duty not to conceal the dangers of the off-label use of Infuse® to Plaintiff and Plaintiffs' physicians.

337.   Misrepresentations made by Defendants about the health and safety of Infuse® independently imposed a duty upon Defendants to fully and accurately disclose to Plaintiffs and Plaintiffs' physicians the true health and safety risks related to Infuse®, and a duty to disclose their dangerous and irresponsible off-label promotion and marketing practices.

338.   Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, Defendants breached their duties to Plaintiffs and to Plaintiffs' physicians.

339.   The following sub-paragraphs summarize, inter alia, Defendants' breaches of duties to Plaintiffs and Plaintiffs' physicians and describe categories of acts or omissions constituting breaches of duty by these Defendants. Each and/or any of these acts or omissions establishes an independent basis for these Defendants' liability in negligence:

a.   Unreasonable and improper promotion and marketing of Infuse® to physicians, including but not limited to the promotion and marketing of Infuse® for off-label use without an LT-Cage™® in lumbar spine fusion surgeries;

b.   Failure to warn physicians and Plaintiffs of the dangers associated with Infuse® when used off-label without an LT-Cage™® and placed posteriorly or laterally in lumbar spine surgery including, but not limited to, pain and weakness in limbs, radiculitis, ectopic bone formation, osteolysis, and poorer global outcomes than alternative treatments;

-74-

c.    Failure to exercise reasonable care by not complying with federal law and regulations applicable to the sale and marketing of Infuse®; and

d.    Failure to exercise reasonable care to prevent Infuse® from creating an unreasonable risk of harm to Plaintiffs and other consumers who might reasonably be expected to be harmed by Infuse® while it was being used in the manner the MEDTRONIC Defendants should have reasonably expected.

340.    Defendants knew, or should have known, that, due to their failure to use reasonable care, Plaintiffs and Plaintiffs' physicians would use and did use Infuse®, to the detriment of Plaintiffs' health, safety and well-being.

341.    As the direct, producing, proximate and legal result of the Defendants' negligence, Plaintiffs have suffered severe physical pain, medical and hospital expenses, lost wages, pain and suffering, and pecuniary loss.

342.    As a result of the off-label use and MEDTRONIC's negligence, callousness and the other wrongdoing and misconduct of MEDTRONIC, as described herein:

343.    Plaintiffs have been injured and suffer injuries to his body and mind, the exact nature of which are not completely known to date;

344.    Plaintiffs have sustained economic losses, including loss of earnings and diminution of the loss of earning capacity, the exact amount of which is presently unknown.

345.    Plaintiffs will be required to incur additional medical expenses in the future to care for him/her as a result of the injury and damages she has suffered.

346.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

347.    Defendant's conduct as alleged above was malicious, intentional and outrageous and constitutes a willful and wanton disregard for the rights and safety of others.  Such conduct was directed specifically at Plaintiff and as such, warrants an imposition of punitive damages.

**SIXTH CAUSE OF ACTION**
**Negligence Per Se**
**(By Plaintiffs against the MEDTRONIC Defendants)**

348.    Plaintiffs incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

349.    This cause of action is not a private right enforcement action of the FDCA against Defendants; rather it is parallel State law negligence per se claim based on Defendants violations of FDCA regulations. *Stengel v. Medtronic, Inc.,* 704 F.3d 1224 (9th Cir.2013); *Howard v. Zimmer, Inc.*, 2013 OK 17, 299 P.3d 463, 472.

350.    Defendants violated applicable federal statutes and regulations relating to medical devices, including but not limited to:

a. 21 C.F.R. § 814.80 (failing to comply with the standards in the PMA approval order);

b. 21 U.S.C. § 352(f) (illegally promoting devices for off-label uses);

c. 21 C.F.R. § 814.39(a) (failing to submit a "PMA supplement" to the FDA for approval for any changes the manufacturer believes could affect the device's safety or efficacy, such as promoting the device for new uses);

d. 21 U.S.C. §§ 331(a), (b) (illegally promoting Infuse for an off-label use - it is prohibited to introduce into interstate commerce any device that is adulterated or misbranded);

f. 21 C.F.R. § 807.81(a)(3) (upon the intended use of a product changing, failing to obtain FDA approval for the new use so that they can label the product appropriately);

g. 21 C.F.R. § 803.50 (failing to report to the FDA information the manufacturer becomes aware of, from any source, that reasonably suggests that its device may have caused or contributed to a serious injury);

i. 21 C.F.R. § 803.50(b)(3) (failing to investigate each adverse event and evaluate the cause of the event);

j. 21 C.F.R. § 820.198(a) (failing to establish internal procedures for reviewing complaints and event reports.)

k. 21 C.F.R. § 814.39(a) (failing to submit a PMA supplement for review and approval by FDA before making a change affecting the safety or effectiveness of the device prior to Defendants' using Infuse with cage devices that were unapproved for such uses).

351. As the direct, producing, proximate and legal result of the Defendants' negligence, Plaintiff has suffered severe physical pain, medical and hospital expenses, lost wages, pain and suffering, and pecuniary loss.

352. As a result of the off-label use and MEDTRONIC's negligence, callousness and the other wrongdoing and misconduct of MEDTRONIC, as described herein:

353. Plaintiffs have been injured and suffer injuries to his body and mind, the exact nature of which are not completely known to date;

354. Plaintiffs have sustained economic losses, including loss of earnings and diminution of the loss of earning capacity, the exact amount of which is presently unknown.

355. Plaintiffs will be required to incur additional medical expenses in the future to care for himself as a result of the injury and damages she has suffered.

356. Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

357. Defendant's conduct as alleged above was malicious, intentional and outrageous and constitutes a willful and wanton disregard for the rights and safety of others. Such conduct was directed specifically at Plaintiffs and as such, warrants an imposition of punitive damages.

### SEVENTH CAUSE OF ACTION
**Breach of Express Warranty**
**(By Plaintiffs against the MEDTRONIC Defendants)**

358. Plaintiffs incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

359. At all times herein mentioned, the MEDTRONIC Defendants utilized journal articles, advertising media, sales representatives/consultants and paid Key Opinion Leaders to urge the use, purchase, and utilization of the off-label use of Infuse® Bone Graft and expressly

warranted to physicians and other members of the general public and medical community that such off-label uses, including uses in lumbar fusion procedures, were safe and effective.

360.    Defendants knew or, in the exercise of reasonable diligence, should have known that such off-label uses had the serious side effects set forth earlier and throughout this Complaint.

361.    Plaintiffs are informed and believe and based thereon alleges that his treating surgeon relied on Defendants' express warranty representations regarding the safety and efficacy of off-label use of Infuse®, but such off-label uses, including uses in lumbar fusion procedures, were not effective, safe, and proper for the use as warranted in that Infuse® was dangerous when put to these promoted uses.

362.    Defendants thus breached their express warranty which was a direct and proximate cause of Plaintiffs' injuries and damages.

363.    As a result of the breach of warranty and the other wrongdoing and misconduct of MEDTRONIC, as described herein:

364.    Plaintiffs have been injured and suffer injuries to his/her body and mind, the exact nature of which are not completely known to date;

365.    Plaintiffs have sustained economic losses, including loss of earnings and diminution of the loss of earning capacity, the exact amount of which is presently unknown.

366.    Plaintiffs will be required to incur additional medical expenses in the future to care for himself as a result of the injury and damages she has suffered.

367.    Plaintiffs are therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

368.    Defendant's conduct as alleged above was malicious, intentional and outrageous and constitutes a willful and wanton disregard for the rights and safety of others.  Such conduct was directed specifically at Plaintiff and as such, warrants an imposition of punitive damages.

**ADDITIONAL ALLEGATIONS REGARDING CLAIM FOR PUNITIVE DAMAGES**

369.    Plaintiffs incorporates by reference all previous and subsequent paragraphs of this Complaint as if fully set forth here and further alleges as follows:

370.    At all times herein referenced, officers, directors, and managing agents of MEDTRONIC knew, and were aware, and concealed, hid, and/or otherwise downplayed the true risks of non-FDA approved off-label uses of its product Infuse®.

371.    At all times herein referenced, officers, directors, and managing agents of MEDTRONIC knew, and were aware, that numerous people had ectopic bone formation, radiculitis, osteolysis, cage migration, and worse overall outcomes as a result of non-FDA approved off-label uses of its product Infuse®.

372.    The MEDTRONIC defendants designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold Infuse®, a product which said Defendants knew to be dangerous and unsafe for the purpose for which they intended it to be used, namely, as a bio-engineering bone draft device in spinal fusion surgeries.

373.    At all times herein mentioned, prior to and at the time that Defendants designed, developed, manufactured, promoted, marketed, supplied, distributed, tested or failed to test, and/or sold Infuse® to Plaintiffs and Plaintiffs' physicians, and prior to the time that said product was used, MEDTROINC knew, or should have known, that Infuse® was defectively designed and manufactured, that it had extremely dangerous properties and defects, and that it had defects which would cause serious injuries and damage to users of said product, thereby threatening the life and health of the users.  Further, at all times, all Defendants knew that Infuse® had caused serious injuries and damage to other members of the public.

374.    At all times herein mentioned, all Defendants, despite the actual knowledge described hereinabove, intentionally suppressed the adverse events and other complaints and reports of injuries, actively concealed and downplayed the risks associated with Infuse®, actively promoted the off-label use of Infuse®, failed to warn Plaintiffs and the medical community of the true risks associated with Infuse®, saturated the scientific and medical literature with biased, industry-funded studies to conceal the true risks of Infuse®, and otherwise failed to warn Plaintiff, the medical community, and/or the general public of the true risks of off-label use of Infuse®.

375.    At all times herein mentioned, Defendants had actual knowledge of the facts hereinabove alleged demonstrating that serious injury to patients in which Infuse® was implanted,

-79-

particularly in an off-label manner such as posterior lumbar fusion surgery Plaintiffs underwent. Defendants nevertheless deliberately suppressed, concealed, downplayed, and/or otherwise hid any information demonstrating the true risks associated with Infuse® from Plaintiffs, the medical community, and/or the general public.  Instead, Defendants continued to actively promote the off-label use of Infuse® to spine surgeons in an effort to maintain and increase Infuse®'s enormous profitability.

376.    As a legal and proximate result of Defendants' conduct, as herein alleged, Plaintiffs sustained the injuries and damages set forth above.

377.    Defendants' conduct and omissions, as set forth above, in allowing such an extremely dangerous product to be used by members of the general public, including Plaintiffs, constitutes fraud, malice and oppression toward Plaintiffs and others, and demonstrates a callous and conscious disregard of the safety of Plaintiffs and others.

378.    Plaintiffs are therefore entitled to exemplary or punitive damages, which would serve to punish the Defendants and to deter wrongful conduct in the future.

379.    Plaintiffs are therefore entitled to judgment against Defendants as hereinafter set forth.

### EIGHTH CAUSE OF ACTION
#### [Loss of Consortium]

**(By Plaintiffs against the MEDTRONIC Defendants)**

380.    Plaintiffs reallege each and every allegation of this Complaint in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

381.    Plaintiffs' spouses are entitled to the comfort, enjoyment, society and services of their spouses.

382.    As a direct and proximate result of the foregoing, Plaintiffs spouses were deprived of the comfort and enjoyment of the services and society, and have suffered and will continue to suffer economic loss, and have otherwise been emotionally and economically injured. Plaintiffs' injuries and damages are permanent and will continue into the future. Plaintiffs seek actual and punitive damages form the Defendants as alleged herein.

383.    For the reasons set forth herein, Plaintiffs' spouses will continue to suffer the loss of loved one's support, companionship, services, society, love and affection.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests of this Court the following relief:

A.      For general damages, in an amount to be proven at the time of trial;

B.      For medical, incidental, hospital, psychological care and other expenses, in an amount to be proven at the time of trial;

C.      For loss of earnings and earning capacity, in an amount to be proven at the time of trial;

D.      For an award of pre-judgment and post-judgment interest as provided by law;

E.      For consequential damages, in an amount to be proven at the time of trial;

F.      For exemplary or punitive damages as provided by law;

G.      For damages for loss of consortium;

H.      For an award providing for payment of costs of suit and attorneys' fees;

I.      For such other and further relief as this Court may deem just and proper.

Dated: 10/10/13

By: _____
Lowell W. Finson
**PHILLIPS LAW FIRM**
2101 Rosecrans Avenue, Suite 3290
El Segundo, CA 90245
877.480.9142 PHONE
213.330.0296 FAX
Email: lowell@justiceforyou.com

*Attorneys for Plaintiffs*

-81-

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Lowell W. Finson (CA Bar No. 275586)
PHILLIPS LAW FIRM
2101 Rosecrans Ave., Suite 3290
El Segundo, CA 90245
TELEPHONE NO.: (877) 480-9142    FAX NO.: (213) 330-0298
ATTORNEY FOR *(Name):* Plaintiffs Carmela Vitale, et al.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Carmela Vitale, et al. v. MEDTRONIC, INC., et al.

**CONFORMED COPY**
ORIGINAL FILED
Superior Court of California
County of Los Angeles

OCT 10 2013

John A. Clarke, Executive Officer/Clerk

By LA TRESE JOHNSON, Deputy

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter    ☐ Joinder    Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | BC524044    JUDGE:    DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☑ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):* 11
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 10, 2013
Lowell W. Finson
(TYPE OR PRINT NAME)                                         (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or
    toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD (35)

**Employment**
  Wrongful Termination (38)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
      domain, landlord/tenant, or
      foreclosure)*

**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*

**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)

**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-
      domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case

**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
      harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case (non-tort/non-complex)
    Other Civil Complaint
      (non-tort/non-complex)

**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition

**CIVIL CASE COVER SHEET**

1   91

**BY FAX**

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Carmela Vitale, et al. v. MEDTRONIC, INC., et al. | BC 524044 |

### CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☐ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL 7   ☐ HOURS/ ☑ DAYS

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:** In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

**Applicable Reasons for Choosing Courthouse Location (see Column C below)**

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☑ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |

LACIV 109 (Rev. 01/07)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

LASC, rule 2.0
Page 1 of 4

92

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Carmela Vitale, et al. v. MEDTRONIC, INC., et al. | |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES    CLASS ACTION? ☐ YES    LIMITED CASE? ☐ YES    TIME ESTIMATED FOR TRIAL 7    ☐ HOURS/ ☑ DAYS

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

### Applicable Reasons for Choosing Courthouse Location (see Column C below)

1. Class Actions must be filed in the County Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☑ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |

| | | |
|---|---|---|
| LACIV 109 (Rev. 01/07)<br>LASC Approved 03-04 | **CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION** | LASC, rule 2.0<br>Page 1 of 4 |

1    93

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Carmela Vitale, et al. v. MEDTRONIC, INC., et al. | |

| | A<br>Civil Case Cover<br>Sheet Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>-See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/Property Damage/ Wrongful Death Tort (Cont'd.)** | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06) (not Insurance) | ☐ A6004 Breach of Rental/Lease Contract (not Unlawful Detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 8. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |



| SHORT TITLE: | CASE NUMBER |
|---|---|
| Carmela Vitale, et al. v. MEDTRONIC, INC., et al. | |

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review (Cont'd.)** | Writ of Mandate<br><br>(02) | ☐ A6151  Writ - Administrative Mandamus<br>☐ A6152  Writ - Mandamus on Limited Court Case Matter<br>☐ A6153  Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Other Judicial Review<br>(39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade<br>Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction defect | 1., 2., 3. |
| | Claims Involving Mass<br>Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental  (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage<br>Claims from Complex<br>Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br><br>(20) | ☐ A6141  Sister State Judgment<br>☐ A6160  Abstract of Judgment<br>☐ A6107  Confession of Judgment (non-domestic relations)<br>☐ A6140  Administrative Agency Award (not unpaid taxes)<br>☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112  Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br><br>(42) | ☐ A6030  Declaratory Relief Only<br>☐ A6040  Injunctive Relief Only (not domestic/harassment)<br>☐ A6011  Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance(21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br><br>(43) | ☐ A6121  Civil Harassment<br>☐ A6123  Workplace Harassment<br>☐ A6124  Elder/Dependent Adult Abuse Case<br>☐ A6190  Election Contest<br>☐ A6110  Petition for Change of Name<br>☐ A6170  Petition for Relief from Late Claim Law<br>☐ A6100  Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |



| SHORT TITLE: Carmela Vitale, et al. v. MEDTRONIC, INC., et al. | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3 on Page 1,** as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE ☐1. ☑2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS: 4369 Brisa Dr | |
|---|---|---|
| CITY: Palmdale | STATE: CA    ZIP CODE: 93551 | |

Item IV. *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the <u>Stanley Mosk Cour</u> courthouse in the <u>central</u> District of the Los Angeles Superior Court (Code Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)).

Dated: <u>October 10, 2013</u>

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

---

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form CM-010.

4. Complete Addendum to Civil Case Cover Sheet form LACIV 109 (Rev. 01/07), LASC Approved 03-04.

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form FL-935, if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL PERSONAL INJURY CASE

Case Number _____ BC524044

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

**Your case is assigned for all purposes to the judicial officer indicated below (Local Rule 3.3(c)).**

| ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|
| Hon. Rafael Ongkeko | 91 | 635 | | | |
| Hon. Amy D Hogue | 92 | 633 | | | |
| Hon. Samantha P. Jessner | 93 | 631 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record on _____OCT 10 2013_____     SHERRI R. CARTER, Executive Officer/Clerk

LACIV PI 190 (Rev09/13)
LASC Approved 05-06
For Optical Use

By _____L. Johnson_____, Deputy Clerk

## NOTICE OF CASE ASSIGNMENT –
## UNLIMITED CIVIL CASE

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

**JUL 1 5 2013**

John A. Clarke, Executive Officer/Clerk

By _E. Regina Collum_ Deputy

1
2
3
4
5    SUPERIOR COURT OF THE STATE OF CALIFORNIA
      FOR THE COUNTY OF LOS ANGELES
6
7    In re Personal Injury Cases Assigned to the    ) Case No.:
      Personal Injury Courts (Departments 91, 92    )
8    and 93)                                         ) AMENDED GENERAL ORDER RE
                                                     ) PERSONAL INJURY COURT ("PI Court")
9                                                    ) PROCEDURES (Effective as of July 10,
                                                     ) 2013)
10   _____
11
12   ┌─────────────────────────────────────────────────┐
     │ **DEPARTMENT:**    **91    92    93**            │
13   │                                                   │
     │ **FINAL STATUS CONFERENCE ("FSC"):**             │
14   │                                                   │
     │   • **Date:** _____ at 10:00 a.m.      │
15   │                                                   │
     │ **TRIAL:**                                        │
16   │                                                   │
     │   • **Date:** _____ at 8:30 a.m.       │
17   │                                                   │
     │ **OSC re DISMISSAL (Code Civ. Proc., § 583.210):**│
18   │                                                   │
     │   • **Date:** _____ at 8:30 a.m.       │
19   └─────────────────────────────────────────────────┘
20       TO EACH PARTY AND TO THE ATTORNEY OF RECORD FOR EACH PARTY:
21       Pursuant to the California Code of Civil Procedure ("C.C.P."), the California
22   Rules of Court, and the Los Angeles County Court Rules ("Local Rules"), the Los
23   Angeles Superior Court ("LASC" or "Court") HEREBY AMENDS AND
24
25   SUPERSEDES ITS March 12, 2013 GENERAL ORDER AND GENERALLY
26
27

1                                                      7/12/13

1    ORDERS AS FOLLOWS IN THIS AND ALL OTHER GENERAL JURISDICTION

2    PERSONAL INJURY ACTIONS:

3        Effective March 18, 2013, the Court responded to systemic budget reductions by

4    centralizing the management of more than 18,000 general jurisdiction personal injury cases

5    in the Stanley Mosk Courthouse.  LASC opened three Personal Injury Courts ("PI Courts")

6    (Departments 91, 92 and 93) to adjudicate all pretrial matters for these cases.  It also

7

8    established a Master Calendar Court (Department One), to manage the assignment of trials to

9    31 dedicated Trial Courts located countywide.  This Amended General Order lays out the

10   basic procedures for the PI Courts' management of pretrial matters.  The parties will find

11   additional information about the PI Courts on the court's website, *www.lasuperiorcourt.org*.

12   1.    To ensure proper assignment to a PI Court, Plaintiff(s) must carefully fill out the Civil

13   Case Cover Sheet Addendum (form LACIV 109).  The Court defines "personal injury" as:

14           "an unlimited civil case described on the Civil Case Cover Sheet Addendum and

15

16           Statement of Location (LACIV 109) as Motor Vehicle-Personal Injury/Property

17           Damage/Wrongful Death; Personal Injury/Property Damage/Wrongful Death-

18           Uninsured Motorist; Product Liability (other than asbestos or

19           toxic/environmental); Medical Malpractice-Physicians & Surgeons; Other

20           Professional Health Care Malpractice; Premises Liability; Intentional Bodily

21           Injury/Property Damage/Wrongful Death; or Other Personal Injury/Property

22           Damage/Wrongful Death. An action for intentional infliction of emotional

23           distress, defamation, civil rights/discrimination, or malpractice (other than

24           medical malpractice), is not included in this definition. An action for injury to

25           real property is not included in this definition."    Local Rule 2.3(a)(1)(A).

26

27

The Court will assign a case to the PI Courts if plaintiff(s) check any of the following boxes in the Civil Case Cover Sheet Addendum:

A7100 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death

A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist

A7260 Product Liability (not asbestos or toxic/environmental)

A7210 Medical Malpractice – Physicians & Surgeons

A7240 Medical Malpractice – Other Professional Health Care Malpractice

A7250 Premises Liability (e.g., slip and fall)

A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism etc.)

A7220 Other Personal Injury/Property Damage/Wrongful Death

The Court will not assign cases to the PI Courts if plaintiff(s) check any boxes elsewhere in the Civil Case Cover Sheet Addendum (any boxes on pages two and three of that form).

2.    The Court sets the above dates in this action in the PI Court circled above (Department 91, 92 or 93) at the Stanley Mosk Courthouse, 111 North Hill Street, Los Angeles, CA 90012. Cal. Rules of Court, Rules 3.714(b)(3), 3.729.

**SERVICE OF SUMMONS AND COMPLAINT**

3.    Plaintiff(s) shall serve the summons and complaint in this action upon defendant(s) within three years of the date when the complaint is filed. C. C. P. § 583.210, subd. (a). On the OSC re Dismissal date noted above, the PI Court will dismiss **the action and/or all**

3                                                7/12/13

1    unserved parties unless the plaintiff(s) show cause why the action or the unserved parties

2    should not be dismissed. C.C.P. §§ 583.250; 581, subd. (b)(4).

3    4.     The Court sets the above trial and FSC dates on condition that plaintiff(s) effectuate

4    service on defendant(s) of the summons and complaint within six months of filing the

5    complaint. Upon a showing that the plaintiff(s) failed to effect service within six months, the

6    PI Court will vacate the trial and FSC date noted above.

7

8    **STIPULATIONS TO CONTINUE TRIAL**

9    5.     Provided that all parties agree (and there is no violation of the "five-year rule," C.C.P.

10    § 583.310), the parties may advance or continue any trial date in the PI Courts without

11    showing good cause or articulating any reason or justification for the change. To continue or

12    advance a trial date, the parties (or their counsel of record) should jointly execute and file (in

13    Room 102 of the Stanley Mosk Courthouse; fee required) a Stipulation to Continue Trial,

14    FSC and Related Motion/Discovery Dates (form available on the court's website, Personal

15    Injury Court link). The PI Courts schedule FSCs for 10:00 a.m., eight (8) court days before

16    the trial date. Parties seeking to continue the trial and FSC dates shall file the Stipulation at

17

18    least eight court days before the FSC date. Parties seeking to advance the trial and FSC

19    dates shall file the Stipulation at least eight court days before the proposed advanced FSC

20    date. Code Civ. Proc., § 595.2; Govt. Code § 70617, subd. (c)(2).

21    **NO CASE MANAGEMENT CONFERENCES**

22    6.     The PI Courts do not conduct Case Management Conferences. The parties need not

23    file a Case Management Statement.

24    **LAW AND MOTION**

25    **Chambers Copies Required**

26

27

7.    In addition to filing original motion papers in Room 102 of the Stanley Mosk Courthouse, the parties must deliver, directly to the PI Court courtrooms, an extra copy (marked "Chambers Copy") of reply briefs and all other motion papers filed less than seven (7) court days before a hearing calendared in the PI Courts.  The PI Courts also strongly encourage the parties filing and opposing lengthy motions, such as motions for summary judgment/adjudication, to submit one or more three-ring binders organizing the Chambers Copies behind tabs.

**Reservation of Hearing Date**

8.    Parties are directed to reserve hearing dates for motions in the PI Courts using the Court Reservation System available online at *www.lasuperiorcourt.org* (link on homepage). Parties or counsel who are unable to utilize the online Court Reservation System may reserve a motion hearing date by telephoning the PI Court courtroom, Monday through Friday, between 3:00 p.m. and 4:00 p.m.

**Withdrawal of Motion**

9.    California Rules of Court, Rule 3.1304(b) requires a moving party to notify the court immediately if a matter will not be heard on the scheduled date. In keeping with that rule, the PI Courts urge parties who amend pleadings in response to demurrers to file amended pleadings before the date when opposition to the demurrer is due so that the PI Courts do not needlessly prepare tentative rulings on demurrers.

**Discovery Motions**

10.    Informal Discovery Conferences ("IDCs").  On a daily basis, the PI Court judges are available to conduct 30-minute, in-person IDCs with lead trial counsel on each side (or another attorney who has full authority to make binding agreements in discovery disputes).

The PI Court judges will not make rulings in an IDC. The purpose of the IDC is to help the parties resolve discovery disputes by agreement rather than by motion practice. To that end, an IDC judge may refer the parties to applicable code sections or other legal authorities. The IDC judge may also promote compromise by suggesting agreements to narrow the scope of the requests, to provide amended responses that better explain the responding party's compliance, or to use an alternative, more efficient means of discovery. The PI Court judges find that, in nearly every case, the parties amicably resolve their discovery disputes at, or as a result of, the IDCs.

11.    Scheduling IDCs.    Parties should reserve (and, if necessary, promptly cancel) appointments for IDCs via email to *PISMC@lasuperiorcourt.org*. Parties should schedule an IDC as soon as a discovery dispute arises, and before any party files a discovery motion. The PI Court judges expect the parties to make every effort to resolve discovery disputes by conferring in person or on the telephone before the PI Court judge invests time in the IDC. Scheduling or participating in an IDC does not extend any deadlines imposed by the Code of Civil Procedure for noticing and filing motions to compel or motions to compel further discovery. In order to avoid unnecessary *ex parte* applications, the PI Courts recommend that the parties extend deadlines for filing discovery motions and for serving discovery responses pending their participation in the IDC.

12.    Motions to Compel Further Responses. The PI Courts will not hear motions to compel further discovery unless and until (a) the parties participate in an IDC; or (b) the moving party submits evidence, by way of declaration, that the opposing party has failed or refused to participate in an IDC. To allow time for an IDC at least 16 court days before the motion hearing, parties must reserve a hearing on any motion to compel further discovery at

7/12/13

1   10:00 a.m. on a date at least 60 days after the date when the reservation is made.  Parties

2   must reserve an IDC with the same judge who is scheduled to hear any discovery motion

3   involving the same discovery.  Likewise, a party who participates in an IDC regarding certain

4   discovery requests, and then files a motion to compel further responses to the same discovery

5   requests, must calendar the motion for a hearing before the same judge who conducted the

6   IDC.  After participating in an IDC, a moving party may advance the hearing on a motion to

7   compel further discovery to 10:00 a.m. on any available hearing date that complies with the

8   notice requirements of the Code of Civil Procedure.  The PI Courts may consider a party's

9   failure or refusal to participate in an IDC as a factor in deciding whether or not to award

10  sanctions on a motion to compel further discovery.

11  **Ex Parte Applications**

12  13.    Under the California Rules of Court, courts may only grant *ex parte* relief upon a

13  showing, by admissible evidence, that the moving party will suffer "irreparable harm,"

14  "immediate danger," or where the moving party identifies "a statutory basis for granting

15  relief ex parte."  Cal. Rules of Court, Rule 3.1202(c).  With over 6,000 cases in each docket,

16  the three PI Courts have no capacity to hear multiple *ex parte* applications or to shorten time

17  to add hearings to their fully booked motion calendars.  The PI Courts do not regard the

18  Court's unavailability for timely motion hearings as an "immediate danger" or threat of

19  "irreparable harm" justifying *ex parte* relief.  Instead of seeking *ex parte* relief, counsel

20  should reserve the earliest available motion hearing date, and stipulate with all parties to

21  continue the trial to a date thereafter using the Stipulation to Continue Trial, FSC and Related

22  Motion/Discovery Dates (form available on the court's website, PI Court Tab).  Counsel

should also check the Court Reservation System from time to time because earlier hearing dates may become available as cases settle or counsel otherwise take hearings off calendar.

**REQUEST FOR TRANSFER TO INDEPENDENT CALENDAR DEPARTMENT**

14.    Parties seeking to transfer a case from a PI Court to an Independent Calendar ("I/C") Court shall file (in Room 102 of the Stanley Mosk Courthouse) and serve the Court's "Motion to Transfer Complicated Personal Injury Case to Independent Calendar Court" (form available on the Court's website, PI Courts link).   The PI Courts will transfer a matter to an I/C Court if the case is not a "Personal Injury" case as defined in the General Order re General Jurisdiction PI Cases, or if it is "complicated."  In determining whether a personal injury case is too "complicated" for the PI Courts to manage, the PI Courts will consider, among other things, whether the case will involve numerous parties, cross-complaints, witnesses (including expert witnesses), and/or pretrial hearings.

15.    Parties opposing a motion to transfer have five days to file (in Room 102) an Opposition (using the same Motion to Transfer form).

16.    The PI Courts will not conduct a hearing on any Motion to Transfer to I/C Court. Although the parties may stipulate to transfer a case to an Independent Calendar Department, the PI Courts will make an independent determination whether to transfer the case or not.

**GENERAL ORDER – FINAL STATUS CONFERENCE**

17.    Parties shall comply with the requirements of the PI Courts' "Amended General Order – Final Status Conference," which shall be served with the summons and complaint.

**JURY FEES**

18.    Parties must pay jury fees no later than 365 calendar days after the filing of the initial complaint. (Code Civ. Proc., § 631, subds. (b) and (c).)

**JURY TRIALS**

19.    The PI Courts do not conduct jury trials. On the trial date, a PI Court will transfer the case to the Master Calendar Court in Department One in the Stanley Mosk Courthouse. Department One assigns the case out for trial to one of 31 dedicated Trial Courts located in the Stanley Mosk, Chatsworth, Van Nuys, Santa Monica, Torrance, Long Beach, Pomona, and Pasadena courthouses.

**SANCTIONS**

20.    The Court has discretion to impose sanctions for any violation of this general order. (C.C.P. §§ 128.7, 187 and Gov. Code, § 68608, subd. (b).)

Dated: July 15, 2013

Daniel J. Buckley,
Supervising Judge, Civil
Los Angeles Superior Court

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

JUL 1 9 2013

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
Regina Collum

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES - CENTRAL DISTRICT

| | |
|---|---|
| In re Personal Injury Cases Assigned to the Personal Injury Courts (Departments 91, 92 and 93), | ) Case No.: _____ ) ) AMENDED GENERAL ORDER - FINAL ) STATUS CONFERENCE, PERSONAL ) INJURY ("PI") COURTS (Effective as of July ) 19, 2013) ) |

The dates for Trial and Final Status Conference ("FSC") having been set in this matter, the Court

**HEREBY AMENDS AND SUPERSEDES ITS March 12, 2013 GENERAL ORDER – FINAL STATUS CONFERENCE AND GENERALLY ORDERS AS FOLLOWS IN THIS AND ALL OTHER GENERAL JURISDICTION PERSONAL INJURY ACTIONS:**

**1. PURPOSE OF THE FSC**

The purpose of the FSC is to verify that the parties/counsel are completely ready to proceed with trial continuously and efficiently, from day to day, until verdict.   The PI Courts will verify at the FSC that all parties/counsel have (1) prepared the Exhibit binders and Trial Document binders and (2) met and conferred in an effort to stipulate to ultimate facts, legal issues, motions *in limine*, and the authentication and admissibility of exhibits.

/

/

Amended General Order FSC - 1

## 2. TRIAL DOCUMENTS TO BE FILED

At least five calendar days prior to the Final Status Conference, the parties/counsel shall serve and file (in Room 102 of the Stanley Mosk Courthouse) the following Trial Readiness Documents:

### A.    TRIAL BRIEFS (OPTIONAL)

Each party/counsel may file, but is not required to file, a trial brief succinctly identifying:

    (1) the claims and defenses subject to litigation;

    (2) the major legal issues (with supporting points and authorities);

    (3) the relief claimed and calculation of damages sought; and

    (4) any other information that may assist the court at trial.

### B.    MOTIONS *IN LIMINE*

Before filing motions *in limine*, the parties/counsel shall comply with the statutory notice provisions of Code of Civil Procedure ("C.C.P.") Section 1005 and the requirements of Los Angeles County Court Rule ("Local Rule") 3.57(a). The caption of each motion *in limine* shall concisely identify the evidence that the moving party seeks to preclude. Parties filing more than one motion *in limine* shall number them consecutively. Parties filing opposition and reply papers shall identify the corresponding motion number in the caption of their papers.

### C.    JOINT STATEMENT TO BE READ TO THE JURY

For jury trials, the parties/counsel shall work together to prepare and file a joint written statement of the case for the court to read to the jury. Local Rule 3.25(i)(4).

### D.    JOINT WITNESS LIST

The parties/counsel shall work together to prepare and file a joint list of all witnesses that each party intends to call (excluding impeachment and rebuttal witnesses). Local Rule 3.25(i)(5).

The joint witness list shall identify each witness by name, specify which witnesses are experts, and estimate the length of the direct, cross examination re-direct examination (if any) of each witness. The parties/counsel shall identify and all potential witness scheduling issues and special requirements. Any party/counsel who seeks to elicit testimony from a witness not identified on the witness list must first make a showing of good cause.

**E.   LIST OF PROPOSED JURY INSTRUCTIONS (JOINT AND CONTESTED)**

The parties/counsel shall jointly prepare and file a list of proposed jury instructions, organized in numerical order, specifying the instructions upon which all sides agree and the contested instructions, if any.

**F.   JURY INSTRUCTIONS (JOINT AND CONTESTED)**

The parties/counsel shall prepare a complete set of full-text proposed jury instructions, editing all proposed California Civil Jury Instructions for Judges and Attorneys ("CACI") instructions to insert party names and eliminate blanks and irrelevant material. The parties shall prepare special instructions in a format ready for submission to the jury (placing citations of authority and the identity of the requesting party above the text in compliance with Local Rules 3.170 and 3.171).

**G.   JOINT VERDICT FORM(S)**

The parties/counsel shall prepare and jointly file a proposed general verdict form or special verdict form (with interrogatories) acceptable to all sides. If the parties/counsel cannot agree on a joint verdict form, each party must separately file a proposed verdict form. Local Rule 3.25(i)(7) and (8).

/

### H.    JOINT EXHIBIT LIST

The parties/counsel shall prepare and file a joint exhibit list organized with columns identifying each exhibit and specifying each party's evidentiary objections, if any, to admission of each exhibit.  To comply with Local Rules 3.52(i)(5) and 3.53, the parties shall meet and confer in an effort to resolve objections to the admissibility of each exhibit.

### 3.  EVIDENTIARY EXHIBITS

The parties/counsel shall jointly prepare (and be ready to temporarily lodge for inspection at the FSC), three sets of tabbed, internally paginated and properly-marked exhibits, organized numerically in three-ring binders (a set for the Court, the Judicial Assistant and the witnesses). The parties/counsel shall mark all non-documentary exhibits and insert a simple written description of the exhibit behind the corresponding numerical tab in the exhibit binder.

### 4.  TRIAL BINDERS REQUIRED IN THE PI COURTS

The parties/counsel shall jointly prepare (and be ready to temporarily lodge for inspection at the FSC) the Trial Documents, tabbed and organized into three-ring binders as  follows:

Tab A: Trial Briefs

Tab B:  Motions *in limine*

Tab C:  Joint Statement to Be Read to the Jury

Tab D: Joint Witness List

Tab E:  Joint List of Jury Instructions (identifying the agreed upon and contested instructions)

Tab F:  Joint and Contested Jury Instructions

Tab G: Joint and/or Contested Verdict Forms

The parties shall organize motions *in limine* (tabbed in numerical order) behind tab B with the opposition papers and reply papers for each motion placed directly behind the moving papers. The parties shall organize proposed jury instructions behind tab F, with the agreed upon instructions first in order followed by the contested instructions (including special instructions) submitted by each side.

## 5. FAILURE TO COMPLY WITH FSC OBLIGATIONS

The court has discretion to require any party/counsel who fails or refuses to comply with this General Order to Show Cause why the court should not impose monetary, evidentiary and/or issue sanctions (including the entry of a default or the striking of an answer).

Dated this 19th day of July, 2013

Daniel J. Buckley
Supervising Judge, Civil
Los Angeles Superior Court

Amended General Order FSC - 5

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____R. Gary Klausner_____ and the assigned Magistrate Judge is _____Alicia G. Rosenberg_____ .

The case number on all documents filed with the Court should read as follows:

### 2:13-CV-7653-RGK (AGRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

October 16, 2013
_____
Date

By  MDAVIS
_____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

☑ Western Division
312 N. Spring Street, G-8
Los Angeles, CA 90012

☐ Southern Division
411 West Fourth St., Ste 1053
Santa Ana, CA 92701

☐ Eastern Division
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Failure to file at the proper location will result in your documents being returned to you.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| Carmela Vitale, an individual; Tammy James, an individual; John Curtis, an individual; Kerry Hardy, an individual; Hector M. Santos, an individual; Debra Izzo-Blount an individual | Medtronic, Inc.; Medtronic Sofamor Danek USA, Inc.; Dr. Gary K. Michelson, and DOES 1-100, inclusive |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) |
|---|---|
| Lowell W. Finson<br>PHILLIPS LAW FIRM<br>2101 Rosecrans Avenue, Suite 3290<br>El Segundo CA, 90245/Tel: (877) 480-9142; Fax: (213) 330-0296 | Michael K. Brown/Lisa Baird/Elizabeth G. Minerd<br>REED SMITH, LLP<br>355 S. Grand Avenue, Suite 2900<br>Los Angeles, CA 90071/ Tel: (213) 457-8000; Fax: (213) 457-8080 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1. Original Proceeding
☒ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes   ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☒ MONEY DEMANDED IN COMPLAINT: $ Exceeds jdx min.

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. § 1332 Diversity of Citizenship and 28 U.S.C. §§ 1441, 1446 - Plaintiffs allege claims for personal injury, product liability, allegedly caused by an implantable medical device.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **TORTS** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | **PERSONAL PROPERTY** | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influ-enced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 370 Other Fraud | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 371 Truth in Lending | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 380 Other Personal Property Damage | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Com-modities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | ☐ 385 Property Damage Product Liability | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | **BANKRUPTCY** | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 440 Other Civil Rights | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 441 Voting | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☒ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 442 Employment | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 445 American with Disabilities-Employment | ☐ 790 Other Labor Litigation | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 791 Employee Ret. Inc. Security Act | |
| | | | ☐ 448 Education | | |

**FOR OFFICE USE ONLY:**   Case Number:   CV13-07653

CV-71 (09/13)        CIVIL COVER SHEET        Page 1 of 3

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

### CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court?<br><br>[X] Yes  [ ] No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | [X] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action?<br><br>[ ] Yes  [X] No<br><br>If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?<br><br>Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?<br><br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| | [ ] Los Angeles | [ ] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | [ ] Riverside or San Bernardino | Eastern |
| | [ ] Other | [ ] Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of defendants reside: | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of claims arose: | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |

**C.1. Is either of the following true? If so, check the one that applies:**

[ ] 2 or more answers in Column C

[ ] only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

[ ] 2 or more answers in Column D

[ ] only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | WESTERN |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?    ☒ NO    ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?    ☐ NO    ☒ YES

If yes, list case number(s):    2:13-cv-06093 SVW (Ex)

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)    ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____    DATE:    October 16, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |